IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

JULIE BAROODY, and )
WILLIAM B. FARMER, )
 )
 Plaintiffs, )
 )
v. ) Case No.: 4:20-cv-217
 )
CITY OF QUINCY, FLORIDA, )
KEITH A. DOWDELL, in his official )
capacity as Commissioner and Mayor of the )
City of Quincy, RONTE R. HARRIS, in his )
official capacity as Commissioner and )
Mayor Pro-Tem of the City of Quincy, and )
ANGELA G. SAPP, in her official capacity )
as Commissioner of the City of Quincy, )
 )
 Defendants. )
_____ )

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

This lawsuit challenges a redistricting plan adopted March 26, 2020 by the City Commission of Quincy, Florida, which unconstitutionally and unlawfully dilutes, denies, and abridges the voting rights of racial-minority residents, solely and intentionally on the basis of their race. Plaintiffs allege as follows in support thereof:

## I.     PRELIMINARY STATEMENT

1.     On March 26, 2020, the Quincy City Commission, which was and long has been predominated by members of Quincy's **racial-majority** population, adopted a redistricting plan intended—through race-based redistricting measures

constituting a quintessential racial gerrymander—to dilute, deny, and abridge the voting rights of Quincy's *racial-minority* electors.

2.     Just months prior on June 25, 2019, the Quincy City Commission was engaged in a regularly-scheduled Commission meeting, open to the public and attended by a number of Quincy residents. During the meeting, several Quincy minority-electors spoke up, openly raising concerns to the majority-controlled Commission. Palpably angered by the vocal and public dissent, Defendant Dowdell (Commissioner and Mayor) issued a thinly-veiled threat to Quincy minorities, whose mere participation in City politics he described as a problem that he could eliminate by use of the Commission's redistricting authority. This was the very first mention of potential redistricting by the City Commission.

3.     Thereafter, the majority-controlled Commission deliberately directed and participated in preparation of redistricting plans. As their plans were designed and intended to enable, and to in-fact cause, subversion of minority voting rights— so egregiously as to render them futile and incapable of meaningful challenge for control of the Commission—the majority-controlled Commission raced to implement their agenda, taking advantage of the restrictions surrounding the Coronavirus pandemic to bypass meaningful opportunity for notice, deliberation, and comment by the public, or even full Commission membership participation, opting instead to adopt their plan into law.

4. The Defendant Commissioners' manifest intent was to deny Quincy's minorities fair participation in the electoral process, by making it virtually impossible for it to elect more than a single Commissioner. Indeed, the redistricted plan adopted by the Commission "cracked" the minority population of District 5—which had been substantial as to consistently result in election of their preferred candidates—redistributing these minority-electors across the various other districts, all but one of which makes it virtually impossible for minority success at the polls. The redistricted plan also placed together in the same District the two Commissioners successfully elected by Quincy's minorities, and moved the forthcoming April 2020 election date back to June 2020—further violating the law, no less, by doing so before passing the requisite ordinance—in order to implement its redistricted plan, and all but certainly claim four (4) of the five (5) total Commission seats for the first time ever in Quincy's history.

5. Plaintiffs represent the racial-minority population, specifically a White/Anglo-minority population, of Quincy, which has a Black/African-American majority population. In fact, these majority/minority statuses have historically been the *status quo* in Quincy for more than 100 years. As U.S. citizens whose voting rights have been denied and abridged on account of their race, Plaintiffs accordingly seek invalidation of, and an injunction against, the redistricted plan under § 2 of the Voting Rights Act, and various protections under the U.S. Constitution.

6. Thus, to remedy Defendants' intentional and unlawful conduct, Plaintiffs ask the Court to: (i) declare the redistricted plan invalid; and (ii) either: (a) compel Quincy to draw a map consistent with §2 of the Voting Rights Act and the U.S. Constitution; or (b) draw one for Quincy, should the Commission fail to timely do so.

## II.   PARTIES

7. Plaintiff, JULIE BAROODY, is a White/Anglo citizen of the United States and of the State of Florida, and a resident of the City of Quincy. Prior to Defendants' adoption of the redistricted plan at-issue, Ms. Baroody resided within City Commission District 5, while under the redistricted plan, she is considered a resident of District 4. Ms. Baroody has been registered to vote since 2002, and has voted in every Commissioner election for which she qualified. Ms. Baroody has been located in a region (*i.e.*, District 5) where the White/Anglo community had been sufficiently large and geographically compact to constitute a majority of qualified electors wherein White/Anglo residents and qualified electors of Quincy had the opportunity to elect their preferred candidates to the City Commission; in fact, Ms. Baroody was able to successfully elect her and the White/Anglo-minorities' candidates of choice to the City Commission in *each* District 5 election held between 2003 and 2019. However, having been removed unlawfully from her district, on the basis of her race, Ms. Baroody will be unable to elect her preferred candidate(s) for

District 5 Commissioner, including despite strong electoral support from other qualified White/Anglo electors in that District and community. Defendants' redistricted plan has resulted in, will result in, and/or was intended to result in, dilution of her voting power and denial and abridgement of equal opportunity for her to elect candidates of choice to the Commission.

8. Plaintiff, WILLIAM B. FARMER, is a White/Anglo citizen of the United States and of the State of Florida, and a resident of the City of Quincy. Mr. Farmer resides, and at all times since 2016 has resided, within City Commission District 4. Mr. Farmer has been registered to vote since 2016, and has voted in every Commissioner election for which he qualified. Mr. Farmer has been located in a region (*i.e.*, District 4) where the White/Anglo community had been sufficiently large and geographically compact to constitute a majority of qualified electors wherein White/Anglo residents and qualified electors of Quincy had the opportunity to elect their preferred candidates to the City Commission. However, Mr. Farmer will be unable to elect his preferred candidate(s) for City Commissioner, and to fair representation by Commissioners, in subsequent elections held for Districts 4 and/or 5, despite strong electoral support for such candidates from other qualified White/Anglo electors in such Districts and communities. Defendants' redistricted plan has resulted in, will result in, and was intended to result in, dilution of his voting

power and denial and abridgement of equal opportunity to elect candidates of choice to the Commission.

9.    Defendant, CITY OF QUINCY, FLORIDA, is a public body and political subdivision of the State of Florida, located within Gadsden County, and incorporated on November 19, 1828. Quincy is governed by an elected City Commission of five (5) members, representing districts drawn by the City Commission, and elected by qualified Quincy residents and electors of such districts. *See* Quincy City Charter (the "Charter"), at Part I, Subpart A, art. II, §§ 2.01 & 2.05; Code of Ordinances, City of Quincy, Florida (the "Code"), at Part II, Chapter 26. Quincy may be served with process through the Quincy City Mayor, at 404 West Jefferson Street, Quincy, Florida 32351. *See* Fla. Stat. § 48.111(1)(a); *see also* Charter at Part I, Subpart A, art. II, § 2.02 (the Mayor "shall be recognized as the official head of the city by the courts for the purpose of service of civil processes").

10.    Defendant, KEITH A. DOWDELL, is currently (and at all times relevant has been) a Commissioner representing District 1 of the Quincy City Commission, and also serves as the Mayor of the City of Quincy. Defendant Dowdell is sued solely in his official capacity as Commissioner and Mayor of the City of Quincy. Defendant Dowdell acted under color of law, in his official capacity as Quincy City Commissioner and Mayor, in adopting, imposing, and applying the unlawful and invalid the redistricted plan at-issue. Defendant Dowdell may be

served with process through and as the Quincy City Mayor, at 404 West Jefferson Street, Quincy, Florida 32351. *See* Charter at Part I, Subpart A, art. II, § 2.02 (the Mayor "shall be recognized as the official head of the city by the courts for the purpose of service of civil processes"); Fla. Stat. §§ 48.111(2) & 48.151(1).

11.    Defendant, RONTE R. HARRIS, is currently (and at all times relevant has been) a Commissioner representing District 3 of the Quincy City Commission, and also serves as the Mayor Pro-Tem of the City of Quincy. Defendant Harris is sued solely in his official capacity as Commissioner and Mayor Pro-Tem of the City of Quincy. Defendant Harris acted under color of law, in his official capacity as Quincy City Commissioner and Mayor Pro-Tem, in adopting, imposing, and applying the unlawful and invalid redistricting map and measures at-issue. Defendant Harris may be served with process through the Quincy City Mayor, at 404 West Jefferson Street, Quincy, Florida 32351. *See* Charter at Part I, Subpart A, art. II, § 2.02 (the Mayor "shall be recognized as the official head of the city by the courts for the purpose of service of civil processes"); Fla. Stat. §§ 48.111(2) & 48.151(1).

12.    Defendant, ANGELA G. SAPP, is currently (and at all times relevant has been) a Commissioner representing District 2 of the Quincy City Commission. Defendant Sapp is sued solely in her official capacity as Commissioner of the City of Quincy. Defendant Sapp acted under color of law, in her official capacity as City

Commissioner, in adopting, imposing, and applying the unlawful and invalid redistricting map and measures at-issue. Defendant Sapp may be served with process through the Quincy City Mayor, at 404 West Jefferson Street, Quincy, Florida 32351. *See* Charter at Part I, Subpart A, art. II, § 2.02 (the Mayor "shall be recognized as the official head of the city by the courts for the purpose of service of civil processes"); Fla. Stat. §§ 48.111(2) & 48.151(1).

## III.   JURISDICTION AND BACKGROUND

13.   The Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(3) & (4), and 1357, as well as under 42 U.S.C. §§ 1983 and 1988, and also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

14.   This Court has jurisdiction to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

15.   Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), because at all times relevant, all Defendants reside in this judicial district and division, all of Plaintiffs reside in this judicial district and division, and all wrongful acts and/or omissions complained of herein occurred in this judicial district and division.

## IV.   LEGAL BACKGROUN

16.   Section 2 of the Voting Rights Act, 52 U.S.C. § 10301(a), prohibits any "standard, practice, or procedure" which "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color . . . ."

Thus, in addition to prohibiting practices that deny the exercise of the right to vote, § 2 prohibits vote dilution, either as a result of discriminatory intent or as having a discriminatory effect. *See Broward Citizens for Fair Dists v. Broward Cty.*, No. 12-cv-60317, 2012 U.S. Dist. LEXIS 46828, at *11-13 n.2 (S.D. Fla. Apr. 3, 2012) (citing *Mobile v. Bolden*, 446 U.S. 55 (1980), and *Thornburg v. Gingles*, 478 U.S. 30, 35 (1986)). A violation of § 2 is established if "it is shown that the political processes leading to nomination or election" in the jurisdiction "are not equally open to participation by members of a [minority group] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b).

17.    The dilution of minority voting strength may be caused by dispersal of minority residents and voters "into districts in which they constitute an ineffective minority of voters" or "into districts where they constitute an excessive majority." *Gingles*, 478 U.S. at 46 n.11.

18.    The United States Supreme Court, in *Thornburg v. Gingles*, identified three necessary preconditions for a claim of vote dilution under § 2 of the Voting Rights Act: (1) the minority group must be "sufficiently large and geographically compact to constitute a majority in a single-member district"; (2) the minority group must be "politically cohesive"; and (3) the majority must vote "sufficiently as a bloc

to enable it . . . usually to defeat the minority's preferred candidate." 478 U.S. at 50-51.

19.    Once all three preconditions are established, the statute directs courts to consider whether, under the totality of the circumstances, members of a racial group have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. 52 U.S.C. § 10301(b). The Senate Report on the 1982 amendments to the Voting Rights Act identifies several non-exclusive and non-exhaustive factors courts should consider when determining if, under the totality of circumstances in a jurisdiction, the operation of the electoral device being challenged results in a violation of § 2.

20.    These Senate Factors include: (1) the history of official voting-related discrimination in the state or political subdivision; (2) the extent to which voting in the elections of the state or political subdivision is racially polarized; (3) the extent to which the state or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority-vote requirements, and prohibitions against bullet-voting; (4) the exclusion of members of the minority group from candidate slating processes; (5) the extent to which minority group members bear the effects of discrimination in areas such as education, employment, and health, which hinder their ability to participate

effectively in the political process; (6) the use of overt or subtle racial appeals in political campaigns; and (7) the extent to which members of the minority group have been elected to public office in the jurisdiction.

21.     The Senate Report itself and the cases interpreting it have made clear that "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." *United States v. Marengo Cty. Comm'n*, 731 F.2d 1546, 1566 n.33 (11th Cir. 1984) (quoting S. Rep. No. 97-417, at 29 (1982)); *see also id.* at 1566 ("The statute explicitly calls for a 'totality-of-the circumstances' approach and the Senate Report indicates that no particular factor is an indispensable element of a dilution claim.").

## V.     FACTUAL BACKGROUND

22.     Here, the City of Quincy electorate votes in cohesive, polarized racial blocs. Black/African-Americans and White/Anglos are each politically cohesive. As a group, Quincy's Black/African-Americans consistently, if not universally, prefer different candidates than do Quincy's White/Anglos.

23.     According to the 2010 census, White/Anglos constitute the racial ***minority*** in Quincy, representing 34.8% of Quincy's population; meanwhile, Black/African-Americans constitute the racial ***majority*** in Quincy, representing 63.5% of Quincy's population.

24.    For decades, Quincy's Black/African-American majority has voted sufficiently as a bloc to consistently deny Quincy's White/Anglo minority the chance to elect its candidates of choice. In fact, since at least 2000 (i.e., at least six (6) cycles for each of the Commission Districts, Quincy's White/Anglo minority has been able to produce narrow majorities for its preferred candidates in City Commission elections of both Districts 4 and 5, succeeding each and every opportunity to elect their candidate of choice, showing consistently that the City Commission races see an ethnically-defined majority reject candidates preferred by Quincy's White/Anglo minority, and often narrowly so.

25.    Quincy has an established history of voting-related discrimination. Quincy has seen consistent, overt and subtle racial appeals in its local elections held since 2006, including in elections to the City Commission. Moreover, racial-majority Commissioners over that period have demonstrated unresponsiveness to Quincy's White/Anglo minorities.

26.    The Defendant Commissioners crafted the redistricted plan following the 2010 census and approved the discriminatory redistricted plan at-issue by a 3-2 vote at a hearing held on March 26, 2020 (minority-preferred and -elected Commissioners Freida Bass-Prieto of District 4, and Daniel McMillian of District 5, were unable to physically attend the hearing upon medical advice and precautions relating to the Coronavirus pandemic, thus voting telephonically and electronically).

When it did so, the majority that approved the redistricted plan had been elected by an ethnically defined, bloc-voting majority coalition that did not include Quincy's White/Anglo electors; this was, of course, the same City Commission majority that has demonstrated unresponsiveness to Quincy's White/Anglo minority. And as demonstrated herein, race was the predominant factor in the Defendant Commissioners' crafting of the unlawful redistricted plan as a whole, as well as in design of each of that plan's four (4) minority-disenfranchising districts.

27.    Furthermore, the Defendant Commissioners intentionally sought to adopt and implement new districting measures, as well as to alter the configurations of specific districts, based on racial animus and with the purpose to discriminate against and disenfranchise Quincy's racial-minorities on the basis of their race.

28.    For example, the redistricted plan itself reveals that Defendants' decision bears more heavily on one race (Plaintiffs, as racial-minority electors) than another (racial-majority electors), in that the minorities formerly in District 5—who, in their last election, cohesively voted to successfully elect their preferred candidate—have been dispersed throughout various districts under the redistricted plan, such that they now have no meaningful opportunity to win the election in District 5, and/or any territory besides District 4 (under the redistricted plan).

29.    The specific sequence of events leading up to the decision, as well as departures from normal procedural sequence, further support Defendants'

discriminatory intent and motivation. Specifically, the Defendant Quincy City Commissioners held a Commission Meeting on March 24, 2020 to determine the redistricted plans that would be considered for adoption: (1) while the public was all-but-prohibited by law from attending and commenting on the issue, due to the public gathering restrictions and stay-at-home orders then-in-place as a result of the Coronavirus pandemic; and (2) while the two Commissioners elected by and representing the racial-minority White/Anglo populations of Districts 4 and 5, were also unable to attend Commission meetings in-person for medical concerns also relating to the Coronavirus pandemic, resulting in the Defendant Commissioners voting on and formally adopting the redistricted plan without even considering alternative redistricted maps proposed and submitted to the Commission, such as those of Commissioner Freida Bass-Prieto of District 4.

30. Rather, the Defendant Commissioners proceeded to adopt the redistricted plan in an inexplicably constrained time period, and on March 26, 2020 held a Special Meeting—despite the fact typically reserved only for emergencies, and not for deliberations or even voting upon enactments or other non-time-sensitive matters, such as the redistricted plan). Indeed, Kurt Spitzer (the redistricting consultant retained by Defendant Commissioners to prepare their desired redistricting proposals), remarked to the Commission that he had never before been asked or required to redistrict a voting territory so quickly, and accordingly District

4 Commissioner Freida Bass-Prieto's repeated requests for the process to be slowed down in order to involve the community, and gain full understanding of the Commissioners' options and consequences for the many potential redistricted plans.

31.     The redistricted plan further placed together within the same District the two Commissioners successfully elected by Quincy's minorities (Freida Bass-Prieto and Daniel McMillian of Districts 4 and 5, respectively), and thus removed a minority-preferred incumbent to ease the usurping of one of its two (**_half_**) minority-preferred Commissioner candidates. Then, Defendant Commissioners abruptly moved the April 2020 Commissioner elections back from April to June 2020—further violating the law, no less, by doing so before and without having passed the requisite ordinance—in order to implement its redistricted plan and ensure they control four (4) of the five (5) total Commission seats for the first time ever in Quincy's history.

32.     Finally, Defendants' intentional discrimination is confirmed by contemporary statements of members of the decision-making body. Most notably, on June 25, 2019, the Quincy City Commission was engaged in a regularly-scheduled Commission meeting, open to the public and attended by a number of Quincy residents. During the meeting, several Quincy minority-electors spoke up, openly raising concerns to the majority-controlled Commission. Palpably angered by the vocal and public dissent, Defendant Dowdell (Commissioner and Mayor)

issued a thinly-veiled threat to Quincy minorities, whose mere participation in City politics he described as a problem that he could eliminate by use of the Commission's redistricting authority. This was the very first mention of potential redistricting by the City Commission, but promptly turned out to be precisely the course of conduct taken by the Defendant Commissioners to ensure the quieting and defeat of their minority-opposition. And to be sure, when asked why the Defendant Commissioners even cared or sought to gain additional voting power (*i.e.*, by taking one of only two Commissioners elected by the minorities), Quincy City Manager, Jack McLean, Jr. (a member of the racial-majority), commented to Plaintiff Baroody that they feel there are not enough white residents of Quincy to deserve two seats.

33.     The Defendant Commissioners could have acted differently. The White/Anglo minority is a sufficiently compact, sufficiently large proportion of Quincy's citizen voting age population, which turns out to vote in sufficient numbers, that the Commissioners could readily have drawn a second performing White/Anglo majority district. Such a district could have been lawfully drawn, and in a manner that better respects Quincy's political subdivisions and more fairly apportions citizens and residents among its districts.

34.     Instead, the Defendant Commissioners chose to punish Quincy's dissenting race, cracking White/Anglo minority voters between districts. The result, when gauged under the totality of the circumstances, is a discriminatory plan

composed of four (4) districts which deny Quincy's White/Anglo minority community the same opportunities to participate in the political process and elect commissioners of their choice as enjoyed by other (*i.e.*, racial-majority) voters. The redistricted plan and its four (4) disenfranchising districts deny Plaintiffs residing in each District the same opportunity to participate in the political process and to elect the Commissioner of their choice as enjoyed by other (*i.e.*, racial-majority) voters.

## VI.   CAUSES OF ACTION

### COUNT ONE
### Violation of § 2 of the Voting Rights Act of 1965,
### Discriminatory Purpose and/or Discriminatory Effect
### (52 U.S.C. § 10301)

35.    Plaintiffs re-allege and incorporate by reference each allegation contained in the preceding paragraphs as though fully set forth herein.

36.    Section 2 of the Voting Rights Act prohibits the enforcement of any "standard, practice, or procedure" that "results in the denial or abridgement of the right of ***any U.S. citizen* to vote *on account of race*** or color," or membership in a language minority group. 52 U.S.C. § 10301(a) (emphasis added).

37.    The district boundaries of the redistricted plan adopted, imposed, and applied by Defendants, "crack" White/Anglo populations in and/or around District 5 (under the redistricted plan), with the effect and/or purpose of diluting White/Anglo voting strength and/or abridging their right to vote on account of race, in violation of § 2 of the Voting Rights Act.

38.     Thus, Defendants' adopted redistricting plan denies Quincy's racial-minority electors an equal opportunity to participate in the political process and to elect representatives of their choice, by denying their right to vote, in violation of § 2 of the Voting Rights Act.

39.     White/Anglo residents and qualified electors in the areas in and/or around District 5 (under the redistricted plan) are sufficiently numerous and geographically compact to constitute a majority of eligible voters in an additional district.

40.     Under § 2 of the Voting Rights Act, the Quincy City Commission was required to create an additional district in which White/Anglo qualified electors would have the opportunity to elect their candidates of choice.

41.     White/Anglo qualified electors, particularly in the areas in and/or around District 5, are politically cohesive. Elections in this area reveal a clear pattern of racially-polarized voting that allows the bloc of Quincy's racial-majority electors (*i.e.*, Black/African-American) usually to defeat the minority-preferred (*i.e.*, Whites/Anglo) candidates.

42.     The totality of the circumstances establishes that the current redistricted map has the effect of diluting, denying, and abridging White/Anglo-electors' equal opportunity to participate in the political process and to elect candidates of their choice, in violation of § 2 of the Voting Rights Act, 52 U.S.C. § 10301.

43. By engaging in the acts and omissions alleged herein, Defendants have acted and continue to act so as to deny Plaintiffs' rights guaranteed to them by § 2 of the Voting Rights Act. Defendants will continue to violate those rights unless the requested relief, including injunctive relief, is granted by this Court.

**COUNT TWO**
**Unconstitutional Discrimination in Violation of Equal Protection,**
**Under the U.S. Constitution**
**(U.S. CONST. AMEND. XIV, 42 U.S.C. § 1983)**

44. Plaintiffs re-allege and incorporate by reference each allegation contained in the preceding paragraphs as though fully set forth herein.

45. Section 1 of the Fourteenth Amendment to the United States Constitution prohibits states from depriving "any person within its jurisdiction of the equal protection of the laws." U.S. Const. amend. XIV, § 1.

46. Pursuant to 42 U.S.C. § 1983, every person acting under color of state law, who deprives any other person of his or her constitutional rights, is also liable at law or equity.

47. The Equal Protection Clause of the Fourteenth Amendment forbids intentionally assigning voters to a district on the basis of race without sufficient justification.

48. It is well established that "a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972); *see Bush v. Gore*, 531 U.S. 98, 104–

05 (2000) ("Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another.").

49. Acting under color of state law, Defendants deprived Quincy's racial-minority population (*i.e.*, White/Anglo) of their right to vote on an equal basis, by redistricting city lines to completely dilute their vote, and deny and abridge their participation in City Commission elections, including those presently scheduled to be held in June 2020.

50. The Defendants' redistricting plan at-issue was adopted, imposed, and applied, and furthermore is being maintained in an effort to segregate voters into separate districts on the basis of their race.

51. Specifically, for example, the redistricted plan purposefully "cracks" and/or fragments Quincy's racial-minority population, dispersing them among districts, in order to dilute and abridge their voting rights, without regard to traditional or race-neutral redistricting principles, and without any rational—much less lawful and compelling—justification, interest, or basis for doing so.

52. The Defendant Commissioners designed the redistricted plan and measures to reduce and lessen the electoral opportunities of Quincy's racial-minority population, significantly below the level of opportunities that would have been available to them under a plan compliant with lawful, constitutional, and race-neutral

principles. This fragmentation provides undue voting advantages to Quincy's bloc-voting-racial-majority population.

53.     The discriminatory redistricted plan was purposefully and intentionally crafted to allow Quincy's racial-majority population, and/or ethnic-majority-coalition, to dominate the Quincy City Commission beyond what their voting power and geographic distribution would otherwise suggest, and to deny Quincy's racial-minority population the chance to meaningfully participate in the choice and election of any City Commissioner outside of District 4.

54.     Discrimination based on race in the context of voting, as here, without compelling justification or interest in creating districts along racial lines, particularly for the purpose and with the intent to limit participation of Quincy's racial-minority population in the political process, is a clear violation of Plaintiffs' Equal Protection rights, as guaranteed under the Fourteenth Amendment to the U.S. Constitution.

55.     By engaging in the acts and omissions alleged herein, the Defendant Commissioners have denied Plaintiffs their rights to Equal Protection, as guaranteed under the Fourteenth Amendment of the U.S. Constitution.

56.     The failure to immediately, as well as permanently, enjoin the Defendant Commissioners, as well as their agents and successors in office, from imposing, applying, implementing, and maintaining the redistricted plan at-issue, will irreparably harm Plaintiffs by violating their constitutional rights to Equal

Protection pursuant to the Fourteenth Amendment of the U.S. Constitution, and inflict injuries for which Plaintiffs have no adequate remedy at law.

### COUNT THREE
**Unconstitutional Burden on Fundamental Rights to Vote, and
Core Political Speech, Association & Expression Rights
(U.S. CONST. AMENDS. I & XIV, 42 U.S.C. § 1983)**

57. Plaintiffs re-allege and incorporate by reference each allegation contained in the preceding paragraphs as though fully set forth herein.

58. The Fourteenth Amendment safeguards the "precious" and "fundamental" right to vote, *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 670 (1966), and prohibits any encumbrance on the right to vote that is not adequately justified by valid and specific state interests, *Anderson v. Celebrezze*, 460 U.S. 780, 788-89 (1983).

59. Moreover and relatedly, the First and Fourteenth Amendments combined to confer upon Plaintiffs the rights to engage in core political speech, expression, and association, including the right to vote and also extending further to participation in election-related and political activities, entitled to robust constitutional protections.

60. Courts reviewing a challenge to a law that burdens the right to vote "must weigh 'the character and magnitude of the asserted injury to the right[]'" to vote "against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those

interests make it necessary to burden the plaintiff's rights.'" *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson*, 460 U.S. at 789).

61.     When these rights to vote, as well as to engage in related speech and associational activities, are "subjected to 'severe' restrictions, the regulation must be 'narrowly drawn to advance a state interest of compelling importance.'" *Burdick*, 504 U.S. at 434 (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992)). "But when a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions." *Id.* at 434 (quoting *Anderson*, 460 U.S. at 788).

62.     Plaintiffs are registered and qualified voters—having voted in past elections for City Commissioners, and with full intent to vote in all future elections for which they qualify (*i.e.*, for their District)—with the fundamental right to vote.

63.     The redistricted plan at-issue, as adopted, imposed, applied, and maintained by Defendants, imposes a severe burden on Plaintiffs' fundamental constitutional right to vote, as well as their freedoms to engage in core political speech and related associational activities.

64.     The severe burden imposed on Plaintiffs, by way of the redistricted plan, does not serve any legitimate or rational—much less compelling and

permissible—basis to authorize or warrant its implementation and/or maintenance, or any other sufficient state interest.

65.     The above-described burdens to Plaintiffs' voting, and free speech and associational rights, are "severe" and discriminatory and impose significant burdens on qualified electors who are members of—and on account of their status as—the racial-minority in Quincy, which burdens are **_not_** imposed on the racial-**_majority_**.

66.     The redistricted plan thus places an unnecessary burden on Plaintiffs' fundamental voting rights, as well as on Plaintiffs' freedoms to engage in core political speech and related associational activities, without advancing a legally sufficient state interest, in violation of Plaintiffs' rights and protections under the First and Fourteenth Amendment to the U.S. Constitution.

67.     The failure to immediately, as well as permanently, enjoin the Defendants, including the Defendant Commissioners' agents and successors in-office, from imposing, applying, implementing, and maintaining the redistricted plan at-issue, will irreparably harm Plaintiffs by violating their fundamental voting rights under Fourteenth Amendment, as well as their related free speech and associational rights under the First and Fourteenth Amendments—injuries for which Plaintiffs have no adequate remedy at law.

## COUNT FOUR
## Intentional Racial Discrimination, in Violation of the U.S. Constitution
## (U.S. CONST. AMENDS. XIV & XV, 42 U.S.C. § 1983)

68.     Plaintiffs re-allege and incorporate by reference each allegation contained in the preceding paragraphs as though fully set forth herein.

69.     The Equal Protection Clause of the Fourteenth Amendment prohibits intentional discrimination on the basis of race. U.S. Const. amend. XIV. Moreover, the Fifteenth Amendment forbids denial or abridgment of the right to vote on account of race or ethnicity. U.S. Const. amend. XV. Both constitutional protections guard against deprivations of the right to vote that are motivated by race. *Rogers v. Lodge*, 458 U.S. 613, 621-25 (1982).

70.     Because a discriminatory motive may hide behind legislation that "appears neutral on its face," the U.S. Supreme Court has articulated several non-exhaustive and non-exclusive factors to inform an analysis of discriminatory intent: (1) evidence that defendants' decision bears more heavily on one race than another; (2) the historical background of the decision; (3) the specific sequence of events leading up to the decision; (4) departures from the normal procedural sequence; (5) substantive departures; and (6) legislative history, including "contemporary statements by members of the decision making body, minutes of its meetings, or reports." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266-28 (1977).

71.    An official action taken for the purpose of discriminating on account of race has no legitimacy under the U.S. Constitution. *City of Richmond, Va. v. U.S.*, 422 U.S. 358, 378-79 (1975).

72.    Demonstrating intentional discrimination "does not require a plaintiff to prove that the challenged action rested solely on racially discriminatory purposes." *Arlington Heights*, 429 U.S. at 265. Instead, the plaintiff's burden is to show that the discriminatory purpose was at least a "motivating factor" (*i.e.*, rather than the primary or sole purpose). *Id.* at 265-66.

73.    Applying the *Arlington Heights* factors to the circumstances at-issue here, reveals that the redistricted plan was composed and adopted with a racially-discriminatory purpose and intent—or at a minimum, motivated in-part—to discriminate against Quincy's racial-minority population in violation of the U.S. Constitution.

74.    For example, the redistricted plan itself reveals that Defendants' decision bears more heavily on one race (Plaintiffs, as racial-minority electors) than another (racial-majority electors), in that the minorities formerly in District 5—who, in their last election, cohesively voted to successfully elect their preferred candidate—have been dispersed throughout various districts under the redistricted plan, such that they now have no meaningful opportunity to win the election in District 5, and/or any territory besides District 4 (under the redistricted plan).

75.     Moreover, the specific sequence of events leading up to the decision, as well as departures from the normal procedural sequence, further support Defendants' discriminatory intent and motivation. Specifically, the Defendant Quincy City Commissioners held a Commission Meeting on March 24, 2020 to determine the redistricted plans that would be considered for adoption: (1) while the public was all-but-prohibited by law from attending and commenting on the issue, due to the public gathering restrictions and stay-at-home orders then-in-place as a result of the Coronavirus pandemic; and (2) while the two Commissioners elected by and representing the racial-minority White/Anglo populations of Districts 4 and 5, were also unable to attend Commission meetings in-person for medical concerns also relating to the Coronavirus pandemic, resulting in the Defendant Commissioners voting on and formally adopting the redistricted plan without even considering alternative redistricted maps proposed and submitted to the Commission, such as those of Commissioner Freida Bass-Prieto of District 4.

76.     Rather, the Defendant Commissioners proceeded to adopt the redistricted plan in an inexplicably constrained time period, and on March 26, 2020 held a Special Meeting—despite the fact typically reserved only for emergencies, and not for deliberations or even voting upon enactments or other non-time-sensitive matters, such as the redistricted plan). Indeed, Kurt Spitzer (the redistricting consultant retained by Defendant Commissioners to prepare their desired

– 27 –

redistricting proposals), remarked to the Commission that he had never before been asked or required to redistrict a voting territory so quickly, and accordingly District 4 Commissioner Freida Bass-Prieto's repeated requests for the process to be slowed down in order to involve the community, and gain full understanding of the Commissioners' options and consequences for the many potential redistricted plans.

77. The redistricted plan further placed together within the same District the two Commissioners successfully elected by Quincy's minorities, and thus removed a minority-preferred incumbent to ease the usurping of one of its two (*i.e.*, *half*) minority-preferred Commissioner candidates. Then, the Defendant Commissioners abruptly moved the April 2020 Commissioner elections back from April to June 2020—further violating the law, no less, by doing so before and without having passed the requisite ordinance—in order to implement its redistricted plan and ensure they control four (4) of the five (5) total Commission seats for the first time ever in Quincy's history.

78. Finally, Defendants' intentional discrimination is confirmed by contemporary statements of members of the decision-making body. Most notably, on June 25, 2019, the Quincy City Commission was engaged in a regularly-scheduled Commission meeting, open to the public and attended by a number of Quincy residents. During the meeting, several Quincy minority-electors spoke up, openly raising concerns to the majority-controlled Commission. Palpably angered

by the vocal and public dissent, Defendant Dowdell (Commissioner and Mayor) issued a thinly-veiled threat to Quincy minorities, whose mere participation in City politics he described as a problem that he could eliminate by use of the Commission's redistricting authority. This was the very first mention of potential redistricting by the City Commission, but promptly turned out to be precisely the course of conduct taken by the Defendant Commissioners to ensure the quieting and defeat of their minority-opposition. And to be sure, when asked why the Defendant Commissioners even cared or sought to gain additional voting power (*i.e.*, by taking one of only two Commissioners elected by the minorities), Quincy City Manager, Jack McLean, Jr. (a member of the racial-majority), commented to Plaintiff Baroody that they feel there are not enough white residents of Quincy to deserve two seats.

79.    These circumstances thus support a strong inference of discriminatory purpose and motivation in violation of the Fourteenth and Fifteenth Amendments.

**COUNT FIVE**
**Declaratory Relief**
**(28 U.S.C. § 2201 and Fed. R. Civ. P. 57)**

80.    Plaintiffs re-allege and incorporate by reference each allegation contained in the preceding paragraphs as though fully set forth herein.

81.    Specifically, Plaintiffs seek a declaration that, for the reasons and on the grounds set forth hereinabove, Defendants' adoption, imposition, imposed, application, and/or maintenance of the redistricted plan at-issue violates Plaintiffs'

rights under the First, Fourteenth, and Fifteenth Amendments of the U.S. Constitution, and their statutory rights under § 2 of the Voting Rights Act.

82.     Absent the relief sought in this Complaint, Plaintiffs reasonably believe that the redistricted plan at-issue, if allowed to remain in-effect for the June 2020 election of City Commissioners (for Districts 1 & 5), will irreparably harm Plaintiffs by violating their fundamental constitutional rights, and statutory protections, and cause Plaintiffs to suffer injuries for which they have no adequate remedy at-law.

83.     Plaintiffs thus are in doubt as to their rights arising from forthcoming elections to be held under the redistricted plan at-issue, and the virtual impossibility it creates for Plaintiffs (and Quincy's minorities) to reelect their preferred Commissioners for Districts 4 and 5, as they had done without exception for decades, and thus render their votes meaningless and futile, and/or otherwise elect their preferred candidate(s) in more than a single District (District 4) moving forward under the redistricted plan, as set forth above.

**COUNT SIX**
**Injunctive Relief**
**(28 U.S.C. § 2202 and Fed. R. Civ. P. 65)**

84.     Plaintiffs re-allege and incorporate by reference each allegation contained in the preceding paragraphs as though fully set forth herein.

85.     This is an action for preliminary injunctive relief seeking to enjoin Defendants from enforcing the redistricted plan adopted, imposed, applied, and

maintained by Defendants, which if allowed to remain valid and in-effect would cause future City Commission elections to be conducted under unlawful, racially-gerrymandered boundaries set intentionally by Defendants to dilute, deny and abridge the voting power of Quincy's racial-minority electors due to their race.

86.     Plaintiffs will suffer irreparable harm, through violations of their constitutional and statutory rights—including, but not limited to, under § 2 of the Voting Rights Act, as well as the First, Fourteenth, and Fifteenth Amendments of the U.S. Constitution—if Defendants are not enjoined as set forth herein.

87.     Plaintiffs have reasonable fear that they will suffer irreparable harm through further and continuing future violations of their statutory and constitutional rights—including, but not limited to, under § 2 of the Voting Rights Act, as well as the First, Fourteenth, and Fifteenth Amendments of the U.S. Constitution—if Defendants are not enjoined as set forth herein.

88.     Plaintiffs have a substantial likelihood of success on the merits, including specifically, for the harms suffered in connection with their claims for (i) violation of their protections against discriminatory and unlawful dilution, denial, and abridgement of their rights to vote, with discriminatory purpose and/or discriminatory effect, pursuant to § 2 of the Voting Rights Act of 1965; (ii) violation of their rights to equal protection and to be free from intentional discrimination in voting on the basis of race and without sufficient justification

discrimination under the law, pursuant to the Fourteenth Amendment of the U.S. Constitution; (iii) unconstitutional burdening, dilution, denial, and abridgement of their fundamental rights to vote, and their freedoms of core political speech and association, pursuant to the First and Fourteenth Amendments of the U.S. Constitution; and (iv) violation of Plaintiffs' constitutional rights and protections to be free from intentional racial discrimination, pursuant to the Fourteenth and Fifteenth Amendments of the U.S. Constitution.

89.     As explained herein, Plaintiffs have no other adequate remedy at law.

90.     The requested injunctive relief serves, and would not be contrary to, the public interest generally.

91.     Plaintiffs have a clear legal right to the relief sought.

92.     If an injunction is granted, Defendants will suffer no hardship.

93.     Plaintiffs do not need to post, and should not be required to post, a bond to acquire the requested injunctive relief.

94.     Plaintiffs have retained the Andrews Law Firm, 822 N. Monroe Street, Tallahassee, Florida 32303 to provide their professional services.

## VII.  PRAYER FOR RELIEF

**WHERERFORE**, Plaintiffs respectfully request that this Court:

A.     Order Declaratory Relief, pursuant to 28 U.S.C. § 2201, deeming and declaring (Ordinance and map) unlawful, unconstitutional, and invalid, including as

purposefully and/or in-effect under § 2 of the Voting Rights Act, pursuant to equal protection, procedural due process, fundamental fairness, and core political speech and associational rights, and/or protections against intentional and effective racial discrimination under the First, Fourteenth, and Fifteenth Amendments of the U.S. Constitution.

B.    Issue Temporary, Preliminary, and/or Permanent Injunctive Relief, pursuant to 28 U.S.C. § 2202 and Fed. R. Civ. P. 65, restraining and enjoining the Defendant Quincy City Commissioners, as well as their agents and successors in office: (1) from enforcing or giving any effect to the redistricted boundaries of the City Commission Districts as adopted by Defendants on or about March 26, 2020, and/or as imposed, applied, and maintained thereafter by Defendants; (2) from conducting any further elections of City Commissioners under the redistricted plan; and also ordering preservation of the *status quo* by requiring that the June 2020 City Commission elections be conducted under the City Districts in-place prior to Defendants' adoption of the redistricted plan at-issue;

C.    Set an emergency hearing date at the Court's earliest possible availability and opportunity to address Plaintiffs' emergency request for Preliminary Injunctive Relief,[1] and consider any related briefing or evidence, as necessary; and

---

[1] Plaintiffs' request for injunctive relief, and further details and explanation of the emergency nature for the relief, pursuant to N.D. Fla. Loc. R. 7.1(L), will be set forth in Plaintiffs' forthcoming Emergency Motion for Preliminary Injunctive Relief.

take any other actions necessary and proper to order and ensure adoption of a valid and lawful district plan, which allows Quincy's racial-minority electors (*i.e.*, Whites/Anglos) an opportunity to elect their preferred candidates, consistent with § 2 of the Voting Rights Act;

D.     Award Plaintiffs their reasonable attorney's fees, and litigation expenses and costs incurred in connection with this action, pursuant to 42 U.S.C. § 1988(b) and/or 52 U.S.C. § 10310(e); and

E.     Grant any such other and further relief as the Court deems just, proper, or appropriate.

DATED this 28th day of April, 2020.

Respectfully submitted,

**ANDREWS LAW FIRM**
822 North Monroe Street
Tallahassee, Florida 32303
T: (850) 681-6416 / F: 681-6984

*/s/ Ryan J. Andrews*
RYAN J. ANDREWS (FBN 0104703)
ryan@andrewslaw.com

*/s/ David A. Weisz*
DAVID A. WEISZ (*Pro Hac Vice Forthcoming*[2])
STEVEN R. ANDREWS (FBN 0263680)
steve@andrewslaw.com
service@andrewslaw.com
*Counsel for Plaintiffs*

---

[2] David Weisz, Esq. is a lawyer registered to practice law in the State of Georgia. Further, Mr. Weisz has passed The Florida Bar and is awaiting receipt of his letter from the Bar with his approval to be notarized and submitted to the Florida Bar.