IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

JULIE BAROODY, and )
BRAD FARMER, )
       )
    Plaintiffs, )
       )
v. )   Case No.: 4:20-cv-217-AW-MAF
       )
CITY OF QUINCY, FLORIDA, )
KEITH A. DOWDELL, in his official )
capacity as Commissioner and Mayor of the )
City of Quincy, RONTE R. HARRIS, in his )
official capacity as Commissioner and )
Mayor Pro-Tem of the City of Quincy, and )
ANGELA G. SAPP, in her official capacity )
as Commissioner of the City of Quincy, )
       )
    Defendants. )
_____)

## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTIVE RELIEF

This lawsuit challenges a redistricting plan adopted March 26, 2020 by the City Commission of Quincy, Florida, which unconstitutionally and unlawfully dilutes, denies, and abridges the voting rights of racial-minority residents, solely and intentionally on the basis of their race. The premise underlying the Complaint—namely, that the redistricted plan adopted by the City of Quincy through a majority of its City Commissioners (*i.e.*, Defendants Dowdell, Harris, and Sapp) discriminates and dilutes the voting rights of Quincy's racial-minority electors—is clearly established and confirmed, by the evidence in this case, including subsequent

conduct and comments of the City Commissioner Defendants, documents and communications of Kurt Spitzer (the contractor hired by the City to create new redistricting plans) and his agents, and the statistical data underlying and bearing on the enacted plan and the population and racial demographic information of that plan and the City of Quincy. Indeed, race was the predominant—if not the *sole*—factor and consideration in the creation and adoption of, and the motivation for, the redistricted plan.

## I.    PRELIMINARY STATEMENT

On March 26, 2020, the Quincy City Commission, which was and long has been predominated by members of Quincy's ***racial-majority*** population, adopted a redistricting plan intended—through race-based redistricting measures constituting a quintessential racial gerrymander—to dilute, deny, and abridge the voting rights of Quincy's ***racial-minority*** electors.

Just months prior on June 25, 2019, the Quincy City Commission was engaged in a regularly-scheduled Commission meeting, open to the public and attended by a number of Quincy residents. During the meeting, several Quincy minority-electors spoke up, openly raising concerns to the majority-controlled Commission. Palpably angered by the vocal and public dissent, Defendant Dowdell (Commissioner and Mayor) issued a thinly-veiled threat to Quincy minorities, whose mere participation in City politics he described as a problem that he could eliminate

by use of the Commission's redistricting authority. This was the very first mention of potential redistricting by the City Commission.

Thereafter, the majority-controlled Commission deliberately directed and participated in preparation of redistricting plans. As their plans were designed and intended to enable, and to in-fact cause, subversion of minority voting rights—so egregiously as to render them futile and incapable of meaningful challenge for control of the Commission—the majority-controlled Commission raced to implement their agenda, taking advantage of the restrictions surrounding the Coronavirus pandemic to bypass meaningful opportunity for notice, deliberation, and comment by the public, or even full Commission membership participation, opting instead to adopt their unlawful and unconstitutional redistricted plan into law.

The Defendant Commissioners' manifest intent was to deny Quincy's minorities fair participation in the electoral process, by making it virtually impossible for it to elect more than a single Commissioner. Indeed, the redistricted plan adopted by the Commission "cracked" the minority population of District 5— which had been substantial as to consistently result in election of their preferred candidates—redistributing these minority-electors across the various other districts, as well as "packed" the racial-minority population of District 4, making it virtually impossible for racial-minority success at the polls. The redistricted plan also placed together in the same District the two Commissioners successfully elected by

Quincy's minorities, and moved the forthcoming April 2020 election date back to June 2020—further violating the law, no less, by doing so before passing the requisite ordinance—in order to implement its redistricted plan, and all but certainly claim four (4) of the five (5) total Commission seats for the first time ever in Quincy's known history.

Plaintiffs represent the racial-minority population, specifically a White/Angle-minority population, of Quincy, which has a Black/African-American majority population. In fact, these majority/minority statuses have historically been the *status quo* in Quincy for more than 100 years. As U.S. citizens whose voting rights have been denied and abridged on account of their race, Plaintiffs accordingly seek invalidation of, and an injunction against, the redistricted plan under § 2 of the Voting Rights Act, and various protections under the U.S. Constitution.

Thus, to remedy Defendants' intentional and unlawful conduct, Plaintiffs ask the Court to: (i) declare the redistricted plan invalid; and (ii) either: (a) proceed under the map and districts previously-in-place; (b) compel Quincy to draw a map consistent with § 2 of the Voting Rights Act and the U.S. Constitution; or (c) draw one for Quincy, should the Commission fail to timely do so.

## III.   FACTUAL BACKGROUND

Here, the City of Quincy electorate votes in cohesive, polarized racial blocs. Black/African-Americans and White/Anglos are each politically cohesive. As a

group, Quincy's Black/African-Americans consistently, if not universally, prefer different candidates than do Quincy's White/Anglos.

According to the most recent U.S. Census data (*i.e.*, the 2018 ACS), White/Anglos constitute the racial *minority* in Quincy, representing 34.8% of Quincy's population; meanwhile, Black/African-Americans constitute the racial *majority* in Quincy, representing 63.5% of Quincy's population.

For decades, Quincy's Black/African-American majority has voted sufficiently as a bloc to consistently deny Quincy's White/Anglo minority the chance to elect its candidates of choice. In fact, since at least 2000 (*i.e.*, at least six (6) cycles for each of the Commission Districts, Quincy's White/Anglo minority has been able to produce narrow majorities for its preferred candidates in City Commission elections of both Districts 4 and 5, succeeding each and every opportunity to elect their candidate of choice, showing consistently that the City Commission races see an ethnically-defined majority reject candidates preferred by Quincy's White/Anglo minority, and often narrowly so.

Quincy has an established history of voting-related discrimination. Quincy has seen consistent, overt and subtle racial appeals in its local elections held since 2006, including in elections to the City Commission. Moreover, racial-majority Commissioners over that period have demonstrated unresponsiveness to Quincy's White/Anglo minorities.

The Defendant Commissioners crafted the redistricted plan following the 2010 census and approved the discriminatory redistricted plan at-issue by a 3-2 vote at a hearing held on March 26, 2020 (minority-preferred and -elected Commissioners Freida Bass-Prieto of District 4, and Daniel McMillian of District 5, were unable to physically attend the hearing upon medical advice and precautions relating to the Coronavirus pandemic, thus voting telephonically and electronically). When it did so, the majority that approved the redistricted plan had been elected by an ethnically defined, bloc-voting majority coalition that did not include Quincy's White/Anglo electors; this was, of course, the same City Commission majority that has demonstrated unresponsiveness to Quincy's White/Anglo minority. And as demonstrated herein, race was the predominant factor in the Defendant Commissioners' crafting of the unlawful redistricted plan as a whole, as well as in design of each of that plan's four (4) minority-disenfranchising districts.

Furthermore, the Defendant Commissioners intentionally sought to adopt and implement new districting measures, as well as to alter the configurations of specific districts, based on racial animus and with the purpose to discriminate against and disenfranchise Quincy's racial-minorities on the basis of their race.

For example, the redistricted plan itself reveals that Defendants' decision bears more heavily on one race (Plaintiffs, as racial-minority electors) than another (racial-majority electors), in that the minorities formerly in District 5—who, in their

last election, cohesively voted to successfully elect their preferred candidate—have been dispersed throughout various districts under the redistricted plan, such that they now have no meaningful opportunity to win the election in District 5, and/or any territory besides District 4 (under the redistricted plan).

The specific sequence of events leading up to the decision, as well as departures from normal procedural sequence, further support Defendants' discriminatory intent and motivation. Specifically, the Defendant Quincy City Commissioners held a Commission Meeting on March 24, 2020 to determine the redistricted plans that would be considered for adoption: (1) while the public was all-but-prohibited by law from attending and commenting on the issue, due to the public gathering restrictions and stay-at-home orders then-in-place as a result of the Coronavirus pandemic; and (2) while the two Commissioners elected by and representing the racial-minority White/Anglo populations of Districts 4 and 5, were also unable to attend Commission meetings in-person for medical concerns also relating to the Coronavirus pandemic, resulting in the Defendant Commissioners voting on and formally adopting the redistricted plan without even considering alternative redistricted maps proposed and submitted to the Commission, such as those of Commissioner Freida Bass-Prieto of District 4.

Rather, the Defendant Commissioners proceeded to adopt the redistricted plan in an inexplicably constrained time period, and on March 26, 2020 held a Special

Meeting—despite the fact typically reserved only for emergencies, and not for deliberations or even voting upon enactments or other non-time-sensitive matters, such as the redistricted plan). Indeed, Kurt Spitzer (the redistricting consultant retained by Defendant Commissioners to prepare their desired redistricting proposals), remarked to the Commission that he had never before been asked or required to redistrict a voting territory so quickly, and accordingly District 4 Commissioner Freida Bass-Prieto's repeated requests for the process to be slowed down in order to involve the community, and gain full understanding of the Commissioners' options and consequences for the many potential redistricted plans.

The redistricted plan further placed together within the same District the two Commissioners successfully elected by Quincy's minorities (Freida Bass-Prieto and Daniel McMillian of Districts 4 and 5, respectively), and thus removed a minority-preferred incumbent to ease the usurping of one of its two (***half***) minority-preferred Commissioner candidates. Then, Defendant Commissioners abruptly moved the April 2020 Commissioner elections back from April to June 2020—further violating the law, no less, by doing so before and without having passed the requisite ordinance—in order to implement its redistricted plan and ensure they control four (4) of the five (5) total Commission seats for the first time ever in Quincy's history.

Finally, Defendants' intentional discrimination is confirmed by contemporary statements of members of the decision-making body. Most notably, on June 25,

2019, the Quincy City Commission was engaged in a regularly-scheduled Commission meeting, open to the public and attended by a number of Quincy residents. During the meeting, several Quincy minority-electors spoke up, openly raising concerns to the majority-controlled Commission. Palpably angered by the vocal and public dissent, Defendant Dowdell (Commissioner and Mayor) issued a thinly-veiled threat to Quincy minorities, whose mere participation in City politics he described as a problem that he could eliminate by use of the Commission's redistricting authority.[1] This was the very first mention of potential redistricting by the City Commission, but promptly turned out to be precisely the course of conduct taken by the Defendant Commissioners to ensure the quieting and defeat of their minority-opposition. And to be sure, when asked why the Defendant Commissioners even cared or sought to gain additional voting power (*i.e.*, by taking one of only two Commissioners elected by the minorities), Quincy City Manager, Jack McLean, Jr. (a member of the racial-majority), commented to Plaintiff Baroody that they feel there are not enough white residents of Quincy to deserve two seats.

The Defendant Commissioners could have acted differently. The White/Anglo minority is a sufficiently compact, sufficiently large proportion of

---

[1] *See* Transcript of June 25, 2019 City of Quincy Meeting of the City Commission, attached hereto as **Exhibit 1**, at pp. 125:2-129:6. Notably, in addition, Commissioner Dowdell appeared to admit to various cyber-crimes, including hacking of the racial-minority commissioners' and/or racial-minority citizens' email accounts or servers, actions which may violate the Computer Fraud and Abuse Act. *See id.*, at pp. 126:23-127:8.

Quincy's citizen voting age population, which turns out to vote in sufficient numbers, that the Commissioners could readily have drawn a second performing White/Anglo majority district. Such a district could have been lawfully drawn, and in a manner that better respects Quincy's political subdivisions and more fairly apportions citizens and residents among its districts.

Instead, the Defendant Commissioners chose to punish Quincy's dissenting race, cracking White/Anglo minority voters between districts. The result, when gauged under the totality of the circumstances, is a discriminatory plan composed of four (4) districts which deny Quincy's White/Anglo minority community the same opportunities to participate in the political process and elect commissioners of their choice as enjoyed by other (*i.e.*, racial-majority) voters. The redistricted plan and its four (4) disenfranchising districts deny Plaintiffs residing in each District the same opportunity to participate in the political process and to elect the Commissioner of their choice as enjoyed by other (*i.e.*, racial-majority) voters.[2]

## IV.   ARGUMENT

### A.   *Background of Section 2 of the Voting Rights Act*

Section 2 of the Voting Rights Act, 52 U.S.C. § 10301(a), prohibits any "standard, practice, or procedure" which "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color . . . ."

---

[2] *See also infra* at Section IV(B)(1).

Thus, in addition to prohibiting practices that deny the exercise of the right to vote, § 2 prohibits vote dilution, either as a result of discriminatory intent or as having a discriminatory effect. *See Broward Citizens for Fair Dists v. Broward Cty.*, No. 12-cv-60317, 2012 U.S. Dist. LEXIS 46828, at *11-13 n.2 (S.D. Fla. Apr. 3, 2012) (citing *Mobile v. Bolden*, 446 U.S. 55 (1980), and *Thornburg v. Gingles*, 478 U.S. 30, 35 (1986)). A violation of § 2 is established if "it is shown that the political processes leading to nomination or election" in the jurisdiction "are not equally open to participation by members of a [minority group] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b).

The dilution of minority voting strength may be caused by dispersal of minority residents and voters "into districts in which they constitute an ineffective minority of voters" or "into districts where they constitute an excessive majority." *Gingles*, 478 U.S. at 46 n.11.

The United States Supreme Court, in *Thornburg v. Gingles*, identified three necessary preconditions for a claim of vote dilution under § 2 of the Voting Rights Act: (1) the minority group must be "sufficiently large and geographically compact to constitute a majority in a single-member district"; (2) the minority group must be "politically cohesive"; and (3) the majority must vote "sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." 478 U.S. at 50-51.

Once all three preconditions are established, the statute directs courts to consider whether, under the totality of the circumstances, members of a racial group have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. 52 U.S.C. § 10301(b). The Senate Report on the 1982 amendments to the Voting Rights Act identifies several non-exclusive and non-exhaustive factors courts should consider when determining if, under the totality of circumstances in a jurisdiction, the operation of the electoral device being challenged results in a violation of § 2.

These Senate Factors include: (1) the history of official voting-related discrimination in the state or political subdivision; (2) the extent to which voting in the elections of the state or political subdivision is racially polarized; (3) the extent to which the state or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority-vote requirements, and prohibitions against bullet-voting; (4) the exclusion of members of the minority group from candidate slating processes; (5) the extent to which minority group members bear the effects of discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process; (6) the use of overt or subtle racial appeals in

political campaigns; and (7) the extent to which members of the minority group have been elected to public office in the jurisdiction.

The Senate Report itself and the cases interpreting it have made clear that "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." *United States v. Marengo Cty. Comm'n*, 731 F.2d 1546, 1566 n.33 (11th Cir. 1984) (quoting S. Rep. No. 97-417, at 29 (1982)); *see also id.* at 1566 ("The statute explicitly calls for a 'totality-of-the circumstances' approach and the Senate Report indicates that no particular factor is an indispensable element of a dilution claim.").

### B.   *Preliminary Injunctive Relief*

A preliminary injunction is warranted if: (1) the moving party has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause to the opposing party; and (4) if issued, the injunction would be consistent with the public interest. *See Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1354 (11th Cir. 2005). As set forth in further detail below, all four factors are present here. Accordingly, a preliminary injunction should issue to enjoin the use the redistricted plan for the upcoming City Commissioner elections for Districts 1 and 5, moved to June 5, 2020, and prevent

– 13 –

the dilution of the voting strength of White/Angle voters in the City of Quincy in that election.

>    1.    There is a Substantial Likelihood that Plaintiffs Will Succeed on the Merits of their Claims Against Defendants

Section 2 of the Voting Rights Act prohibits the enforcement of any "standard, practice, or procedure" that "results in the denial or abridgement of the right of ***any U.S. citizen*** *to vote* ***on account of race*** or color," or membership in a language minority group. 52 U.S.C. § 10301(a) (emphasis added).

*First*, the minority group at-issue is sufficiently large and geographically compact to constitute a majority in *two* single-member districts (namely, districts 4 and 5). *See Gingles*, 478 U.S. at 50-51. This is plainly and easily demonstrated by Plaintiffs' Demonstration Plan 1, which demonstrates that White/Anglo residents of Quincy constitute a majority in two single-member districts, in conjunction with a coalition of Hispanic voters, based upon population and demographic data from the 2010 U.S. Decennial Census.[3] *See* Declaration of Dr. Jowei Chen, attached hereto as **Exhibit 2**, at pp. 3-5, ¶¶6-7 & Figure 1. In addition, White/Anglo residents of Quincy constitute a majority in two single-member districts, ***alone***, based upon

---

[3] Hispanic residents of Quincy more often than not prefer and vote for the same candidate as White/Anglo residents of Quincy, as reflected by analysis of data from numerous 2018 elections. *See* Ex. 2 at pp. 9-10, ¶16 & Table 1.

population and demographic U.S. Census ACS data from 2018. *See id.* at pp. 5-7, ¶¶ 9-10 & Figure 2.

*Second*, the minority group at-issue is politically cohesive. *See Gingles*, 478 U.S. at 50-51. Indeed, among White/Anglo voters in Gadsden County (*i.e.*, including Quincy), a straightforward ecological inference analysis reflects that "White support for Republican candidates ranged from 68.87% to 76.72%." *See id.* at pp. 9-10, ¶16 & Table 1. Accordingly, it is beyond dispute that White/Anglo voters in Quincy are politically cohesive.

*Third*, the majority must vote "sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *See Gingles*, 478 U.S. at 50-51. Indeed, the results of Quincy City Commissioner elections reveal that the majority-Black/African-American citizens of Districts 1, 2, and 3 have voted as a bloc to consistently defeat the minority's preferred candidate, as no White/Anglo-preferred candidates having been elected in those districts since their initial implementation over forty years ago. *See* also Ex. 2, at p. 10, Table 1.

*Finally*, whereas each of the *Gingles* preconditions is clearly established, the totality of the circumstances further and plainly demonstrate that members of the racial-minority group at-issue here have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. *See* 52 U.S.C. § 10301(b). Indeed, it is readily evident that the Defendant

Commissioners intentionally sought to adopt and implement new districting measures, as well as to alter the configurations of specific districts, based on racial animus and with the purpose to discriminate against and disenfranchise Quincy's racial-minorities on the basis of their race.

For example, the redistricted plan itself reveals that Defendants' decision bears more heavily on one race (Plaintiffs, as racial-minority electors) than another (racial-majority electors), in that the minorities formerly in District 5—who, in their last election, cohesively voted to successfully elect their preferred candidate—have been dispersed throughout various districts under the redistricted plan, such that they now have no meaningful opportunity to win the election in District 5, and/or any territory besides District 4 (under the redistricted plan).

The specific sequence of events leading up to the decision, as well as departures from normal procedural sequence, further support Defendants' discriminatory intent and motivation. Specifically, the Defendant Quincy City Commissioners held a Commission Meeting on March 24, 2020 to determine the redistricted plans that would be considered for adoption: (1) while the public was all-but-prohibited by law from attending and commenting on the issue, due to the public gathering restrictions and stay-at-home orders then-in-place as a result of the Coronavirus pandemic; and (2) while the two Commissioners elected by and representing the racial-minority White/Anglo populations of Districts 4 and 5, were

also unable to attend Commission meetings in-person for medical concerns also relating to the Coronavirus pandemic, resulting in the Defendant Commissioners voting on and formally adopting the redistricted plan without even considering alternative redistricted maps proposed and submitted to the Commission, such as those of Commissioner Freida Bass-Prieto of District 4.

Rather, the Defendant Commissioners proceeded to adopt the redistricted plan in an inexplicably constrained time period, and on March 26, 2020 held a Special Meeting—despite the fact typically reserved only for emergencies, and not for deliberations or even voting upon enactments or other non-time-sensitive matters, such as the redistricted plan). Indeed, Kurt Spitzer (the redistricting consultant retained by Defendant Commissioners to prepare their desired redistricting proposals), remarked to the Commission that he had never before been asked or required to redistrict a voting territory so quickly, and accordingly District 4 Commissioner Freida Bass-Prieto's repeated requests for the process to be slowed down in order to involve the community, and gain full understanding of the Commissioners' options and consequences for the many potential redistricted plans.

The redistricted plan further placed together within the same District the two Commissioners successfully elected by Quincy's minorities (Freida Bass-Prieto and Daniel McMillian of Districts 4 and 5, respectively), and thus removed a minority-preferred incumbent to ease the usurping of one of its two (***half***) minority-preferred

Commissioner candidates. Then, Defendant Commissioners abruptly moved the April 2020 Commissioner elections back from April to June 2020—further violating the law, no less, by doing so before and without having passed the requisite ordinance—in order to implement its redistricted plan and ensure they control four (4) of the five (5) total Commission seats for the first time ever in Quincy's history.

Defendants' intentional discrimination is confirmed by contemporary statements of members of the decision-making body. Most notably, on June 25, 2019, the Quincy City Commission was engaged in a regularly-scheduled Commission meeting, open to the public and attended by a number of Quincy residents. During the meeting, several Quincy minority-electors spoke up, openly raising concerns to the majority-controlled Commission. Palpably angered by the vocal and public dissent, Defendant Dowdell (Commissioner and Mayor) issued a thinly-veiled threat to Quincy minorities, whose mere participation in City politics he described as a problem that he could eliminate by use of the Commission's redistricting authority.[4] This was the very first mention of potential redistricting by the City Commission, but promptly turned out to be precisely the course of conduct taken by the Defendant Commissioners to ensure the quieting and defeat of their

---

[4] *See* Transcript of June 25, 2019 City of Quincy Meeting of the City Commission, attached hereto as **Exhibit 1**, at pp. 128-29. Notably, in addition, Commissioner Dowdell appeared to admit to various cyber-crimes, including hacking of the racial-minority commissioners' and/or racial-minority citizens' email accounts or servers. *See id.*, at pp. 126-27.

minority-opposition. And to be sure, when asked why the Defendant Commissioners even cared or sought to gain additional voting power (*i.e.*, by taking one of only two Commissioners elected by the minorities), Quincy City Manager, Jack McLean, Jr. (a member of the racial-majority), commented to Plaintiff Baroody that they feel there are not enough white residents of Quincy to deserve two seats.

Furthermore, while Defendants will argue that they redistricted in order to remedy a potential one-person one-vote issue, statistical analysis of the redistricted plan clearly demonstrates that it does ***not*** actually remedy such an issue, but rather perpetuates such an issue in light of the changes in population and demographic trends in Quincy since the 2010 U.S. Decennial Census, as reflected by the most recent (i.e., 2018) U.S. Census ACS data:

> [U]sing this most recent ACS data, all five districts in the Enacted Plan are either significantly overpopulated or significantly underpopulated. All five districts deviate from equal population by well over 5%. Although the Enacted Plan's districts were equalized using 2010 Census data, it is clear that all five of the Enacted Plan's districts are now significantly malapportioned when analyzed using the most recent ACS data. Therefore, the Enacted Plan's districts will likely again be malapportioned by well over 5% deviation when analyzed using the 2020 Decennial Census data that will be released next year.

*See* Ex. 2, at pp. 7-9, ¶13. This is due largely to the trend in Quincy's population and demographics, which have changed drastically since the 2010 U.S. Decennial Census, as follows:

> An across-time comparison of these annual ACS estimates reveals that Quincy's total population has declined noticeably over the past decade.

> This decline has been primarily caused by a 15% decline in Quincy's Black population from 5,570 (2007-2011 ACS estimate) to 4,771 (2014-2018 ACS estimate). Meanwhile, during this same time period, Quincy's White population actually increased dramatically by over 75% from 1,492 (2007-2011 ACS estimate) to 2,612 (2014-2018 ACS estimate). Figure 4 illustrates how these demographic changes translated to a significant decline in the Black share of Quincy's total population and a significant increase in the White share of Quincy's total population. Whites grew from 19.2% of Quincy's population in the 2007-2011 ACS estimate to 34.8% of Quincy's population in the 2014-2018 ACS estimate.

See Ex. 2, pp. 10-11, ¶18, Table 2 & Figure 4. Accordingly, it is manifest that the Defendant Commissioners' purpose in redistricting so close to (namely, mere months from) the 2020 U.S. Decennial Census, was to "lock in" the far more favorable Black/African-American demographic numbers of the 2010 U.S. Decennial Census.

Statistical analysis of the redistricted plan confirms that racial considerations predominated in its creation and adoption, based upon racial outliers (*i.e.*, including packing, cracking, and lack of compactness) in the redistricted plan itself:

> Figure 5 compares the Enacted Plan to these 2,500 computer-simulated plans with respect to the racial composition of each district in each plan. Each plan contains five districts, and I calculated the White (single-race) share of each district's total population, using 2010 Census data. For each plan, I then identified the district with the largest White population share, the district with the second-largest White share, and so on. For each plan, I then plotted these five districts' White population shares in the five rows in Figure 5.

> Specifically, the top row in Figure 5 contains each plan's district with the largest White population share, the second row contains each plan's second-most heavily White district, and so on. For example, the

Enacted Plan's District 4 is the most heavily White district in the plan, so this district's White population share (55.3%) is plotted in the top row of Figure 5. The Enacted Plan's District 5 is the second-most heavily White district, so this district's White population share (20.5%) is plotted in the second row of the Figure. Note that in Figure 5, the red stars depict the five districts in the Enacted Plan, while gray dots depict the districts in each of the 2,500 computer-simulated plans. On each row in the right column of Figure 5, the two percentages in parentheses report the number of computer-simulated districts with a smaller and with a larger White percent than the Enacted Plan's district for that row.

Figure 5 illustrates that the Enacted Plan is a statistical outlier in terms of the racial composition of its districts. Specifically, District 4's White population share of 55.26% is more heavily White than the most-heavily-White district in 2,478 (99.1%) of the 2,500 computer-simulated plans. Hence, the Enacted Plan's District 4 is an extreme statistical outlier in terms of its White population. A district with such a heavily White population is statistically very unlikely to emerge under a race-neutral map-drawing process in Quincy. I am thus able to conclude from this simulation analysis, with well over 95% statistical certainty, that White residents were heavily packed into District 4, creating an unnaturally White-heavy district that suggests racial intent in the map-drawing process.

If White residents were heavily and unnaturally packed into District 4 of the Enacted Plan, then where were these excess White residents drawn from? The second row in Figure 5 reveals that District 5, the second-most heavily White district in the Enacted Plan, contains less White population than 93.2% of the corresponding second-most heavily White districts in the 2,500 computer-simulated plans. Although this result is not an extreme statistical outlier, the finding is nevertheless striking because it sheds light on precisely how District 4 was racially packed: An unnaturally large number of White residents were packed into District 4, and these excess White residents were drawn from the adjacent District 5. In other words, White residents in District 5 were "cracked" in the sense that they were siphoned off into District 4, leaving District 5 with a lower White population than the over 93% of the second-most heavily White districts in the 2,500 computer-simulated plans.

Figure 6 is similar to Figure 5, except that Figure 6 analyzes the Hispanic share of each district in the Enacted Plan and the 2,500 computer-simulated plans. Hence, the top row in Figure 6 contains each plan's district with the largest Hispanic population share. Specifically, the Enacted Plan's District 5 is the most heavily Hispanic district in the plan, so this district's Hispanic population share (32.7%) is plotted in the top row of Figure 6. In Figure 6, the red stars depict the five districts in the Enacted Plan, while gray dots depict the districts in each of the 2,500 computer-simulated plans. On each row in the right column of Figure 6, the two percentages in parentheses report the number of computer-simulated districts with a smaller and with a larger Hispanic share than the Enacted Plan's district for that row.

The top row of Figure 6 illustrates that District 5's Hispanic percentage of 32.7% is more heavily Hispanic than the most-heavily-Hispanic district in 2,297 (91.88%) of the 2,500 computer-simulated plans. Hence, the Enacted Plan's District 5 is an outlier in terms of its Hispanic population when compared to the computer-simulated plans. A district with such a heavily Hispanic population is statistically unlikely to emerge under a race-neutral map-drawing process in Quincy. Instead, these findings suggest that Hispanic residents were intentionally packed into District 5, creating an unnaturally Hispanic-heavy district that did not emerge from a race-neutral map-drawing process.

These findings regarding the racial composition of Districts 4 and 5 of the Enacted Plan demonstrate the statistical likelihood that racial considerations in the map-drawing process explain the packing of White residents into District 4, the cracking of White residents in District 5, and the packing of Hispanic residents into District 5. Meanwhile, Figures 7 and 8 illustrate that the traditional districting criterion of geographic compactness was subordinated to these racial considerations in the drawing of the Enacted Plan.

Figure 7 compares the Enacted Plan to the 2,500 race-blind, computer-simulated plans. For each plan, the horizontal axis depicts the White population share of the most heavily White district in each plan. The vertical axis in Figure 7 depicts the plan's geographic compactness, as measured quantitatively by the plan's Polsby-Popper score. The Polsby-Popper score is a standard and commonly used measure of a districting plan's compactness, with higher scores indicating more

compact district shapes. In Figure 7, the red star depicts the Enacted Plan, while the many gray circles depict the 2,500 computer-simulated plans.

Similarly, in Figure 8, the vertical axis again depicts each plan's geographic compactness, as measured quantitatively by the plan's Polsby-Popper score. However, the horizontal axis in Figure 8 depicts the White population share of the second-most heavily White district in each plan. Once again, the red star in this Figure depicts the Enacted Plan, while the many gray circles depict the 2,500 computer-simulated plans.

Figure 7 illustrates not only that the Enacted Plan is an extremely statistical outlier in terms of the racial composition of its most heavily White district, but also that the Enacted Plan is less geographically compact than 99.92% (2,498 out of 2,500) of the computer-simulated plans. In other words, a race-blind districting process that strictly follows traditional districting criteria virtually always produces a more compact districting plan than the Enacted Plan. Together, these results demonstrate that the traditional districting criterion of geographic compactness was subordinated by racial considerations in the drawing of the Enacted Plan. The racial considerations that led to the extreme packing of White residents in District 4, the packing of Hispanics in District 5, and the cracking of White residents in District 5 predominated over the traditional districting criterion of compactness, thus resulting in the Enacted Plan having statistical outliers in its racial composition as well as lower compactness scores than nearly all of the 2,500 race-blind, computer-simulated plans. In other words, it is clear that racial considerations predominated in the drawing of the Enacted Plan, and the traditional districting criterion of geographic compactness was subordinated to these predominant racial considerations in the map-drawing process.

*See* Ex. 2, at pp. 14-21, ¶¶21-30 & Figures 5-8.

And an analysis of Mr. Spitzer's files confirm the racially discriminatory motive and intent of Defendants in creating and adopting the redistricted plan:

On February 27, 2020, Mr. Spitzer instructed Mr. Kenneth Lewis to assist him by drafting some possible districting plans for Quincy's City Commission. Around this time, Mr. Spitzer apparently used both telephone and email communications to give detailed instructions to Mr. Lewis regarding how to construct these draft districting plans. Mr. Lewis followed Mr. Spitzer's instructions by drafting a districting plan entitled "Alternative 1." In the evening of February 27, Mr. Lewis emailed Mr. Spitzer to describe how he had designed the "Alternative 1" plan to follow Mr. Spitzer's instructions for a draft plan. Mr. Lewis' email reported the following information regarding the "Alternative 1" draft plan's compliance with Mr. Spitzer's apparent instructions regarding Hispanic population:

> "Alternative 1 largely matches your emailed instructions and what we discussed by phone. While it is <u>not</u> possible to get to 35% Hispanic population in District 5, it is very close. I looked for additional blocks to increase the percentage, but none will get it to 35%." [underline in original]

Figure 9 displays a screenshot of the full February 27 email from Mr. Lewis to Mr. Spitzer. This email makes apparent that Mr. Spitzer had previously instructed Mr. Lewis to attempt to increase the Hispanic population in District 5 to 35%. And although Mr. Lewis reported that he was unable to achieve this 35% Hispanic target, he nevertheless reported that he had "looked for additional [Census] blocks to increase the [Hispanic] percentage" to "very close" to the 35% target requested by Mr. Spitzer.

Mr. Lewis' description of his special efforts to increase the Hispanic population in District 5 confirms my earlier findings described in Paragraph 26 and Figure 6 of this affidavit. I had found that the Enacted Plan's District 5's was unlikely to have emerged from a race-blind map-drawing process because District 5's Hispanic percentage of 32.7% is an outlier when compared to the race-blind, computer-simulated versions of the district. The Enacted Plan's District 5 is more heavily Hispanic than the most-heavily Hispanic district in the overwhelming majority of the 2,500 computer-simulated plans, suggesting that District 5 was drawn in an intentional effort to pack together Hispanic residents. Mr. Lewis' February 27 email confirms that he had indeed

exerted an intentional, race-conscious effort to increase the Hispanic percentage of District 5 in an early version of the "Alternative 1" plan that was ultimately adopted by the City Commission on March 26.

In addition to Mr. Spitzer's apparent instructions regarding increasing the Hispanic population of District 5, on March 3, 2020, Mr. Spitzer also developed two racial "heatmaps" that track the precise block-level location and size of racial groups throughout Quincy. Specifically, one heatmap ("Heatmap_HispanicPop.pdf") depicts the block-level density of Hispanic residents. This heatmaps shows each block in Quincy, and a numerical label on this map reports the number of Hispanic residents in each block. Blocks in this heatmap are also color-coded to signify the relative density of Hispanics across the blocks, allowing for easy identification of city blocks with more significant numbers of Hispanics. A second heatmap ("Heatmap_WhitePop.pdf") depicts similar block-level counts of White population throughout Quincy and employs a similar racial color-coding scheme. Figure 10 contains screenshots of both of Mr. Spitzer's racial heatmaps. Within each heatmap, the number within each of Quincy's block reports the racial counts of population residing within the block.

Based on my expert opinion and experience, a map-drawer intending to conduct a race-blind redistricting process would have no reason to produce such detailed, block-level racial heatmaps. On the other hand, such detailed, color-coded racial heatmaps are extremely useful for a mapdrawer seeking to manipulate the racial and ethnic composition of various draft districting plans.

Mr. Spitzer's files also reveal that, with Mr. Lewis' assistance, he developed and saved eleven unique draft districting plans for Quincy on his computer during March 1 to March 23, 2020. It is possible that Mr. Spitzer drafted more plans that he did not save and turn over, but I examined all of the files turned over by Mr. Spitzer and found exactly eleven unique draft plans. Additionally, a number of the draft plans that Mr. Spitzer saved were exact duplicates of plans he had drafted and saved earlier; I do not count these duplicate plans among the eleven unique draft plans Mr. Spitzer produced during March 2020. Table 3 lists the names of the PDF files in which these eleven draft plans were saved, along with the date on which each unique

draft plan was first saved on Mr. Spitzer's computer. Three of these plans were developed and saved on March 1, two more were developed and saved on March 12, one more on March 15, two more on March 17, and three final drafts were developed and saved on March 23, 2020.

For each of these eleven different draft maps developed during March 2020, I analyzed the racial composition of District 4, which always covers the northeast portion of Quincy. This analysis revealed a striking trend during March 2020 as Mr. Spitzer developed these eleven draft maps: Initially, in the first three draft maps saved on March 1, the racial composition of District 4 varied significantly, ranging from 34.8% White in the "Alternative2_3-1-20.pdf" draft plan up to 55.26% white in the "Alternative1_3-1-20.pdf" draft plan. But later in March, this variance disappeared, and every single draft map that Mr. Spitzer saved between March 12 to March 23 created over a 55% White population in District 4.

In other words, on March 1, Mr. Spitzer considered several different alternative draft plans, some of which did not pack together White residents in District 4. But by mid to late March, every single new draft plan saved by Mr. Spitzer packed White residents heavily into District 4. Without exception, the eight new draft plans saved by Mr. Spitzer for the first time during March 12 to March 23 created a 55%-62% White population in District 4.

Clearly, Mr. Spitzer did not display an exclusive focus on packing White voters into District 4 when he was developing and saving multiple very different draft plans at the beginning of March. But as Mr. Spitzer refined his various draft plans during mid and late March, he shifted his focus to developing and exclusively saving new draft plans that heavily packed together White voters in District 4.

Finally, Mr. Spitzer saved each one of these eleven draft plans during March 2020 in the form of a PDF file. The PDF file for each of the eleven draft plans always followed the same general format, with a table of data regarding the districts placed just below the districting map. Notably, for each of Mr. Spitzer's draft plans, this table of district-level data contains no information on the plan's compliance with traditional districting criteria, aside from population equality. Instead, Mr. Spitzer's draft plan PDF files contain detailed racial and ethnic

breakdowns of each district's population. For each draft plan, Mr. Spitzer detailed the White, Black, Hispanic, and other race populations of each district. Within these draft plan PDF files, Mr. Spitzer did not appear to analyze, for example, non-racial districting criteria such as the geographic compactness of his draft districts or the districts' respect for neighborhoods, major roads, or other geographic features. Instead, aside from analyzing population equality, Mr. Spitzer exhibited a near-exclusive focus throughout these PDF files on the racial demographics of his various draft districting plans. This near-exclusive focus on racial considerations in his draft map PDF files reinforces the earlier finding that racial considerations predominated over traditional districting criteria in the drawing of the March 26 Enacted Plan.

*See* Ex. 2, at pp. 22-28, ¶¶ 31-41.

Lastly, comments and conduct of the Defendant (racial-majority) City Commissioners, subsequent to their adoption of the unlawful redistricted plan, further confirm their racially-discriminatory intent and motivation. For example, the Defendant Commissioners have prohibited minority-preferred Commissioners Bass-Prieto and/or McMillan from attending legal meetings relating to this action on behalf of the City, a Defendant in this action, absent agreement not to testify or serve as a witness in this action. Moreover, Defendant Commissioner Harris has publicly spread misinformation via social meeting—*i.e.*, such as proclaiming the racial demographics of Quincy to reflect a White/Anglo resident percentage of 21%, despite the dramatic shift in population and demographics which, as of the far more recent 2018 ACS data which is widely and publicly available and likely reviewed by the Commission prior to the decision to redistrict, reflect a White/Anglo resident

percentage of 34.8%—as well as seeking to incite racial animus against Plaintiffs and Quincy's racial-minority White/Anglo residents.

        2.    <u>Plaintiffs Will Suffer Irreparable Injury in the Absence of the Preliminary Injunction</u>

There is no question that Plaintiffs will suffer irreparable injury if Defendants are allowed to proceed with the City Commissioner elections under the redistricted plan, which will dilute Plaintiffs' votes in those elections. The Supreme Court has long recognized that the right to vote is "fundamental," *Bartlett v. Strickland*, 556 U.S. 1, 10 (2009), because it is "preservative of all rights," *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886); *see also Williams v. Rhodes*, 393 U.S. 23, 30 (1968) (noting that "the right of qualified voters . . . to cast their votes effectively . . . rank[s] among our most precious freedoms"). The Supreme Court also has made clear that "the right of suffrage can be denied by [means of] dilution . . . just as effectively as by wholly prohibiting the free exercise of the franchise." *Reynolds v. Sims*, 377 U.S. 533, 555 (1964). Adhering to these precepts, courts have widely recognized that an infringement upon the right to vote, including by its dilution, constitutes an irreparable injury. *See, e.g., Chatman v. Spillers*, 44 F.3d 923, 924-25 (11th Cir. 1995); *United States v. Dallas Cnty. Comm'n*, 791 F.2d 831, 831-33 (11th Cir. 1986); *Dillard v. Crenshaw Cty.*, 640 F. Supp. 1347, 1363 (M.D. Ala. 1986); *Harris v. Graddick*, 593 F. Supp. 128, 135 (M.D. Ala. 1984).

Here, the Defendant Commissioners' decision to redistrict threatens to inflict such an irreparable injury upon Plaintiffs, and no amount of monetary compensation could undo these harms. *See Scott v. Roberts*, 612 F.3d 1279, 1295 (11th Cir. 2010) ("An injury is irreparable if it cannot be undone through monetary remedies.").

### 3.   The Threatened Injury to Movants Outweighs Whatever Damage the Proposed Injunction May Cause to Defendants

The balance of equities in this case weigh strongly in favor of the Plaintiffs. Plaintiffs are seeking to protect their right to suffrage—"one of [their] most fundamental rights." *Bartlett*, 556 U.S. at 10. As the Supreme Court has explained, "[n]o right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964); *see also Reynolds*, 377 U.S. at 555 ("The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government.").

Absent an injunction, hundreds (if not thousands) of White/Anglo voters in existing District 5 will have their vote in the 2020 City Commissioner elections diluted and rendered meaningless because of the color of their skin. On the other hand, granting of the injunction will not be a hardship for the City of Quincy; it will use the same district boundaries that it has used for dozens of years, and the cost to

proceed as such and re-distribute election materials (to the extent it has already administered any) will not exceed $2,000.[5]

4.    The Injunction Would Be Consistent with the Public Interest

The preliminary injunction undoubtedly will advance the public interest. "[T]he right of suffrage is a fundamental matter in a free and democratic society," *Reynolds v. Sims*, 377 U.S. 533, 561-62 (1964), and "Section 2, as amended, represents 'a strong national mandate for the immediate removal of all impediments, intended or not, to equal participation in the election process.'" *Dillard v. Crenshaw Cty.*, 640 F. Supp. 1347, 1363 (M.D. Ala. 1986) (quoting *Harris v. Graddick*, 593 F. Supp. 128, 135 (M.D. Ala. 1984)). The preliminary injunction will further this mandate by enabling White/Anglo voters in the City of Quincy to participate on an equal basis in a district-based election in the upcoming (and future) City Commissioner elections. *See Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1355 (11th Cir. 2005) (holding that protection of "franchise-related rights is without question in the public interest").

---

[5] *See, e.g.*, City of Quincy Election Billing Records, attached hereto as **Exhibit 3**. In addition, Plaintiffs are willing to defray any such election costs to the City of Quincy by paying or reimbursing the City for same in accordance with what has previously been paid by the City to the Gadsden Supervisor of Elections.

## V.    CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request that this Court

grant their Motion for Preliminary Injunction.

Respectfully submitted this 15th day of May, 2020.

**ANDREWS LAW FIRM**
822 North Monroe Street
Tallahassee, Florida 32303
T: (850) 681-6416 / F: 681-6984

***/s/ Ryan J. Andrews***
RYAN J. ANDREWS (FBN 0104703)
DAVID A. WEISZ (*PHV forthcoming*)
ryan@andrewslaw.com
service@andrewslaw.com
*Counsel for Plaintiffs*

## LOCAL RULE 7.1(F) CERTIFICATE

Pursuant to N.D. Fla. Loc. R. 7.1(F), the undersigned hereby certifies that the foregoing Reply contains 7,850 words.

/s/ *Ryan J. Andrews*
RYAN J. ANDREWS

## CERTIFICATE OF SERVICE

The undersigned certifies that on this 15th day of May, 2020, a true and correct copy of the foregoing was electronically filed in the U.S. District Court, Northern District of Florida, using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

/s/ *Ryan J. Andrews*
RYAN J. ANDREWS