**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

JULIE BARODY, and
WILLIAM B. FARMER,

      PLAINTIFFS,

v.

      Case No. 4:20-cv-217-AW-MAF

CITY OF QUINCY, FLORIDA,
KEITH A. DOWDELL, in his official
capacity as Commissioner and Mayor
of the City of Quincy, RONTE R.
HARRIS, in his official capacity as
Commissioner and Mayor Pro-Tem of
the City of Quincy, and ANGELA G.
SAPP, in her official capacity as
Commissioner of the City of Quincy,

      DEFENDANTS.

**DEFENDANTS' RESPONSE IN OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTIVE RELIEF**

## I.   INTRODUCTION

      The City of Quincy has not been redistricted since the 1970s.  As a result of

community comments, the potential need for redistricting became an issue of interest

for the City.[1]   The starting point and overarching criterion in redistricting is

---

[1] This Response refers to the Defendants as "City," the Plaintiffs collectively as "the
Plaintiffs,"  and the filings before this Court as "ECF" followed by the appropriate
pin-citation.

apportioning population to create nearly equal populations between districts; a population deviation between districts of over 10 percentage points from the mean constitutes a prima facie one-person-one-vote equal protection violation.

Upon investigation, the City found that its population was severely malapportioned under its 1970s-era plan. In fact, based on 2010 Decennial Census data, the population difference between the most populous and least populous districts was more than 110 percentage points. In short, the City was severely in need of redistricting. Plaintiffs do not dispute the severely malapportioned character of the City's districts under its 1970s-era plan.

Faced with this fact, the City sought to resolve this issue in time for the City's next election in 2020. The City hired an outside consultant to develop alternative maps for the City's consideration. The City's consultant prepared potential alternative district plans that sought to adjust district boundaries to remedy the severe malapportionment between existing districts while also considering other redistricting criteria. At the end of this process, the City selected one of the first alternative district maps created by its consultant, which achieved a maximum population deviation of 5.5 percentage points based on the 2010 Decennial Census.

Plaintiffs now claim that the City's enacted redistricting plan violates Section 2 of the Voting Rights Act by impermissibly diluting the voting strength of Whites[2]

_____

[2] "Whites" as referred to herein means single-race non-Hispanic White.

in the City of Quincy.  As an initial matter, Plaintiffs' claim turns Section 2 – which was intended to help end historic discriminatory treatment of minorities, *Bartlett v. Strickland*, 556 U.S. 1, 10 (2009) – on its head.  Plaintiffs offer no argument that Whites in the City of Quincy are a historically disadvantaged race, nor could they. Assuming, however, that it is appropriate for Plaintiffs to allege protections for Whites, Plaintiffs' Section-2 based Motion for Preliminary Injunctive Relief lacks all merit.

First, the Plaintiffs cannot show likelihood of success on the merits or irreparable harm necessary to support preliminary injunctive relief because they do not offer competent, substantial evidence to support any Section 2 claim.  Plaintiffs' Motion asserts that the City's enacted redistricting plan violates Section 2 by depriving them of a second majority-White District.  But as demonstrated by the City's expert, Plaintiffs have not demonstrated that a second majority-White district can be created.  Moreover, the analysis of Plaintiffs' own expert reflects that out of 2,500 computer-simulated "race-blind" districting plans, not a single plan resulted in a second district with a majority-White population.  Appropriately demonstrating that a second majority-White district can be created is a critical precondition to any Section 2 claim.  There is simply no evidence that this is possible.  Plaintiffs' Motion similarly fails to provide competent substantial evidence to satisfy the other elements of a Section 2 claim.

Second, the equities and the public interest weigh against any preliminary injunction. As an initial matter, Plaintiffs' requested relief in part asks this Court to consider requiring upcoming commission elections to proceed under the City's malapportioned 1970s-era plan that is prima facie in violation of the Fourteenth Amendment. Plaintiffs' entirely unsupported Section 2 claim cannot warrant such an outcome. Even putting aside that request, however, Plaintiffs' unsupported claim equally fails to warrant Plaintiffs' alternative requests that this Court halt the City's June 9 election and either compel the City to draw a new districting plan or alternatively draw one for the City itself.

Further, even assuming there was any merit to Plaintiffs' claims (there is not), Plaintiffs' request for preliminary relief simply comes too late with regard to the City's scheduled June 9 election. The City approved its redistricting plan on March 26. Plaintiffs waited more than a month to file their complaint alleging a Section 2 violation and 17 more days before filing for a preliminary injunction. Moreover, Plaintiffs claim to have had concerns about the City's redistricting effort since June 25, 2019, almost a year before Plaintiffs filed their suit. The City's election is now mere days away. Voter registration based on the City's new districts has been completed. Candidate qualifying deadlines have come and gone. Absentee ballots have been mailed and those votes are already being returned. It is simply impossible for an election to occur on June 9 other than based on the City's enacted redistricting

plan.   And the imposition of any new maps at this point would result in voter confusion, require cancellation of the June 9 election, and repeating the entire election cycle process – reconstruction of voter registration rolls, candidate qualifying, voter education and outreach, and poll operations – without the Gadsden County Supervisor of Elections to administer and run the election.

## II.   THIS COURT SHOULD DENY THE PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTIVE RELIEF.

The Plaintiffs' request for preliminary relief lacks merit and should be denied. "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).  "A preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establishes the burden of persuasion as to the four requisites." *Keister v. Bell*, 879 F.3d 1282, 1287 (11th Cir. 2018) (collecting citations). The four requisites the Plaintiffs "must clearly establish" are: "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) that the threatened injury to the [P]laintiff[s] outweighs the potential harm to the [D]efendant; and (4) that the injunction will not disservice the public interest." *Id.* (citations omitted).  Notably, the rule governing preliminary injunctions "does not place upon the nonmoving party the burden of coming forward and presenting its case against a preliminary injunction." *Ala. v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1136 (11th Cir. 2005) (quoting *Granny*

*Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70*, 415 U.S. 423, 442 (1974)).

### A. The Plaintiffs cannot *clearly establish* likelihood of success.

The Plaintiffs have not "clearly establishe[d]" a likelihood of success against the City. *Keister*, 879 F.3d at 1287. Section 2 of the Voting Rights Act, Title 42 U.S.C. § 1973, makes it illegal for any state or political subdivision to deny or abridge the right of any citizen to vote on the basis of race or color. 42 U.S.C. § 1973(a). Section 2 is violated "if, based on the totality of circumstances, it is shown that . . . members of a class of citizens protected by subsection (a) . . . have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U.S.C. § 1973(b).

As established by the United States Supreme Court in the seminal case *Thornburg v. Gingles*, to prove a vote dilution claim under Section 2 of the Voting Rights Act the Plaintiffs must first satisfy three preconditions and further demonstrate that under the "totality of the circumstance" that there is impermissible vote dilution. 478 U.S. 30, 50-51, 79 (1986); *see also Negron v. City of Miami Beach*, 113 F.3d 1563, 1566 (11th Cir. 1997).

In sum, the purpose of the *Gingles* analysis is to "establish that 'the minority [group] *has the potential to elect a representative of its own choice*' in a possible district, but that racially polarized voting prevents it from doing so in the district as

actually drawn because it is 'submerg[ed] in a larger [majority race] voting population.'" *Cooper v. Harris*, 137 S. Ct. 1455, 1470 (2017) (emphasis and some alterations added).  The Plaintiffs' Motion for Preliminary Injunctive Relief fails to demonstrate any likelihood of success under the *Gingles* preconditions or under the totality of the circumstances.

1. *Plaintiffs Have Not Clearly Established a Likelihood of Success Under* Gingles *Precondition 1*

Under *Gingles'* first precondition, the Plaintiffs must demonstrate that Whites are "sufficiently large and geographically compact to constitute a majority in a single member district." *Gingles*, 478 U.S. at 50-51.  This first precondition includes dual elements: numerosity and compactness.  *See, e.g.*, *Negron*, 113 F.3d at 1567 (noting dual components of the first *Gingles* precondition).

Numerosity is determined by evaluating the voting age population ("VAP"), as may be refined by citizenship ("CVAP").  *Id.* at 1568-69.  The compactness inquiry should take into account "traditional districting principles such as maintaining communities of interest and traditional boundaries."  *Abrams v. Johnson*, 521 U.S. 74, 92 (1997). This first precondition requires the Court to consider whether it can fashion an appropriate remedy in the context of the particular system at issue. *Nipper v. Smith*, 39 F.3d 1494, 1530-31 (11th Cir. 1994); *see also Holder v. Hall*, 512 U.S. 874 (1994).

The first *Gingles* precondition is preeminent.  In considering Section 2 claims, "courts uniformly express[] a desire to maintain ascertainable and objective standards from which to adjudicate section 2 claims."  *Dillon v. Baldwin Cty Comm'nrs*, 376 F.3d 1260, 1268 (11th Cir. 2004).  The first *Gingles* precondition, the Eleventh Circuit explained, "provides a gate-keeping mechanism by which the courts maintain these standards."  *Id.*  When faced with the choice, rather than "open[ing] the door to the inevitable flood of marginal section 2 claims [which] would impose an unwarranted burden on lower federal courts and an indefensible encroachment into the affairs of state governments," the Eleventh Circuit chose instead to "follow the near universal view of other federal courts that a minority group cannot obtain relief under section 2 without first showing that it is 'large enough to *control* a district' not just "influence" it.'"  *Id.* at 1269 (quoting *Illinois Legislative Redistricting Comm'n v. LaPaille*, 786 F. Supp. 704, 715 (N.D. Ill. 1992)).

In this case, Plaintiffs are already a majority in one district and seek to demonstrate that Whites are sufficiently large and geographically compact enough to constitute a majority in two districts.  ECF 15, at 14 (arguing Whites are "sufficiently large and geographically compact to constitute a majority in ***two*** single-member districts (namely Districts 4 and 5)" (emphasis in original)).  However, Plaintiffs'  proffered  demonstration plans ("Demonstration Plan 1" and

"Demonstration Plan 2," ECF 15-2, at 4, Fig. 1; 6, Fig. 2) fail to demonstrate that two majority-White districts are possible.

Indeed, the likely impossibility of creating two out of five majority-White districts is discernable from the simple fact that Whites constitute less than a quarter of the City's population. Exh. 1, ¶ 62. It is also demonstrated by analysis supplied by Plaintiffs' own expert, which reflects that out of 2,500 computer-simulated "race-blind" districting plans, not a single plan resulted in a second district with a majority-White population. Exh. 1, ¶ 63; ECF 15-2, at 21, Fig. 8. Thus, it is not surprising that as demonstrated below, Plaintiffs have utterly failed to demonstrate that either of their demonstration plans result in a second majority-White district.

        a. Plaintiffs' Demonstration Plan 1 Fails *Gingles* Precondition 1.

On its face, Plaintiffs' Demonstration Plan 1 fails *Gingles* precondition 1 for one very simple reason: per Plaintiffs' own analysis it fails to create *any* majority-White districts, much less two (or even one as is the case under the City's enacted plan). ECF 15-2, at 4, Fig. 1 (reflecting the highest percentage White districts as being 41.3 percent and 37.3 percent White under Plaintiffs' Demonstration Plan 1).[3]

---

[3] The "White share" calculated by Plaintiffs in Figure 1 is based on total population, and not VAP or CVAP as required for *Gingles* precondition 1. The City's expert has calculated VAP and CVAP percentages for Plaintiffs' Demonstration Plan 1, however, and Whites remain a minority in all districts under Demonstration Plan 1 measured by either VAP or CVAP. Exh. 1, ¶ 43. This conclusion is further confirmed by review of voter registrations, which reflect that under Plaintiffs'

This should end the Court's analysis with respect to Plaintiffs' Demonstration Plan 1.[4]

Plaintiffs attempt to evade this conclusion by erroneously suggesting that Whites and Hispanics (e.g., Latinos)[5] create a majority by coalition. ECF 15, at 14 (asserting Demonstration Plan 1 "plainly and easily" satisfies *Gingles* precondition 1 because "White/Anglo residents of Quincy constitute a majority in two single-member districts, in conjunction with a coalition of Hispanic voters."). Plaintiffs' efforts to make such a minority-coalition claim fail because they do not demonstrate that Whites and Hispanics are politically cohesive, which is an "essential" element of any such claim.[6] *Growe v. Emison*, 507 U.S. 25, 41 (1993) ("when dilution of the

---

Demonstration Plan 1, 47.2 percent of registered voters in District 4 are White, as are 44.6 percent of registered voters in District 5. *Id.* ¶ 64-65.

[4] In addition to total population, Plaintiffs provide data asserting that the White share of voter turnout in the November 2018 general election was 51.2 percent and 51.4 percent among registered voters in Districts 4 and 5 of Demonstration Plan 1. ECF 15-2, ¶ 6, Fig. 1. But this information is entirely irrelevant under *Gingles* precondition 1, which must be based on VAP or CVAP, not voter turnout for a single general election. *See, e.g.*, *Negron*, 113 F.3d at 1568-69.

[5] "Hispanic" or "Latino" refers to a person of Cuban, Mexican, Puerto Rican, South or Central American, or other Spanish culture or origin regardless of race. "There are two minimum categories for ethnicity: Hispanic or Latino and Not Hispanic or Latino. OMB considers race and Hispanic origin to be two separate and distinct concepts. Hispanics and Latinos may be of any race. Thus, the percent Hispanic should not be added to percentages for racial categories." *See* https://www.census.gov/quickfacts/fact/note/US/RHI725218.

[6] While the Eleventh circuit recognizes Section 2 claims based on minority coalitions, this question has not been directly addressed by the United States Supreme Court, and other circuit courts do not recognize such coalition-based claims. *See  Growe v. Emison*, 507 U.S. 25, 41 (1993) (assuming without deciding

power of such an agglomerated political bloc is the basis for an alleged violation, proof of minority political cohesion is all the more essential."); *Concerned Citizens of Hardee Cty. v. Hardee Cty. Bd. of Commrs*, 906 F.2d 524, 526-27 (11th Cir. 1990) (affirming district court opinion and finding that the district court's determination that Blacks and Hispanics were not politically cohesive was "fatal" to their Black/Hispanic minority-coalition claim).

As discussed in more detail in section II.A.2, *infra,* not only do Plaintiffs utterly fail to present any competent evidence of political cohesion between Whites and Hispanics in the City of Quincy, but available evidence actually indicates the absence of cohesion.  Thus, Plaintiffs have failed to demonstrate any likelihood of success on a Section 2 claim based on a coalition of Whites and Hispanics under *Gingles* precondition 1.

Beyond these fatal numerosity issues, there are other problems with Demonstration Plan 1.  For one, Plaintiffs' Demonstration Plan 1 unnecessarily concentrates Black[7] voters into District 1, creating an extremely segregated district

---

that such a claim could be made); *Hall v. Virginia*, 385 F.3d 421, 431 (4th Cir. 2004) ("A redistricting plan that does not adversely affect a minority group's potential to form a majority in a district, but rather diminishes its ability to form a political coalition with other racial or ethnic groups, does not result in vote dilution 'on account of race' in violation of Section 2."); *see also Frank v. Forest Cty.*, 336 F.3d 570, 575 (7th Cir. 2003); *Nixon v. Kent Cty.*, 76 F.3d 1381, 1387 (6th Cir. 1996).

[7] As used herein, "Black(s)" generally means single-race non-Hispanic Black.

with a Black VAP population of 95.87 percent.  Exh. 1, ¶ 45.  Further, for unknown reasons Plaintiffs' Demonstration Plain 1 shifts populations such that many voters who last voted in the 1970s-era plan's extremely overpopulated District 3 would be moved from District 1 under the City's enacted plan to District 2 under Demonstration Plan 1, and would therefore be forced to wait until 2022 to vote instead of in the upcoming 2020 election.  *Id.* ¶ 44.  Finally, beyond simply reporting "Polsby-Popper[8]" and population deviation calculations[9] for each district in Demonstration Plan 1, Plaintiffs offer no affirmative explanation or demonstration of how Demonstration Plan 1 complies with traditional redistricting criteria as required by the "compactness" component of *Gingles* precondition 1.

> b. Plaintiffs' Demonstration Plan 2 Fails *Gingles* Precondition 1.

Plaintiffs' Demonstration Plan 2 fairs no better.  Implicitly acknowledging that it is impossible to draw a properly apportioned, second majority-White district based on 2010 Census data, Demonstration Plan 2 instead attempts to rely solely on

---

[8] Polsby-Popper scores are one test of geographic compactness.  Exh. 1, ¶ 36, n. 11. "Reock" is another such measure.  *Id.* ¶ 36, n. 10.  Plaintiffs' Motion provides no discussion of these measures, nor does it provide the mean score for the overall demonstration plan.  However, Plaintiffs' Demonstration Plan 1 scores lower than the City's enacted plan on Reock, and slightly better on Polsby-Popper.  *Id.* ¶ 46.

[9] Plaintiffs' Motion does not provide the maximum deviation between the least and most populous districts in Plaintiffs' Demonstration Plan 1.  ECF 15-2 , at 4, Fig. 1 (just providing deviation from the mean for each individual district).  However, the maximum deviation is 9.23 percentage points, higher than the maximum deviation of 5.53 percentage points under the City's enacted Plan.  Exh. 1, ¶¶ 33, 41.

2014-2018 American Community Survey ("ACS") data. ECF 15, at 14-15; ECF 15-2, at 6, Fig. 2. But no matter what data is used to evaluate Plaintiffs' Demonstration Plan 2, it fails to satisfy *Gingles* precondition 1.

First, as to numerosity, Plaintiffs' Demonstration Plan 2 fails to create a second majority-white CVAP district. Exh. 1, ¶¶ 56, 57. Plaintiffs do not provide CVAP calculations for Demonstration Plan 2, instead presenting a calculation of *total* White population share based on 2014-2018 ACS data. ECF 15-2, at 6, Fig. 2. But total population share is simply not the appropriate legal metric for determining numerosity under *Gingles* precondition 1, which must be based on VAP or CVAP. *See, e.g.*, *Negron*, 113 F.3d at 1568-69. The conclusion that Demonstration Plan 2 fails to create two CVAP majority-White districts is further confirmed by review of voter registrations, which reflect that White registered voters are estimated to be 48.7 percent of the population in District 4, and 32.3 percent of the population in District 5. Exh. 1, ¶ 64-65.

Second, even if Plaintiffs Demonstration Plan 2 did create a second majority-White CVAP district (it does not), it still fails under the compactness component of *Gingles* precondition 1, which requires the demonstration plan to be evaluated under traditional redistricting criteria. Most importantly, Plaintiffs' Demonstration Plan 2 results in districts with a maximum population deviation well in excess of the 10 percent threshold for a prima facie one-person-one-vote equal protection violation.

Exh. 1, ¶¶ 48-55; *Brown v. Thomson*, 462 U.S. 835, 842-43 (1983) (noting 10 percent prima-facie threshold).

As an initial matter, evaluation of population apportionment under Plaintiffs' Demonstration Plan 2 based on 2010 Decennial Census data reflects a maximum population deviation of 49.8 percent, Exh. 1, ¶ 48, which is well in excess of the maximum 10 percent threshold. Likely in recognition of this fact, Plaintiffs assert that Demonstration Plan 2 is appropriately apportioned based on population estimates created by disaggregating block-group level 2014-2018 ACS estimates. ECF 15-2, ¶¶ 9-10, Fig. 2. But there are two problems with Plaintiffs' ACS-based population apportionment.[10]

One, the 2010 Decennial Census is the proper basis for determining apportionment of total population between districts. The City is aware of no case that has relied on ACS data to determine proper population apportionment and compliance with the one-person-one-vote mandate of the Fourteenth Amendment (versus use of ACS data in disaggregation of decennial Census data to determine CVAP or to consider the relative socioeconomic positions of different populations, for example). *See, e.g.*, *Mo. State Conf. of the NAACP v. Ferguson-Florissant Sch. Dist.*, 201 F. Supp. 3d 1006, 1030 (E.D. Mo. 2016), *affirmed, Mo. State Conf. of the*

---

[10] For a general discussion of 2010 and post-2010 demographics, *see* Exh. 1, ¶¶ 16-23.

*NAACP v. Ferguson-Florissant Sch. Dist.*, 894 F.3d 924, 929 (8th Cir. 2018) (finding Decennial Census data must be used versus ACS estimates as total population for apportionment base because where Decennial Census data goes down to the census block level, the ACS does not report census block-level data and does not allow a demographer to avoid splitting census blocks, making it is impossible to measure precisely the population in a given voting district.); *Pope v. Cty. of Albany*, 94 F. Supp. 3d 302, 344 (N.D.N.Y. 2015) ("However, when the Court noted in the Summary Judgment Order that the ACS was less reliable than census data for redistricting, the Court was referring to population numbers for the purpose of drawing redistricting maps. The Court finds that ACS data is reliable for the purpose of considering the relative socioeconomic positions of different populations in the County."); *New York v. United States DOC*, 315 F. Supp. 3d 766, 778 (S.D.N.Y. 2018) ("Unlike the decennial census, the ACS is conducted annually and is not used to obtain an 'actual Enumeration' of the population for purposes of apportionment; instead, it is given each year to only about 3.5 million households — roughly one in every thirty-eight households in the country — for the sole purpose of collecting demographic data on the population.")

Two, even if ACS population estimates could trump the decennial Census for population apportionment, properly disaggregated population estimates using 2014-2018 ACS data reflect that Plaintiffs' Demonstration Plan 2 is still malapportioned

with a maximum population deviation of 37.9 percent.  Exh. 1, ¶¶ 48-55.  Plaintiffs'
population deviation calculations, which assert a maximum population deviation of
8.65 percent, ECF 15-2, at 6, Fig. 2, are erroneous and unreliable because Plaintiffs'
method of disaggregating block-group-level ACS population estimates imputes
more population to the City of Quincy than the ACS itself estimates exists.  Exh. 1,
¶¶  48-55.  In sum, Plaintiffs' Demonstration Plan 2 is fatally flawed both in its
failure to create a second majority-White CVAP district and in its failure to create
properly apportioned districts for one-person-one-vote purposes.

Beyond these fatal issues, there are other problems with Demonstration Plan
2.  Like Plaintiffs' Demonstration Plan 1, Demonstration Plan 2 unnecessarily
concentrates Black voters into District 1, but to an even more severe degree –
creating an extremely segregated district with a Black CVAP population of about
100 percent.  Exh. 1, ¶ 59.  It also suffers from the same problem as Demonstration
Plan 1 with respect to how it shifts populations from District 1 under the City's
enacted plan to District 2 under Demonstration Plan 1.  *Id.* ¶¶ 58, 44.  Finally, beyond
the erroneous population deviation calculations discussed above, Plaintiffs offer no
affirmative explanation or demonstration of how Demonstration Plan 2 complies
with traditional redistricting criteria as required by the "compactness" component of
*Gingles* precondition 1.  Among other things, Plaintiffs do not provide any Polsby-
Popper or Reock scores for Demonstration Plan 2 (as they provided for

Demonstration Plan 1).  However, as determined by the City's expert, Plaintiffs' Demonstration Plan 2 scores lower than the City's enacted plan on both Polsby-Popper and Reock.  Exh. 1, ¶ 60.

In sum, Plaintiffs' Demonstration Plans 1 and 2 have failed to meet Plaintiffs' burden to *clearly establish* likelihood of success on their Section 2 claim under *Gingles* precondition 1.

### 2. *Plaintiffs Have Not Clearly Established a Likelihood of Success Under* Gingles *Preconditions 2 or 3*

Plaintiffs have failed to provide evidence to clearly establish a likelihood of success under *Gingles* preconditions 2 or 3.  These preconditions require a demonstration that the minority group is "politically cohesive" and that a "majority group votes sufficiently as a bloc to enable it … to defeat the minority's preferred candidate." *Gingles*, at 51-52.  "Because the extent of bloc voting necessary to demonstrate that a minority's ability to elect its preferred representative is impaired varies according to several factual circumstances, the degree of bloc voting which constitutes the threshold of legal significance will vary from district to district." *Id.* at 55.  In other words, the second and third *Gingles* factors can be characterized as requiring Plaintiffs to establish "legally significant racially polarized voting." *Id.* at 56.

The only alleged evidence Plaintiffs offer in support of their claim on these points consists of statistics estimating the preference of Whites, Blacks, and

Hispanics in Gadsden County as between Republican and Democratic candidates for four state-wide offices in the 2018 election:[11]

| Table 1: Ecological Inference Estimates for Black, White, and Hispanic Voters in Gadsden County | | | |
|---|---|---|---|
| Election contest: | Black Voters' Estimated Republican Vote Share: | White Voters' Estimated Republican Vote Share: | Hispanic Voters' Estimated Republican Vote Share: |
| 2018 US Senator | 3.26% | 68.87% | 53.54% |
| 2018 Attorney General | 3.90% | 76.72% | 54.52% |
| 2018 Chief Financial Officer | 3.18% | 76.47% | 52.16% |
| 2018 Comm. of Agriculture | 3.41% | 72.93% | 54.34% |

*See* ECF 15, at 15; ECF 15-2, at 10, Tbl. 1.

But, these statistical estimates constitute a limited data set of only four exogenous state-wide, partisan races in a single election year  They say nothing about voter behavior in endogenous, non-partisan city elections with respect to minority cohesion and especially with respect to the existence of any majority bloc voting sufficient to defeat any allegedly minority-preferred candidate in City of Quincy elections.  *See, e.g.*, *Johnson v. Hamrick*, 196 F.3d 1216, 1222 (11th Cir. 1999) (noting that the law of the Eleventh Circuit is that endogenous elections are more probative in *Gingles* analysis than exogenous elections); *see also Carrollton*

---

[11] With regard to the third *Gingles* precondition, Plaintiffs also assert that city commission election results in City of Quincy Commission Districts 1, 2, and 3 reflect Blacks have consistently defeated White-preferred candidates.  But Plaintiffs provide no citation to any evidence or testimony on this point.  They offer no analysis to identify any asserted candidate that was allegedly preferred as between Whites or Blacks, nor any analysis to indicate how Whites or Blacks voted in any particular city commission election for any particular city commission candidate.  Beyond this totally unsupported assertion, Plaintiffs' Motion only offers a citation to Table 1 of their experts' declaration. ECF 15, at 15.

*Branch of NAACP v. Stallings*, 829 F.2d 1547, 1558 (11th Cir. 1987) (noting the *Gingles* inquiry is focused on the jurisdiction in questions, e.g., whether Plaintiffs have less opportunity to elect city commissioners of their choice, not state-wide officials); *Harding v. Cty. of Dall.*, 336 F. Supp. 3d 677, 692-693, 698 (N.D. Tex. 2018) (wherein plaintiffs challenging county commission districts presented ecological regression and ecological inference analysis of six endogenous county commission races from four different election years to demonstrate minority cohesion and bloc voting); *Johnson v. Hamrick*, 155 F. Supp. 2d 1355, 1370 (N.D. Ga. 1997) (finding cohesiveness where seven out of eleven endogenous elections demonstrated clear cohesiveness of minority preference); Exh. 2 (McLean Declaration), ¶ 13 (identifying City of Quincy elections as nonpartisan). The relevance of this data is further diluted because it is for all voters in Gadsden County, and not just for voters in the City of Quincy.

In sum, these statistics say absolutely nothing about the existence or extent of racially polarized voting in local, non-partisan, city commission elections. Nor do Plaintiffs even attempt to demonstrate that these limited statistical estimates for state-wide partisan elections are the result of racially polarized voting versus any other factor, such as party politics. *S. Christian Leadership Conf. v. Sessions*, 56 F.3d 1281, 1290 (11th Cir. 1995) (*en banc* decision affirming district court decision

that no Voting Rights Act violation shown when "factors other than race, such as *party politics* . . ., were driving the election results" (emphasis added)).

Further, with respect to minority cohesion under *Gingles* precondition 1, these statistical estimates utterly fail to present any competent evidence of political cohesion between Whites and Hispanics in the City of Quincy under Plaintiffs' Demonstration Plan 1, which is essential to any Section 2 coalition-based claim. ECF 15, at 14, n. 3 (citing ECF 15-2, at 10, Tbl. 1, for inferred assertion that Whites and Hispanics form a cohesive minority coalition); *Concerned Citizens of Hardee Cty.* 906 F.2d at 526-27; *Growe*, 507 U.S. at 41 ("when dilution of the power of such an agglomerated political bloc is the basis for an alleged violation, proof of minority political cohesion is all the more essential.").

Plaintiffs' statistics, to the extent they are probative or relevant at all, reflect that Hispanics in the four state-wide races cited voted in an approximately 50/50 split for Democratic and Republican candidates. Rather than supporting Plaintiffs' claim that Hispanics are politically cohesive, this 50/50 split among Hispanics is the textbook definition of the opposite: division. In addition, socioeconomic data for the City of Quincy indicates no reason to expect Whites and Hispanics in the City of Quincy would form a politically cohesive coalition. Exh. 1, ¶¶ 14, 24(a)-(d). In fact, Latinos are at a severe economic disadvantage as compared to Whites. *Id.* For

example, the child poverty rate for Whites in the City of Quincy is zero, compared to 95.1 percent for Latinos. *Id*

In sum, the Plaintiffs have failed to meet their burden to clearly establish a likelihood of success under *Gingles* preconditions 2 or 3.

### 3. *Plaintiffs Have Not Clearly Established a Likelihood of Success Under the Totality of the Circumstances*

Plaintiffs have failed to clearly establish a likelihood of success on even one of the *Gingles* preconditions. Assuming solely for the sake of argument that they could, Plaintiffs have still failed to clearly demonstrate they are likely to show that there is impermissible vote dilution under the totality of the circumstances, *Gingles*, 478 U.S. at 79, or establish that they have "'. . . the potential to elect a representative of its own choice' in a possible district, but that racially polarized voting prevents it from doing so in the district as actually drawn because it is 'submerg[ed] in a larger [majority race] voting population.'" *Cooper,* 137 S. Ct. at 1470 (quoting *Growe*, 507 U.S. at 40) (first alteration in original).

The "totality of the circumstances" must be based "upon a searching practical evaluation of the 'past and present reality'" to determine whether the political process is equally open to minority voters. *Gingles*, 478 U.S. at 79. "'This determination is peculiarly dependent upon the facts of each case,'" and requires "an intensely local appraisal of the design and impact" of the contested electoral mechanisms. *Id.* To assist in this final evaluation, courts commonly rely on a non-

exhaustive, non-exclusive list of factors identified in the Senate Report on the 1982 amendments to the Voting Rights Act.  *Id.* at 45.

Plaintiffs fail to offer any substantive analysis applying the factors traditionally evaluated under the totality of circumstances analysis, including the two "the Supreme Court has said are the most important: (1) the extent to which minority group members have been elected to public office in the jurisdiction; and (2) the extent to which voting in the election of the state or political subdivision is racially polarized." *Carrollton Branch of NAACP v. Stallings*, 829 F.2d 1547, 1555 (11th Cir. 1987) (internal quotations omitted); ECF 15, at 15-28 (Plaintiffs' totality-of-the-circumstances argument).  Of note, however, socioeconomic data for the City of Quincy weighs against Plaintiffs under Senate Factor number five: "The extent to which minority groups bear the effects of discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process." *See, e.g.*, *Carrollton Branch of NAACP*, 829 F.2d at 1553; Exh 1, ¶¶ 14, 24(a)-(d) (socioeconomic data for Quincy).

More significantly, however, Plaintiffs have failed to make the ultimate demonstration that Whites' opportunity to participate in the political process under either of their proposed demonstration plans would be any better than it is under the City's enacted plan.  *Cooper*, 137 S. Ct. at 1470, s*ee also Abbott v. Perez*, 138 S. Ct. 2305, 2332 (2018) (denying vote dilution claim where evidence of expected

performance of two majority-minority districts in remedial plan only performed for minorities 7 out of 35 times in one district and 0 out of 35 times in the other); *Harding v. City of Dallas*, 948 F.3d 302, 309 (5th Cir. 2020) (affirming denial of vote dilution claim where plaintiff-minorities failed to present evidence of their ability to elect preferred candidates under their proposed remedial plan).

As compared to the City's enacted redistricting plan in which Whites constitute a majority in at least one district, Plaintiffs' demonstration plans either fail to create a second majority-White CVAP district or would actually result in Whites having *zero* majority-White CVAP districts. *Supra*, at II.A.1.a-b. Moreover, even if the data and analysis proffered by Plaintiffs was accepted for the sake of argument as demonstrating the valid creation of two White-majority CVAP districts and Plaintiffs' asserted evidence of minority cohesion and racially polarized voting were accepted for the sake of argument as demonstrative of voter behavior in the City's nonpartisan local elections, Plaintiffs own proffered statistics belie their claim.

As asserted by Plaintiffs, Whites in Plaintiffs' demonstration plans only achieve nominal population majorities (essentially an almost 50/50 split) in Districts 4 and 5. ECF 15-2, at 4, Fig. 1; 6, Fig. 2. Further, Plaintiffs assert that Whites only vote for allegedly White-preferred candidates at a 75 percent rate (and Hispanics at an approximately 50 percent rate) while asserting that Blacks vote for their preferred candidate at an approximately 96 percent rate. *See* ECF 15-2, at 10, Tbl. 1. Simple

math thus indicates that Whites would be unlikely to elect any candidate of preference in either Districts 4 or 5 under Plaintiffs' demonstration plans given a nearly 50/50 population split between Whites and Blacks, but a Black populous that allegedly votes far more cohesively.  The burden is on the Plaintiffs to clearly establish that Whites in their proposed remedial plan could elect their allegedly preferred candidates, s*ee, e.g.*, *Harding*, 948 F.3d at 311, and they have utterly failed to do so.

In sum, the purpose of the *Gingles* analysis is to "establish that 'the minority [group] has the potential to elect a representative of its own choice' in a possible district, but that racially polarized voting prevents it from doing so in the district as actually drawn because it is 'submerg[ed] in a larger [majority race] voting population.'" *Cooper*, 137 S. Ct. at 1470 (quoting *Growe*, 507 U.S. at 40).  Plaintiffs have entirely failed to clearly establish a likelihood of success in this regard on any asserted Section 2 claim.  As such, their Motion for Preliminary Injunctive Relief should be denied.

Rather than providing any robust totality-of-the-circumstances analysis, Plaintiffs' Motion instead provides unsubstantiated, inflammatory, and spurious assertions regarding the intent of the City in adopting its enacted redistricting plan.  ECF 15, at 15-28 (arguing that the City's "readily evident" discriminatory intent

"plainly demonstrate[s]" that Whites have less opportunity to participate in the electoral process than other members of the electorate).

First, even if Plaintiffs' claims of discriminatory intent had merit (they do not), evidence of discriminatory intent alone is simply insufficient to demonstrate a claim under Section 2 of the Voting Rights Act.  Section 2 "expressly requires a showing of discriminatory results, and it admits of no exception for situations in which there is discriminatory intent but no discriminatory results."  *Johnson v. DeSoto County Board of County Commissioners*, 72 F.3d 1556, 1563 (11th Cir. 1996); *see also Burton v. City of Belle Glade*, 178 F.3d 1175, 1201 (11th Cir. 1999) (affirming grant of summary judgment to appellees on appellants' vote dilution claim where "Appellants have offered no evidence of political cohesion or a majority white voting bloc.  Indeed, as discussed earlier, Appellants' only evidence concerns allegations of Appellees' discriminatory intent.  This evidence is wholly insufficient to meet the requirements of the *Gingles* factors.").

Second, to the extent that Plaintiffs' allegations are relevant to their Section 2 claim, they lack merit.  *See Miller v. Johnson*, 515 U.S. 900, 915 (1995) (in redistricting cases "the good faith of the legislative body is presumed").  While the City believes the Plaintiffs' claims lack merit, given their irrelevance for purposes of the instant Section 2 analysis the City only addresses them briefly here.  As an initial matter, many of Plaintiffs' arguments consist of bald assertions without

citation to any testimony or other evidence, *see* ECF 15, at 16-28, and accordingly cannot serve to support Plaintiffs' claims even if they were relevant.

Further, they are simply inaccurate.  Plaintiffs insinuate nefariousness in the process and timing of the City's enactment of it redistricting plan, but the circumstances simply reflect that upon realizing the malapportioned nature of their 1970s-era plan the City sought to rectify the infirmity and implement a properly apportioned plan before its next commission election.  *See generally*, Exh. 2. Plaintiffs claim that the City redistricted to intentionally place two White incumbents in the same District to remove a minority preferred incumbent, but it is impossible to interfere with an incumbent's reelection effort when he has already declared that he is not seeking reelection.  Exh. 3 (Spitzer Deposition), at 44:15-45:4.

Plaintiffs claim that a transcript of the City Commission's June 25, 2019 meeting reflects some intent to discriminate against Whites in the City of Quincy, but it simply cannot bear the insinuations Plaintiffs want it to carry.  ECF 15, at 18, n. 4; ECF 15-1.  Plaintiffs claim that somehow the City's effort to redistrict to address the existing malapportioned districts actually reflects a "manifest" intent to "lock in" allegedly more favorable districts under the 2010 Decennial Census, but there is no legal principal or precedent that would allow any jurisdiction to "lock in"

a certain district map.   If the 2020 Decennial Census data reflects significant population changes, it is possible that further redistricting may be required.[12]

Plaintiffs expert offers a statistical analysis to suggest that the City's enacted plan is a statistical outlier thereby implying the City's enacted plan was created with discriminatory intent.  ECF 15, at 19-23.   Plaintiffs expert further asserts that he believes race predominated in the City's consultant's creation of alternative Districting plans.  ECF 15, at 23-27.  But this is simply not the case.  Exh. 3, at 32:19-34:15; 35:16-37:4; 43:17-44:14; 69:10-73:8; 120:16-121:18; 165:13-168:24; s*ee also* Exh. 2; Exh. 4 (Spitzer Declaration).

In summary, Plaintiffs' allegations regarding discriminatory intent are unfounded but are neither here nor there for purposes of Plaintiffs' Section 2 claim. What is important is that Plaintiffs have failed to clearly establish that they are likely

---

[12] 2014-2018 ACS data does estimate some population decline in the City of Quincy versus the 2010 Decennial Census, although the population share by race and ethnicity has remained relatively stable. Exh. 1, ¶¶ 16-23. Regardless, until the 2020 Decennial Census is released it is impossible to know what it will reflect. *See, e.g.*, *Mo. State Conf. of the NAACP v. Ferguson-Florissant Sch. Dist.*, 201 F. Supp. 3d 1006, 1033 n.10 (E.D. Mo. 2016) ("The danger of using ACS estimates to determine the population has proven to be well founded. Before the 2010 Decennial Census count, ACS estimates predicted that the City of St. Louis had gained in population after 60 years of decline, only to discover at the 2010 Decennial Census count that the population had declined by approximately 30,000 residents.").

to succeed under any of the applicable *Gingles* requirements.  Therefore, Plaintiffs'

Motion for Preliminary Injunctive Relief should be denied.

### B. The Plaintiffs have not *clearly established* that they will suffer an irreparable injury

Plaintiffs note that an infringement upon the right to vote constitutes an

irreparable injury, and thereby assert that they have satisfied the need to demonstrate

that they will suffer an irreparable injury entitling them to injunctive relief.  *U.S.*

*Army Corps of Eng'rs*, 424 F.3d at 1136 (noting irreparable injury as a prerequisite

to preliminary injunctive relief).  But Plaintiffs' assertion assumes the predicate, that

there is in fact an infringement on their right to vote.  As demonstrated herein,

Plaintiffs have failed to demonstrate any likelihood of demonstrating a Section 2

vote dilution claim.  Therefore, while infringement on the right to vote may

constitute an irreparable injury, Plaintiffs have failed to demonstrate the likelihood

of such injury and have accordingly failed to demonstrate any likelihood that they

will suffer an irreparable injury as a prerequisite to injunctive relief.

### C. The Plaintiffs cannot *clearly establish* that the equities and the public interest favor a preliminary injunction.

Even if Plaintiffs had shown a likelihood of success on the merits (they have

not), relief would not be warranted because the balance of hardships do not weigh

in their favor.  Here, the equities and public interest decidedly favor the City.  "Call

it what you will – laches, the *Purcell* principle, or common sense – the idea is that

courts will not disrupt imminent elections absent a powerful reason for doing so."
*Crookston v. Johnson*, 841 F.3d 396, 398 (6th Cir. 2016) (citing *Purcell v. Gonzalez*,
549 U.S. 1, 5-6 (2006).

In considering potential harms and the public interest, courts must "consider
the harms specific to elections cases," when "attendant on enjoining the enforcement
of the state's voting law while it is currently in play," especially so, when voting has
already begun. *Feldman v. Raegan*, 843 F.3d 366, 394 (9th Cir. 2016) (quoting
*Purcell*, 549 U.S. at, 4). "Interference with an impending election is extraordinary,
and interference with an election after voting has begun is unprecedented."
*Southwest Voter Registration Educ. Project v. Shelly*, 344 F.3d 914, 919 (9th Cir.
2003) (citing *Reynolds v. Sims*, 377 U.S. 533, 555 (1964)). For this reason, courts
are reluctant to grant injunctive relief, even if the existing districts present
constitutional infirmities. *Ely v. Klahr*, 403 U.S. 108, 113 (1971); *see also Reynolds*,
377 U.S. at 586 ("where an impending election is imminent and a State's election
machinery is already in progress, equitable considerations might justify a court in
withholding the granting of immediately effective relief . . ., even though the existing
apportionment scheme was found invalid.").[13]

---

[13] "Challengers to election procedures often have been left without a remedy in
regard to the most immediate election because the election is too far underway or
actually consummated prior to judgment. Justiciability in such cases depends not so
much on the fact of past injury but on the prospect of its occurrence in an impending
or future election." *Babbitt v. UFW Nat'l Union*, 442 U.S. 289, 300 n.12 (1979).

The present situation is no different.  The City of Quincy election is underway.

Vote-by-mail ballots have been sent out, and as of the date of this pleading, over 200

completed ballots have already been received by the Supervisor of Elections.[14]  If

voter turnout is equal to that of the 2019 City of Quincy election, then this number

represents over 40 percent of the total ballots cast in the election.[15]  This fact weighs

heavily against granting a preliminary injunction in this case.

Further, the City "indisputably has a compelling interest in preserving the

integrity of its election process."  *Purcell v. Gonzalez*, 549 U.S. 1 (2006) (citing *Eu*

*v. San Francisco County Democratic Central Comm.*, 489 U.S. 214 (1989)).  A

Court order at this point affecting the conduct of the City's June 9 election could

only lead to voter confusion.  *See id.* at 4-5 ("Court orders affecting elections,

especially conflicting orders, can themselves result in voter confusion and

consequent incentive to remain away from the polls.").  For this reason, in the

---

[14] The Gadsden County Supervisor of Elections Office reports real-time voter turnout statistics available here: https://tqv.vrswebapps.com/?state=FL&county=GAD&election=202.  The Court may take judicial notice of information contained on government-maintained public websites.  *See, e.g.*, *Cannon v. District of Columbia*, 717 F.3d 200, 205 n.2 (D.C. Cir. 2013) (taking judicial notice of contents of document, available on D.C. Retirement Board's website, summarizing operation of pension fund for its beneficiaries).

[15] According to the election results posted on the Gadsden County Supervisor of Elections website, 240 out of 452 ballots cast in the 2019 City of Quincy election. were cast by mail.  *See* https://www.gadsdensoe.com/Portals/Gadsden/Documents/Municipal%20Results.pdf?ver=2019-04-30-210500-557

context of redistricting, federal courts have concluded that it would be better to allow an election to proceed even when districts did not fully comport with the constitution, to avoid the necessity to delay an election which "would involve serious risk of confusion and chaos." *Ely*, 403 U.S. at 113.

Changing district boundaries for the current June 9 election on its face raises significant complications as a result of the unavoidable change in voters' registration within particular districts.  Voters that have already cast ballots may no longer be located in the districts that are up for election.  Similar issues are present for candidates who may no longer reside in the Districts they have qualified for. "Because the conduct of elections is so essential to a state's political self-determination, the strong public interest in having elections go forward generally weighs heavily against an injunction that would postpone an upcoming election." *Cano v. Davis*, 191 F. Supp. 2d 1135, 1139 (C.D. Cal. 2001).

In this case, it is self-evident that there is no way to grant the relief Plaintiffs' request without cancelling the City's June 9 election.  In addition to the voter confusion that would result, cancelling the City's June 9 election would force the City to conduct the election independently of the Gadsden County Supervisor of Elections, whose office has historically prepared, administered, and conducted the City's elections.  Exh. 2, ¶¶ 9, 13.  Contrary to the Plaintiffs' contention that the relief they request could not involve more than re-distribution of election material at

a cost of no more than $2,000, the City would actually be in the position of securing extensive personnel and resources at an unknown cost and implementation schedule to be able to prepare, administer, and conduct the election independently of the Supervisor of Elections.  Exh. 2, ¶¶ 9, 14-16.

Moreover, Plaintiffs' suggestion that this Court consider ordering the City to conduct its election under its 1970s-era plan is entirely untenable.  ECF 15, at 29-30.   Forcing elections to be conducted under the City's unconstitutionally malapportioned 1970s-era plan cannot be a remedy even if the Court believed there was some merit to Plaintiffs' Section 2 claims.

Finally, the Plaintiffs' delay in seeking relief weighs against granting their request for preliminary relief.  *See Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018) (denying a request for a preliminary injunction where Plaintiffs did not demonstrate reasonable diligence in requesting injunctive relief); *Wreal, Ltd. Liab. Co. v. Amazon.com,* 840 F.3d 1244, 1246 (11th Cir. 2016) (affirming denial of preliminary relief where "the plaintiff pursued its preliminary injunction motion with the urgency of someone out on a meandering evening stroll rather than someone in a race against time").  The City's redistricting plan was approved March 26.  Plaintiffs waited a month, until April 28, to file their complaint, and for 17 more days, until May 15, before filing their instant Motion for Preliminary Injunctive Relief.  Moreover, Plaintiffs claim to have had concerns about the City's redistricting effort since June

25, 2019, almost a year before Plaintiffs filed their suit. ECF 15, at 18 (claiming that City's intent to discriminate against Whites was confirmed in Plaintiffs mind as early as the City's June 25, 2019 City Commission Meeting).

While the Plaintiffs sat on their hands, the City's election proceeded. New voter rolls were created and voter registration cards mailed. Candidate qualifying came and went. Ballots were prepared and vote-by-mail ballots distributed. And, perhaps most importantly, voters cast their ballots—all while Plaintiffs dithered. In sum, the equities and public interest weigh against the Plaintiffs' request.

## III.   CONCLUSION

The facts of this case reflect that Plaintiffs' Motion for Preliminary Injunctive Relief makes a truly extraordinary and drastic request. Plaintiffs ask this Court to stop an election days before it is completed and force the City to undergo the cost and burden of independently recreating and conducting that election at some unknown future date. And Plaintiffs ask for this extraordinary remedy based on a claimed Section 2 violation that Plaintiffs have entirely failed to substantiate. In summary, there is simply no basis to grant the extraordinary and drastic relief Plaintiffs request. As such, this Court should deny Plaintiffs' Motion for Preliminary Injunctive Relief.

***

## <u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULES</u>

The undersigned certifies that this Motion complies with the size, font, and formatting requirements of Local Rule 5.1(C). The undersigned further certifies that this Motion complies with the word limit in Local Rule 7.1(F); this Motion contains 7,962 words, excluding the case style, signature block, and certificates.

***

Respectfully submitted by:

*/s/ Joseph A. Brown*
MOHAMMAD O. JAZIL (FBN 72556)
 mjazil@hgslaw.com
JOSEPH A. BROWN (FBN 25765)
 jbrown@hgslaw.com
KRISTEN C. DIOT  (FBN 118625)
 KDiot@hgslaw.com
HOPPING GREEN & SAMS, P.A.
119 South Monroe Street, Suite 300
Tallahassee, Florida 32301
Phone: (850) 222-7500
Fax: (850) 224-8551

Dated:  May 29, 2020              ***Counsel for Defendants***

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via transmission of a Notice of Electronic Filing through the Court's CM/ECF system to the following on this 29th day of May, 2020:

*/s/ Joseph A Brown*
Attorney
