## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

JULIE BARODY, and
WILLIAM B. FARMER,

     PLAINTIFFS,

v.

CITY OF QUINCY, FLORIDA,
KEITH A. DOWDELL, in his official
capacity as Commissioner and Mayor
of the City of Quincy, RONTE R.
HARRIS, in his official capacity as
Commissioner and Mayor Pro-Tem of
the City of Quincy, and ANGELA G.
SAPP, in her official capacity as
Commissioner of the City of Quincy,

     DEFENDANTS.

Case No. 4:20-cv-217-AW-MAF

## DECLARATION OF JACK L. MCLEAN Jr.
### (28 U.S.C. §1746)

Jack L. McLean Jr., declares under penalty of perjury:

    1.    My name is Jack L. McLean Jr. I am over eighteen (18) and competent to testify as to the matters set forth herein. I serve as the City Manager for the City of Quincy.

    2.    I have served as the City Manager of Quincy since 2019 and served as the Interim City Manager prior to that since May of 2018. Additionally, I have

previously served as either the Interim City Manager of City Manager of Quincy from 2008-2014 and was the City Attorney for the City of Quincy prior to that from 1999-2007.

3.      The issue of redistricting was first brought to the attention of the current City Commission on January 22, 2019, at a public meeting, when a citizen raised the issue.  At that meeting, City Commissioners first inquired about the process for redistricting.

4.      Because of more pressing issues, I did not immediately begin looking into the redistricting issue.

5.      Redistricting was raised again at the City Commission's June 26, 2019. Mayor Dowdell noted at that time that it had been decades since the City had been through redistricting.

6.      Subsequent to the June 26, 2019 City Commission meeting, the City retained consulting firm KMR to advise the City on whether there was any need to redistrict and the process for redistricting.  That firm held a workshop in November 2019 and KMR provided data and analysis indicating that the City of Quincy's districts were malapportioned and in need of redistricting.

7.      Following the workshop, the City Commission voted to send out a request for qualifications for a redistricting consultant.  Ultimately, two responses were received, one from KMR and one from Kurt Spitzer and Associates ("KSA").

Declaration of Jack L. McLean Jr.
Page 2 of 5

KMR's proposal was not price competitive, and KMR eventually withdrew its proposal. KSA was awarded the contract by the City Commission on January 21, 2020.

8.     At the same commission meeting on January 21, 2020, the City Commission voted to utilize new districts for upcoming City Commission elections in 2020, which includes elections for Districts 1 and 5.

9.     On March 2, 2020, the City Commission approved Ordinance 1110-2020, which both pushed back the April election to June 9, 2020 and extended the terms of the City Commissioners to account for the June election date.  Before deciding to postpone the election, the City investigated whether it could conduct the election as planned in April utilizing a new district plan.  However, based on my discussions with the Gadsden County Supervisor of Elections, June 9 was the only date in 2020 on which the Gadsden County Supervisor of Elections could prepare for, administer, and conduct the City of Quincy's upcoming election for Districts 1 and 5 utilizing a new district plan.

10.     On March 18, 2020 Mr. Kurt Spitzer provided a memo regarding his redistricting effort with three proposed redistricting maps – labeled "Alternative 1," "Alternative 2," and "Alternative 3" – and the City's existing district map attached. A true and correct copy of this material is attached as Composite Exhibit 1.  On

Declaration of Jack L. McLean Jr.
Page 3 of 5

March 19, 2020, the City of Quincy held a redistricting workshop where Mr. Spitzer's memo and three redistricting maps were discussed.

11.    On March 24, 2020, the City Commission meet at a regular meeting and again considered the three district maps previously provided by Mr. Spitzer. In addition, Mr. Spitzer provided some review regarding analysis of additional redistricting alternatives based on suggestions from Commissioners and the public. This resulted in one additional map that met the criteria for proper apportionment, "Alternative 4."   Alternative 4 was based on an effort to keep each sitting commissioner's residence within their current district. A true and correct copy of Alternative 4 is attached as Exhibit 2. The City Commission ultimately voted at that meeting to narrow the alternatives presented to Alternatives 1 and 4. A true and correct copy of the draft minutes from that meeting are attached as Exhibit 3.

12.    The City Commission's discussion of redistricting and the alternative redistricting maps supplied by Mr. Spitzer was continued at a meeting held on March 26, 2020. A true and correct copy of the draft minutes of the City Commission's March 26, 2020 meeting are attached as Exhibit 4. Mr. Spitzer addressed one additional hand-drawn map provided earlier on March 26 by Commissioner Bass-Prieto. At that same meeting the Commission voted to adopt Mr. Spitzer's Alternative 1.

Declaration of Jack L. McLean Jr.
Page 4 of 5

13.   The City of Quincy's elections are nonpartisan.  Since the City was last redistricted in the 1970s, the City Commission has been comprised of five single-member districts.  The City relies on the Gadsden County Supervisor of Elections to administer and conduct its elections.

14.   If, as a result of this Court ordering relief in this case, the Gadsden County Supervisor of Elections was not able to conduct the City of Quincy's election, then the City would be required to administer and conduct the election.

15.   The City does not have the in-house resources or expertise to administer and conduct an election.  This includes the necessary software and personnel.

16.   If the City needed to conduct an election independently of the Gadsden County Supervisor of Elections, the City would need to secure the resources and personnel necessary to conduct the election itself, or identify and hire an outside consultant to perform the activities and functions necessary to administer and conduct the election.  At this time, I do not know the viability, associated cost, or implementation timeline of either of those options.

I declare under penalty of perjury that the foregoing is true and correct.


Affiant's Signature: _____
                     Jack L. McLean Jr.


Executed on: _____
             5/29/2020


Declaration of Jack L. McLean Jr.
Page 5 of 5

EXHIBIT 1

**From:**          Kurt Spitzer
**Sent:**          Wednesday, March 18, 2020 12:09 PM
**To:**            mccl3690@comcast.net; Jack McLean (jmclean@myquincy.net)
**Subject:**       Redistricting Memorandum
**Attachments:**   Alternative3_FINAL_11x17.pdf; Alternative2_FINAL_11x17.pdf; Alternative1_FINAL_
                   11x17.pdf; ExistingDistricts_FINAL_11x17.pdf; CityCommMemo_3-18-20.docx.pdf


Jack –

Attached please find our Memorandum to the City Commission and four maps of Commission district
boundaries:  Existing Districts and Alternative Plans 1, 2 and 3.  The maps may be printed on 11 x 17" paper.  I will bring
large format (33 x 44") maps with me this afternoon.

Please let me know if you have questions.


Kurt Spitzer
KURT SPITZER and ASSOCIATES
693 Forest Lair
Tallahassee, FL 32312
850-228-6212



# M E M O R A N D U M

**TO:**      City Commission
               City of Quincy

**FROM:**    Kurt Spitzer

**DATE:**     March 18, 2020

**RE:**        Redistricting Commission District Boundaries

The purpose of this Memorandum is to update you on the status of the redistricting effort and to provide you with three draft alternative district maps for your review and discussion.

Data from the Bureau of the Census, the City of Quincy and the office of the Gadsden County Property Appraiser has been added to the software we use in the redistricting process. Once added, district boundaries lines can be moved and the changes to the demographic information of each district is recalculated.

Redistricting Criteria

There are several criteria used in the redistricting process. They are considered in total and balanced with each other. However, the dominant criterion is population.

1. Use census blocks. Data from the US Bureau of the Census is updated every 10 years by surveying the population of the United States and is presumed to be correct. The smallest unit within which that information is tabulated is "blocks."

2. Equal population. Individual districts should be as nearly equal in population as is possible or practicable. "Population" means residents, not registered voters. "Nearly equal" means that the population of individual districts should be as close to the average size as is possible. Generally, a reasonable goal is to have districts that are approximately 3% over or under the average population, with the difference in the size of the largest and smallest districts should not be more than a total of 10 percentage points.

Quincy City Commission
March 18, 2020
Page two

3. Don't dilute minority voting strength.  Districting plans should not dilute the voting strength of a minority community.

4. Compact and contiguous.  Districts should be relatively compact and contiguous. Unusual, "bizarre" or serpentine district shapes that are created without furthering a valid underlying public policy purpose must be avoided.

5. Significant natural and man-made boundaries.  Where possible, district boundaries should follow easily recognized or understood boundaries, like major roads, waterbodies or parklands.

6. Recognize existing district boundaries.  The boundaries of the new districts may seek to retain their existing boundaries to the extent possible.

7. Avoid splitting communities of interest.  District boundaries should seek to avoid splitting communities that have similar interests (e.g. neighborhoods) where possible.

<u>Alternative Maps</u>

Four maps are provided to you for your consideration.  Each includes a table at the bottom of the map showing the following information by Commission District:

- Actual Population
- Ideal (average) Population
- Population and Percent Deviation from the Ideal
- Population and Percent by Race
- Population and Percent by Hispanic Ethnicity

<u>Existing Districts.</u>  The Existing Districts map simply applies or "layers" the existing district boundaries onto the 2010 census data.  Most district populations deviate significantly from the average or target population of 1,734 people in each district, whether due to population changes since 1975 due to growth, annexation or distribution within the City.  The disparity between the largest and smallest districts is over 100 percentage points – well beyond the general guideline of 10 points

Quincy City Commission
March 18, 2020
Page three


The Alternative Plans are intended to illustrate different options that could be considered. All Alternatives meet generally accepted criteria used in the redistricting process.

1. <u>Alternative Plan 1.</u>  Alternative 1 has a deviation between the largest and smallest districts of 5.53 percentage points.

2. <u>Alternative Plan 2.</u>  Alternative 2 has a deviation between the largest and smallest districts of 7.61 percentage points.

3. <u>Alternative Plan 3.</u>  Alternative 3 has the smallest deviation between the largest and smallest districts of 3.06 percentage points.


We look forward to reviewing the Plans and process in greater detail later today and are happy to consider revisions to any of the alternative plans.


Attachments

cc:  Jack McClean



# Existing Districts





| DISTRICT | 2010 Population ACTUAL | 2010 Population IDEAL | Population Deviation | Percent Deviation | Population White | Percent White | Population Black | Percent Black | Population Other | Percent Other | Population Hispanic | Percent Hispanic |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 1,668 | 1,734 | (66) | -3.83% | 113 | 6.77% | 1,272 | 76.26% | 283 | 16.97% | 315 | 18.88% |
| 2 | 1,007 | 1,734 | (727) | -41.94% | 10 | 0.95% | 980 | 97.36% | 17 | 1.69% | 20 | 1.94% |
| 3 | 2,958 | 1,734 | 1,224 | 70.55% | 574 | 19.41% | 2,075 | 70.15% | 309 | 10.45% | 385 | 13.02% |
| 4 | 1,123 | 1,734 | (611) | -35.25% | 511 | 45.50% | 545 | 48.53% | 67 | 5.97% | 62 | 5.56% |
| 5 | 1,916 | 1,734 | 182 | 10.47% | 765 | 39.90% | 801 | 41.78% | 351 | 18.32% | 400 | 20.88% |
| TOTALS | 8,672 | 8,672 | - | - | 1,972 | - | 5,673 | - | 1,027 | - | 1,182 | - |

Since 1825 Quincy ...in the heart of Florida's Future

# Redistricting Plan - Alternative 1

KSA Governmental Consultants

| DISTRICT | 2010 Population ACTUAL | 2010 Population IDEAL | Population Deviation | Percent Deviation | Population White | Percent White | Population Black | Percent Black | Population Other | Percent Other | Population Hispanic | Percent Hispanic |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 1,724 | 1,734 | (10) | -0.60% | 319 | 18.50% | 1,330 | 77.15% | 75 | 4.35% | 111 | 6.44% |
| 2 | 1,696 | 1,734 | (38) | -2.21% | 155 | 9.14% | 1,456 | 85.85% | 85 | 5.01% | 104 | 6.13% |
| 3 | 1,792 | 1,734 | 58 | 3.32% | 184 | 10.27% | 1,393 | 77.73% | 215 | 12.00% | 242 | 13.50% |
| 4 | 1,739 | 1,734 | 5 | 0.27% | 961 | 55.26% | 625 | 35.94% | 153 | 8.80% | 162 | 9.32% |
| 5 | 1,721 | 1,734 | (13) | -0.77% | 353 | 20.51% | 869 | 50.49% | 499 | 28.99% | 563 | 32.71% |
| TOTALS | 8,672 | 8,672 | - | - | 1,972 | - | 5,673 | - | 1,027 | - | 1,182 | - |

Since 1825 Quincy ...in the heart of Florida's Future

KSA Governmental Consultants

# Redistricting Plan - Alternative 2

| DISTRICT | 2010 Population ACTUAL | 2010 Population IDEAL | Population Deviation | Percent Deviation | Population White | Percent White | Population Black | Percent Black | Population Other | Percent Other | Population Hispanic | Percent Hispanic |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 1,699 | 1,734 | (35) | -2.04% | 316 | 18.60% | 1,308 | 76.99% | 75 | 4.41% | 111 | 6.53% |
| 2 | 1,720 | 1,734 | (14) | -0.83% | 189 | 10.99% | 1,422 | 82.67% | 109 | 6.34% | 130 | 7.56% |
| 3 | 1,689 | 1,734 | (45) | -2.62% | 161 | 9.53% | 1,337 | 79.16% | 191 | 11.31% | 216 | 12.79% |
| 4 | 1,821 | 1,734 | 87 | 4.99% | 1,005 | 55.19% | 609 | 33.44% | 207 | 11.37% | 217 | 11.92% |
| 5 | 1,743 | 1,734 | 9 | 0.50% | 301 | 17.27% | 997 | 57.20% | 445 | 25.53% | 508 | 29.15% |
| TOTALS | 8,672 | 8,672 | - | - | 1,972 | - | 5,673 | - | 1,027 | - | 1,182 | - |

Since 1825 Quincy ...in the heart of Florida's Future

# Redistricting Plan - Alternative 3

KSA Governmental Consultants

| DISTRICT | 2010 Population ACTUAL | 2010 Population IDEAL | Population Deviation | Percent Deviation | Population White | Percent White | Population Black | Percent Black | Population Other | Percent Other | Population Hispanic | Percent Hispanic |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 1,715 | 1,734 | (19) | -1.12% | 314 | 18.31% | 1,330 | 77.55% | 71 | 4.14% | 103 | 6.01% |
| 2 | 1,768 | 1,734 | 34 | 1.94% | 245 | 13.86% | 1,439 | 81.39% | 84 | 4.75% | 93 | 5.26% |
| 3 | 1,729 | 1,734 | (5) | -0.31% | 248 | 14.34% | 1,228 | 71.02% | 253 | 14.63% | 274 | 15.85% |
| 4 | 1,730 | 1,734 | (4) | -0.25% | 807 | 46.65% | 807 | 46.65% | 116 | 6.71% | 141 | 8.15% |
| 5 | 1,730 | 1,734 | (4) | -0.25% | 358 | 20.69% | 869 | 50.23% | 503 | 29.08% | 571 | 33.01% |
| TOTALS | 8,672 | 8,672 | - | - | 1,972 | - | 5,673 | - | 1,027 | - | 1,182 | - |

# EXHIBIT 2

Since 1825 Quincy ...in the heart of Florida's Future

# Redistricting Plan - Alternative 4

KSA Governmental Consultants

| DISTRICT | 2010 Population ACTUAL | 2010 Population IDEAL | Population Deviation | Percent Deviation | Population White | Percent White | Population Black | Percent Black | Population Other | Percent Other | Population Hispanic | Percent Hispanic |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 1,668 | 1,734 | (66) | -3.83% | 113 | 6.77% | 1,272 | 76.26% | 283 | 16.97% | 315 | 18.88% |
| 2 | 1,776 | 1,734 | 42 | 2.40% | 292 | 16.42% | 1,430 | 80.54% | 54 | 3.04% | 96 | 5.38% |
| 3 | 1,757 | 1,734 | 23 | 1.30% | 249 | 14.17% | 1,262 | 71.83% | 246 | 14.00% | 283 | 16.11% |
| 4 | 1,773 | 1,734 | 39 | 2.23% | 617 | 34.80% | 1,037 | 58.49% | 119 | 6.71% | 119 | 6.74% |
| 5 | 1,698 | 1,734 | (36) | -2.10% | 702 | 41.31% | 672 | 39.55% | 325 | 19.14% | 369 | 21.73% |
| TOTALS | 8,672 | 8,672 | - | - | 1,972 | - | 5,673 | - | 1,027 | - | 1,182 | - |

EXHIBIT 3

| | |
|---|---|
| **CITY COMMISSION** | **REGULAR MEETING** |
| **CITY HALL, COMMISSION CHAMBER** | **March 24, 2020** |
| **QUINCY, FLORIDA 32351** | **6:00 P.M. (Eastern)** |

The City of Quincy City Commission met in regular session, Tuesday, March 24, 2020, with **Mayor Commissioner Dowdell** presiding and the following commissioners present:

> Commissioner Daniel McMillan – by conference telephone
> Commissioner Ronte Harris
> Commissioner Freida Bass-Prieto - by conference telephone
> Commissioner Angela G. Sapp

City Staff and Guests Present:

> Jack L. McLean Jr., City Manager
> Gary Roberts, City Attorney
> Chief Glenn Sapp, Police Department and Sergeant-At-Arms
> Reginald Bell, Director, Public Works Department
> Chief Curtis Bridges, Fire Department
> Ann Sherman, Director, Human Resources and Customer Services
> Dr. Beverly Nash, Grants
> Vancheria Perkins, Executive Assistant to the City Manager
> Robin Ryals, Director, Utilities Department
> Marcia Carty, Director, Finance Department

> Kurt Spitzer, Kurt Spitzer and Associates, Inc.

**Called to Order:**

Mayor Dowdell called the regular meeting to order at 6:00 pm. Invocation provided by Rev. Rev. Robin Ryals. Pledge of Allegiance in unison. Roll call requested by Mayor Dowdell.

**1. Approval of Agenda**

Approval of agenda for March 24, 2020 (Regular Meeting) motioned by Commissioner Harris; seconded by Commissioner Sapp. The motion carried 5 to 0.

**2. Approval of Minutes of Previous Meetings**

Approval of Minutes of February 20, 2020 (Special Meeting) motioned by Commissioner Sapp; seconded by Commissioner Harris. The motion carried 5 to 0.

Approval of Minutes of March 13, 2020 (Special Meeting) motioned by Commissioner Harris; seconded by Commissioner Sapp. The motion carried 5 to 0.

**Public Opportunity to Speak - None**

**3. Resolution 1406-2020 – Redistricting Plan**

1

Commissioner Sapp motioned to read Resolution 1406-2020 by title only; seconded by Commissioner Harris. Roll call requested by Mayor Dowdell.

| Commissioner McMillan | Yes |
|---|---|
| Commissioner Harris | Yes |
| Commissioner Sapp | Yes |
| Commissioner Bass-Prieto | No |
| Mayor Dowdell | yes |

The motion carried 4 to 1.

Resolution read by title and appeared below in its entirety.

## REDISTRICTING RESOLUTION NUMBER: 1406-2020
## RESOLUTION OF THE CITY OF QUINCY, FLORIDA, ADOPTING A REDISTRICTING PLAN, PROVIDING FOR COMPLIANCE WITH LAW.

**WHEREAS,** Article VIII Section 2(b) of the Florida Constitution states that municipalities shall have the governmental powers to enable them to conduct municipal government, perform municipal functions and render municipal services, and may exercise any power for municipal purposes, except when expressly prohibited by law; and

**WHEREAS,** Section 166.021(4), Florida Statutes, provides that changes in terms of elected officers and the manner of their election shall be by charter amendment via referendum, except for the selection of election dates and qualifying periods for candidates and to changes in terms of office necessitated by such changes in elections dates; and

**WHEREAS,** Section 100.3605(2), Florida Statutes, further provides that the governing body may, by ordinance change the dates for qualifying and for the election of members of the governing body of the municipality and provide for the orderly transition of office resulting from such date changes; and

**WHEREAS,** the Florida Attorney General in 1995 opined that the changes to Section 100.3605 allow a municipality to amend their charter to change the election dates and qualifying periods for candidates, including any changes in terms of offices necessitated by such amendment, such as an extension of term, without a referendum (Op. Att'y Gen. Fla. 2000-61, Op. Att'y Gen. Fla. 2003-52, Op. Att'y Gen. Fla. 2007-34, Op. Att'y Gen. Fla. 2013-05); and

**WHEREAS**, the City Commission for the City of Quincy recently determined that the current district boundary result in malapportioned districts; and

**WHEREAS**, the City Commission for the City of Quincy determined that the current voting district boundaries do not achieve the "one person one vote" constitutional principle: and

**WHEREAS,** On January 30, 2020 in a Special Meeting**,** the City Commission for the City of Quincy voted to amend Section 2.01 of Article II of the Charter of the City of Quincy and to reapportion the City Commission districts for each of the five members: and,

**WHEREAS,** On January 30, 2020 in a Special Meeting**,** the City Commission for the City of Quincy voted to authorized Kurt Spitzer of Kurt Spitzer & Associates, Inc., Governmental Consultants to draft proposed redistricting plans for consideration by the City Commissioners as the City has not redrawn the City districts since 1974; and,

2

**WHEREAS**, the City Commission has considered the alternative Proposed Redistricting PLANS; and

**WHEREAS**, the City Commission has selected one of the Alternative Proposed Redistricting PLANS; and

**NOW, THEREFORE, BE IT RESOLVED** the City Commission for the City of Quincy, Florida, at an open public meeting, declares that:

**Section 1.**   The City Commission for the City of Quincy adopts Redistricting Plan Alternative_____, as set forth in Exhibit A, attached hereto and made part hereof.

**PASSED AND DULY ADOPTED** by the City Commission of the City of Quincy, Florida this 24th day of March 2020.

**4. Summary of Redistricting Plan and Process: by Kurt Spitzer, Kurt Spitzer and Associates, Inc**. City had not done redistricting in 45 years and current districts are not evenly populated. Three redistricting maps were previously presented in a commission workshop meeting. Other suggestions were provided and resulted in redistricting alternative 4. The guiding principle for alternative 4 was that each of the sitting commissioners would reside in their current districts. Adjustments were made so that the districts were equal enough in populations in order to meet redistricting criteria. In addition, the lower part of city around I-10 was connected to district two. With alternative 4, all districts were in acceptable tolerances in terms of populations and deviations from the mean.

There were four or more other alternative maps provided after the commission workshop by the city commissioners to Mr. Spitzer. In addition, there were two others, provided later by commissioners and one from a member of the public.  The ones received by Mr. Spitzer relatively quickly were analyzed and produced alternatives 1-A, 1-B and 1-C (submitted by Commissioners Sapp and Harris). Received suggestion from Commissioner McMillan and one from the public that were similar in design in that the commissioner in district 5 would remain.

Commissioner Bass-Prieto's plan design indicated that each commissioner would remain in existing districts. She also recommended changes to redistricting alternative plan 4.

Commissioner Harris requested the data or numbers for the redistricting alternative plan 4 and commissioners were given updated and/or corrected copies of alternative plan 4. The statistics were as follows for alternative 4: for district number one = under-populated by 66 individuals; 3.83 percentage; for district two = over-populated by 42 individuals, 2.4 percentage; for district three = over-populated by 23 individuals, 1.3 percentage; for district four = over-populated by 39 individuals, 2.23 percentage; for district five = under-populated by 36 individuals, 2.1 percentage.  The deviation between the largest to the smallest district was 6.23 percentage.

Please note per City Manager McLean – all hand-written copies of submitted maps will be held for official record.

In addition, please note information/data is per actual map and is located at the bottom of each map.

Alternative Plan 4 - Population Data by Districts:

| District | Total Population | Populations by Race | | | Percentage |
|---|---|---|---|---|---|
| | | Whites | Blacks | Other | Blacks |
| One | 1699 | 316 | 1308 | 75 | 76.99% |
| Two | 1720 | 189 | 1422 | 109 | 82.67% |
| Three | 1689 | 161 | 1337 | 191 | 79.16% |
| Four | 1821 | 1005 | 609 | 207 | 33.44.% |
| Five | 1743 | 301 | 997 | 445 | 57.20% |
| TOTAL | 8672 | 1972 | 5673 | 1027 | |

For the three other alternatives that were received and maps were readily printed by the consultant.

- Alternative 1-A, the deviation between largest and smallest districts was over 44 percentage (Requirement less than 10% percentage).

| District | Total Population | Under vs Over | Deviation |
|---|---|---|---|
| One | 1716 | Under by 18 | -1.06% |
| Two | 1366 | Under by 368 | -21.24% |
| Three | 2130 | Over by 396 | 22.81% |
| Four | 1739 | Over by 5 | 0.27% |
| Five | 1721 | Under by 13 | .077% |

- Alternative 1-B, the deviation was almost 73% percentage. Similar to what was submitted by Commissioners Sapp and Harris.

| District | Total Population | Under vs Over | Deviation |
|---|---|---|---|
| One | 1656 | Under by 78 | -4.52% |
| Two | 1248 | Under by 486 | -28.04% |
| Three | 2514 | Over by 780 | 44.95% |
| Four | 1601 | Under by 134 | -7.72% |
| Five | 1654 | Under by 81 | -4.66% |

- Alternative 1-C, the deviation was

| District | Total Population | Under vs Over | Deviation |
|---|---|---|---|
| One | 1703 | Under by 31 | -1.81% |
| Two | 1248 | Under by 486 | -28.04% |
| Three | 2252 | Over by 518 | 29.84% |
| Four | 1739 | Over by 5 | 0.27% |
| Five | 1730 | Under by 4 | -0.25% |

Commissioner Bass-Prieto stated that she did not receive the maps described as alternatives. The information sent to her was totally difference from what was explained. She stated that she was not provided the map for recommended alternative 4.

The City Manager asked that the map be sent to Commissioner Bass-Prieto. Mayor Dowdell stated that the commissioners had just received the recommended alternative 4 map. Commissioner Bass-Prieto asked "Why?" She expressed that she was being treated differently and expressed that she did not receive accurate information. In addition, she had concerns that the public did not receive the correct information. She expressed that she did not see her plan design being presented or produced for reasons of not getting it in on time. The map that was presented was not her map.

The City Manager explained, "When he received the maps, he immediately sent them out early in the morning. If there were mistakes . . . then, he pull the wrong ones, however he thinks that they may be there . . . given that we (the commissioners) have alternative 4." The City Manager further explained "the maps had been possibly sent . . . under 1A, 1B and 1C . . . and then moved into map 4."

Commissioner Bass-Prieto had objections . . . she stated, "Her map was not drawn or presented, and given her district is affected the most, she had a map that does not resemble what was presented." In addition, she had concerns that the wrong maps were on the City's website. She stated, "Yes, my map was late, but I was never sent the address for Mr. Spitzer . . . no one from Mr. McLean's office sent it to me. I even spoke to him about it . . . now I am being told that since I did not get it in on time, it is a combination of 3. . ."

City Manager McLean stated, "He had nothing to do with Commissioner Bass-Prieto's map." The situation "had to do with a timing issue with the consultant". In addition, he did "asked the consultant to bring to the meeting a copy of her (Commissioner Bass-Prieto) map and her hand-drawn plan design would be made a part of the official record". The consultant expressed, "He had not shared the numbers with Commissioner Bass-Prieto, however, they had email exchanges regarding her map and concluded that her design was similar to others hand-drawn maps that had been submitted."

The consultant expressed, "He did not have time to produce her map (like the others), but had data calculations based on his best interpretation of her map design. He had only total numbers to present."

| District | Total Population | Under vs Over |
|----------|------------------|---------------|
| One | 1397 | Under the mean by 19% |
| Two | 1835 | Over by 5.8% |
| Three | 2009 | Over by 15.9% |
| Four | 1688 | Under by 2.7% |
| Five | 1743 | Over 0.50% |

The consultant stated, "Three of the maps were within acceptable tolerances and three were not."

The City Manager stated, "Commissioner Bass-Prieto's hand drawn map would become a part of the official records by way of the City Clerk."

The City Manager asked the consultant, "When you said we, did the City Manager have anything to do with your calculations?" The consultant stated, "No".

The City Manager asked the consultant to summarize and "if any of the maps sent to him meet the criteria?" He stated, "No (none of the alternative maps – 1A, 1B or 1C) and that the map from Commissioner Bass-Prieto specifically did not meet the criteria". The consultant did not check the map from Commissioner McMillan, but felt "it was very similar to map 4 which does meet the criteria."

The City Manager asked the consultant to identity those maps that met criteria. The consultant stated, "It was alternative 1, 2, 3, and 4 which the commission had seen . . . and they all meet current criteria as outlined".

Commissioner Sapp asked the consultant to elaborate on the criteria.  The consultant stated, "the criteria was: districts needed to be as nearly even or equal as possible or practical; each district needed to be as close to a zero percentage point deviation from the average size; 2-3 percentage points over or under would be great, and a deviation of 10% or more (red flag) between largest and smallest districts that is an indication that the districts are not as equal in population as practical. The second criteria was that you needed to draw districts that do not dilute minority voting strength and should preserve communities of interest that vote in a similar fashion. Beyond that is a host of several other criteria . . ., which we tried to follow. We used census blocks because that data is presumed to be correct and are easily accessible; they integrate into commonly used redistricting software; try to follow man-made or natural boundaries so that the district boundaries are easy to understand for voters, and all of the maps do that . . . you try not to split city neighborhoods into two different districts. . . The primary two criteria are: equal population and do not dilute minority voting strength."

## 5. Summary of Public Comments from the Floor

**Citizen #1 – (Ms. Julie) -** Presented a couple of questions and ideas – first one - was process related and the possibility of having a public committee that would take part. She indicated, "There were certain citizens had been asked to serve on this committee." Question: What happened to that committee? Second point, she felt that the process was a little rushed; she realized that there is a deadline because of the election. "In light of the new district format that was not visually seen by all citizens," she suggested, "The Commission may want to put the information up for a day or two in order to let citizens take note before making a final decision." She thought, "It would be important to slow thing down . . . in order to have transparency and maximum public participation on the part of the citizens and the City of Quincy." She expressed, "The decision will be something that we will have to live with forever. . ." In addition, she recommended, "The districts be disturbed as little as possible, especially districts 1 and 5 where individuals are up for reelection..." She agreed, "The redistricting issue needed to be looked at every ten years to make sure that we are re-apportioned properly

and balanced and that everyone has proper representation. . ." She thought it was important to "keep the incumbents in their districts . . . especially the seated commissioners."

Commissioner Sapp commented, ". . . The public committee." She stated, "She had made a suggestion to a former commissioner to be on a committee; she did not hear back from the individual until last week and felt that they did not have the interest of being on a committee." She further stated, "A former commissioner did talk with Mr. Spitzer about the committee."

**Citizen #2 – (Written/Phone Question) (Mr. Brad Farmer) –** "If the only challengers to an incumbent has his district redistricted into another district, does that mean the incumbent would be running unopposed or is there a provision to have another challenger added before the election date?"

The City Manager answered the question, "The ordinance provides for and the supervisor of election provides for . . . once you choose a map and submit by the end of this month, there will be a new period to petition to be on the ballot in the new districts. . . For those qualified candidates living in the district, they do not have to go back out to petition. Therefore, the answer is yes. A person can run for any of the seats up for re-election and there is a period of time to do that. . ."

**Citizen #3 (Mr. Richard May, 331 North Monroe Street)** – He expressed his opposition to the proposed changes to the voting districts in the City of Quincy. He expressed, "The importance of the city's business affecting thousands of its constituents, during a national health emergency where everyone is asked to stay home and avoid unhealthy places . . ." He observed, "There were 20 people in the public meeting." "You have specifically and purposefully moved the dates of the election, rushed the process of redistricting . . . to further your own agenda. You are using redistricting to remove challengers . . . from existing commissioners who are running for re-election. You have chosen to do all these things in the middle of a 2020 Census that is based on 10-year old data in an effort to expedite your agenda. This has been done without proper order because a large percentage of the citizens cannot come to the meeting. . . "

No further comments from the public.

## 6. Summary of Discussion/Debate by Commissioners

**<u>Commissioner Sapp</u>** commented that she has "sat, heard, studied and people historically do not like change . . . especially when somebody or a group of individuals think that they will not get it to work to their advantage. The whole purpose of redistricting is to make sure that populations are equally represented and there are challenges to that. . . Mr. Spitzer shared the criteria. Some say that we are rushing this, but we have been talking about this for months and months. . . My district is in the middle of the city and I am surrounded by everybody else . . . any way you cut the pie, I will have a difficult election. . . . District boundaries have to be re-drawn, we should have done it years ago . . . we should have done it before. . . Mr. Farmer's comments was very nice. . . Mr. May, I appreciate your comments tonight. I did not appreciate being called racist on last week, but I do appreciate your calmness . . . Mr. Farmer stated to me, I know that you will go ahead with it, because you have started, however,

maybe you can make some adjustments after 2020. All I asked is that you all trust the commissioners that you have elected to make the best decision. Trust us, we live and work in Quincy, too. . . We do not want to make anyone think that we have hidden agendas. . . While we are meeting, we need to get as much taken care of as possible. . . Trust us to do what is right."

**Commissioner Bass-Prieto** asked a question about one of the maps – "On alternative 4 that was emailed, is that someone's map or is that one that you adjusted?" The consultant answered, "It is a map based on suggestions received and we did adjust the numbers with acceptable tolerances." She voiced some of her concerns: "She did not find out until last week that she could even draw a map. . . .The meetings were not given very much notice. She was supposed to given an address, that was not given . . . was not given an opportunity to work on map. . . If we are going to have this process, we need to have everyone . . . our citizens never got to see alternative 4 map. . . I do not think this process was open, was not fair. We are doing this during a pandemic. . . We have a meeting at 4:00 pm, when most of our citizens are at work. . . Mr. Spitzer has stated time and time again, that he has never done one this quickly. . .  this is not how it is usually done. To say that we have spent all this time in meeting is not so . . . every citizen has not been given an opportunity. . . This is not the way to have open government . . . and not the way to involve our citizens. . .  This process is one big rush and nothing open to our citizens. . . as a commissioner with health issues, I was told this morning that he did not have time to run my numbers. . . I did not know that alternative 4 even existed. . . . I think we are rushing and will put a wedge in this community . . . our citizens need to be able to look at these maps. A lot of citizens do not have Internet . . . or cable TV, we are not even including them. . . We need to have our citizens involved. . . We need to slow this process down. . . Thank you. "

**Commissioner McMillan** commented, ". . . . He has same feeling as Commissioner Bass-Prieto. Redistricting should have the community involved and there has been no attempt to do that. . . Having 4:00 pm meetings is very suspect. . . It felt to me that we are not including the community and I object to any map that would exclude and remove any commissioner and would benefit any commissioner. . . Thank you."

Mayor Dowdell called for a motion to adopt the maps to be considered.

**Commissioner McMillan** stated, "Also, at our last meeting it was brought to our attention by Mr. Spitzer and the City Attorney that it is optional to include the prison and jail numbers". These numbers were not excluded in any of the maps. "I would like to see a map that removes the prison and jail populations . . . who are generally not Gadsden County residents. . ."

**Commissioner Bass-Prieto** agreed with Commissioner McMillan that this is another thing that has not been done. She stated, "There was another issue . . . , we, as commissioners, received two sets of numbers; one from the first consultant and another from Mr. Spitzer. The first set of numbers was 677 persons less than the second set of numbers that we had . . .  which there is a big discrepancy. . . We did pay the first consultant and we are paying Mr. Spitzer . . . we are getting a lot of variation. We need to look at the numbers and the deviations . . . and an explanation as to why these numbers vary so greatly. . . "

**Commissioner Harris** requested clarification on the instructions from the Mayor. . . "To adopt the resolution and narrow down the plans that are within the legal ramification of the 10 percentage point margin. Are you asking us to narrow it down to two and the question that I am asking is if we narrow it down to two, are we locked in to those two plans as drawn or we going to go back and revisit those? Can we go back and revisit those?"

**Commissioner Harris** continued by saying, "with all of the plans given to us by the consultant, we are well within the 10 percentage points; there is room to not divide neighborhoods if we do not have to . . . What I saying is that we can play around with the 10% if we keep neighborhoods cohesive. . . I would like us to try to keep neighborhoods together and I think the other commissioners would like to see that as well. Once we chose the two, will we have room to make minor adjustments . . .?"

Response from the consultant, "the short answer is yes, but. . . it depends on the variations of where you might want to move; how the blocks are configured in the lines that you may want to move; how many people live in that block and things like that. . . You can make minor adjustments to any of these (maps/plans), recognizing that if you move one block from District A to B within tolerances, but if you make more significant changes, then. . . "

In addition, Commissioner Harris commented, "We are using the Census blocks, those Census blocks appear to be drawn arbitrarily . . ., can we adjust those numbers within the blocks?"

Response from consultant, "You are not confirmed to those blocks, but when you use the blocks, the numbers are presumed to be correct. However, you can split blocks, we try and stay away from that . . . then the question becomes what percentage will you use to split the block, 50/50 or 75/25 or 90/10 or 80/20. In two of the plans, alternative 1A, 1B and 1C, we did split blocks. . . It is tricky. . .  If you want to split a block, then the city commission needs to tell us tonight."

**Commissioner Sapp** questioned the consultant, "Back to your total population 2010, you had 8,672 as opposed to 7,972 that is a difference of about 670 people; where is this is from?" Reply from consultant, "I will have to look at it."

City Manager McLean commented, "Commissioner Bass-Prieto had also asked the question in terms of the comparison between what KMR had done and KSA; an explanation would be helpful?" Reply from the consultant, "I don't know where KMR got their numbers; by looking at the map that they had given was not the current map; not the current municipal boundaries . . . beyond that I do not know. The area to the west of the city was not included and the part of the area to the south of the city was also not included in that map. . ."

City Manager McLean further explained for the record, "What KMR produced and the material provided were sent over to the consultant. They (KMR) addressed the issues of the population that was being considered at the time and their annexation stopped short of not including what Mr. Spitzer mentioned . . . not including the 2015 annexation explained the difference."

Commissioner Bass-Prieto expressed, "She was looking at the 2010 Census that indicated less than what we have. . ." She asked the question, "Does that mean that they (KMR) did not do

it right and that they gave us wrong number?" Reply from the City Manager, "No, that is not correct. They did a preliminary assessment to determine if we needed to go further. Because they were only looking at mal-apportionment. Their second phase was the decision of the commission to go for a more detailed and deeper scope. Their (KMR) scope was much more limited and at a level to determine whether to redistrict. . . Mr. Spitzer's work has confirmed that. . ."

The City Manager explained, "Whatever two maps selected and whatever comments or changes that you want to see need to be told to Mr. Spitzer tonight."

Commissioner Harris seeking clarification, "We are adopting the resolution and whatever two maps that we want to see to go along with the resolution? But the work continues on these maps?"

Commissioner Sapp commented, "She did not ask Mr. Spitzer if she could submit a map. I assumed it was my duty as a commissioner to offer my suggestion since I did not like the maps that I saw. . ."

City Manager McLean commented, "Staff recommended maps into the initial RFP that went out about the public being able to submit maps. It was mentioned in the workshop and told before that they could do it. . ."

Commissioner Harris restated the motioned to **adopt Resolution 1406-2020 Redistricting Plan** to take into consideration **alternative plans 1 and 4** as presented at commission meeting. Seconded by Commissioner Sapp. Roll call requested by Mayor Dowdell:

| Commissioner McMillan | No |
|---|---|
| Commissioner Harris | Yes |
| Commissioner Sapp | Yes |
| Commissioner Bass-Prieto | No |
| Mayor Dowdell | yes |

The motion carried 3 to 2.

Commissioner Sapp offered a suggestion to Mr. Spitzer; the City Manager recommended that tweets to maps be given or send to him. She recommended, The meeting be adjusted from Wednesday to Thursday in order to give Mr. Spitzer time; staff time to email the correct maps and the public time to see the maps. Mayor Dowdell asked Commissioners McMillan and Bass-Prieto about changing the meeting. Mayor Dowdell announced the meeting for Thursday at 5:00 pm as a continuation of current meeting agenda.

### 7. Reports, Request and Communications by the City Manager

   a. **Request to Purchase Pump for Redundancy at Eight Lift Stations within the City of Quincy's Sewer Collection System by Robin Ryals, Director, Utilities Department.**

The agenda item request is to purchase a diesel self-priming trailer mounted pump to relieve the flow at eight lift stations. Per the Florida Department of Environmental Protection Consent Order 18-0059, this item will serve as the required in-kind project.

The City of Quincy in late February 2020 with a due date of March 13, 2020, sent out an invitation to bid, along with specifications. The 2019-2020 budgeted amount was $54,000 (GL number 402-540-535-60644). Staff received two bids . . . one from TAW Power Systems, Inc. (a Kohler dealer) and one from Hydra Service, Inc. The TAW bid was for $94,808 and the Hydra Service bid was for $38,000. Staff recommended the Hydra Service Godwin Dri-Prime Yanmar pump and hose at a cost of $38,000.

Commissioner Harris motioned to approve, seconded by Commissioner Sapp. The motion carried 5 to 0.

## 8. Reports from Departments

a. **Human Resources Monthly Report – Ann Sherman, Director, Human Resources Department** – no questions or comments by commissioners. Commissioner Sapp commented on a new employee who appeared to be really enjoying his job.

b. **Fire Department Monthly Activities and District Calls – Chief Bridges, Fire Department** – Commissioner Bass-Prieto questioned, "The fire inspections . . . are so much higher than last year – what is that attributed to?" Response from Chief Bridges, 'The inspections vary from year to year . . . are done according to requests." Commissioner Bass-Prieto expressed, "They are extremely high . . . much higher than last year. . ." Chief Bridges stated, "He would check and get back with her."

c. **Finance Monthly Reports – (P-Card Statements and Allocations, Expenditures, and Budget Transfers) – Marcia Carty, Director, Finance Department –** Commissioner Bass-Prieto commented, "Under the Law Enforcement Administration, the utilities . . . how did we managed to have negative utilities?" Response from Ms. Carty, "she will look into it, she believed it was an credit or correction for that month . . . She is accurately studying that . . ."

Ms. Carty reviewed the "month of February, the expenditures are supposed to be at 42% for the entire City, have spent approximately $14 million, the actual is at 38% which is not bad. . . It means that we are controlling costs. . ." "We have spent most of the reroofing monies . . . and will start spending on the fire burn tower in March. . . ""Regarding revenue . . . the budget is approximately $36 million . . . we should be at 46% of our budget and we are. . . In reference to the arrearage report, a subsequent modification was sent out. Staff is looking at it to understand why people are behind and how to improve on what is happening. The revised account receivable report, looked at 72 accounts, of the 72, there were one account who had been meeting with the City Manager; five that were water and gas issues; 14 accounts had become current between the time this report was produced . . . 15 accounts on payment plans. . ." She reviewed cycle 1 (20,874 means 1% of the billing) and dollars it represented. She proceeded to explain "cycle 2 with 22,000 behind . . ."

11

## 9. Comments – Summary

### a. City Manager

The City Manager announced an emergency issue, "There was a deep hole (25 ft.) on North Cleveland (near Shanks) and the issue would be put on the next commission agenda."

The Mayor has increased the Declaration Emergency Resolution . . . that included Internet Cafes' that have been shut down for 14 days (reflected in City Ordinance); original Declaration has 250 people gatherings, has been lowered to 50 in public places. Added feature: on private and public properties, no gatherings of more than 10 people in a space.  "Things are changing in other communities, for example, Leon County is going to a curfew, dust to dawn (11:00 pm – 5:00 am) . . ."

<u>Discussion</u>

Commission Harris requested, "We need not overreact to the situation . . . and there are no active cases in Gadsden County. . ." Mayor Dowdell agreed with Commissioner Harris.  Commissioner Sapp had an opposing opinion. She did not believe that the City needed to wait. . .

Commissioner Bass-Prieto asked, ". . . How many had been tested?" Answer: "18".

### b. City Clerk – no comments.
### c. City Attorney – Reminder: Executive Session following meeting. "There are two cases. . . . "

### d. Commissioners
**i.   Commissioner McMillan –** He expressed the demographics of the City and that the City needed to be proactive.

The City Manager responded, "The City requested testing by way of the Gadsden County Emergency Management. Also, a request as gone forward for quarantine. . . we have supported the use of the hospital which appears to be a more appropriate place. . . In terms of being proactive, we have suggested alternative sites in Quincy to have testing. . . mobile places. . . Our staff has done a very good job. . . we have been meeting . . . we are putting a lot of materials on the street and in the community . . . and we are trying to stay active. . . How we expand and how far we go . . . are commission issues. . ."

Commissioner Harris observations, "There is currently no testing site in Gadsden County. . ." The City Manager affirmed, "No. . . you have to go to Leon County. . ."

The City Manager stated, "Regarding jobs, I have visited companies and they have been laying people off. . . and are unemployed. The City and CRA are working together to bring to the community information about the Governor's new Bridge Program and what the federal government is doing . . . We are looking at the stay-in-place . . . I am signing-off by departments on several things with staff. . . trying to lessen

the number of people being exposed. . . some people will be working remotely and we have brought additional equipment. . . you will see the technology show up in the budget. . . Some staff will be working from home. Customer Services lobby is being closed. . . we will only use the drive-thru. . . encouraging people to use point and pay or call-in to get it done. . . No one is being laid off, in fact, we have given staff an additional week in case staff need to be out. . ."

**ii.**     **Commissioner Harris**
He expressed appreciation on the Joyland project and requested an update. In addition, he inquired about the "Jump Start Program" for new houses being built and other new program for young utility customers. He wants to look at storm water drains in District 3. He requested an update from code enforcement for downtown.

**iii.**    **Commissioner Bass-Prieto**
She requested, "we need to be wise about our budget based on forecast of a recession." She requested, "a plan of action where we look at 3/6 months in the future. . . need to look at where we can save money by looking at non-essential. . ." She extended a thank you to Ms. Haygood, Ms. Figgers and others for feeding the students in the park. Ms. Sapp on King Street is concerned about her ditch and went over other citizen's' concerns. Commissioner Bass-Prieto expressed concerns from citizens regarding damaged tire that occurred at the Boy Scouts Center. In addition, she expressed technical problems during meeting, accommodation issues, concerns and opposition regarding transparency and equality regarding the redistricting process. Likewise, she expressed concerns regarding COVID-19 and the City needing proactive strategies.

**iv.**    **Commissioner Sapp**
She extended a thank you to the City of Quincy Parks and Recreations and Public Works Department, her church, the CRA and others in the distribution of food to the students at Campbell-Kelly Recreational Center. Thank you to the City for fixing the icemaker and refrigerator. She thanked staff for taking care of the open sewer problem behind Campbell-Kelly. "Shout out to all the staff of the City of Quincy. . ."

Commissioner Sapp commented, "When we review the position of the city clerk, I would like to see the job be taken from under the commission and put under the city manager's office so that there is more oversight of that person's duties and responsibilities. . . "

**v.**     **Commissioner/Mayor Dowdell** – He inquired about the status of the city clerk. The City Manager commented, "She will remain on the payroll until June 2. . . Staff is assuming some of her responsibilities. . . and phone calls are going to staff. . ." "Thank you to the City of Quincy employees on behalf of all commissioners. . ."

There being no further business to discuss, therefore meeting adjournment at 8:11 pm.

**Please Note**: The City places a typed hardcopy of meeting minutes and electronic data version on file with the Office of the City Clerk upon approval.

Submitted by: Dr. Beverly A. Nash, Acting Clerk

APPROVED:

_____
Keith A. Dowdell, Mayor and Presiding Officer of the City Commission and of the City of Quincy, Florida

ATTEST:

_____
Dr. Beverly A. Nash, Acting Clerk per
Sylvia Hicks, Clerk of the of Quincy, Florida
Clerk of the City Commission thereof

**14**

EXHIBIT 4

| | |
|---|---|
| **CITY COMMISSION** | **SPECIAL MEETING** |
| **CITY HALL, COMMISSION CHAMBERS** | **March 26, 2020** |
| **QUINCY, FLORIDA 32351** | **5:03 P.M. (Eastern)** |

The City of Quincy City Commission met in special session, Thursday, March 26, 2020, with **Mayor Commissioner Dowdell** presiding and the following commissioners present:

> Commissioner Daniel McMillan – by conference telephone
> Commissioner Ronte Harris
> Commissioner Freida Bass-Prieto - by Cisco WebEx (online meeting application).
> Commissioner Angela G. Sapp

City Staff and Guests Present:

> Jack L. McLean Jr., City Manager
> Gary Roberts, City Attorney
> Chief Glenn Sapp, Police Department and Sergeant-At-Arms
> Reginald Bell, Director, Public Works Department
> Dr. Beverly Nash, Grants
> Vancheria Perkins, Executive Assistant to the City Manager
> David Rittman, Administrator, Information Technology

> Kurt Spitzer, Kurt Spitzer and Associates, Inc. – by Cisco WebEx

**Called to Order:**

Mayor Dowdell called the special meeting to order at 5:03 pm with an overview of agenda and the roll call.

The special meeting was recorded, televised and transmitted by way of the City's Facebook page, TV Channel (WQTN-13) and Cisco WebEx.

Commissioners McMillan and Bass-Prieto expressed technical difficulties. Commissioner Bass-Prieto was changed to a physical phone line to accommodate communication issues.

**Summary of Special Meeting Discussion Items**

**Request to Repair Sewer Drain on North Cleveland Street** presented by Reggie Bell, Director, Public Works Department. Emergency repairs request was brought to the City Manager earlier in week. The repair site presented a public danger and required immediate attention. Commissioner Sapp observed a $50,000 difference in quotes. Mr. Bell explained difference and recommended Barnes Equipment Company for $22,575.00.

Commissioner Harris motioned and seconded by Commissioner Sapp to approve the emergency repairs and accept the quote from Barnes Equipment Company. The motion carried 5 to 0.

**1**

**Continuation from Regular Commission Meeting on the Redistricting Plan** presented by Kurt Spitzer, Kurt Spitzer and Associates, Inc. and City Manager, Jack L. McLean Jr. City Manager McLean explained that consideration was to be given to redistricting plan alternatives 1 and 4 per previous regular commission meeting. Summarized by City Manager McLean, the commissioners agreed to choose one of the two plans and attach it to the Redistricting Plan Resolution (see below). Commissioner Bass-Prieto's map was emailed to the City Manager who then emailed it out to the other commissioners. The consultant analyzed Commissioner Bass-Prieto's map.

The companion Redistricting Plan Resolution:

<div align="center">

**REDISTRICTING RESOLUTION NUMBER: 1406-2020**
**RESOLUTION OF THE CITY OF QUINCY, FLORIDA, ADOPTING A REDISTRICTING PLAN, PROVIDING FOR COMPLIANCE WITH LAW.**

</div>

**WHEREAS,** Article VIII Section 2(b) of the Florida Constitution states that municipalities shall have the governmental powers to enable them to conduct municipal government, perform municipal functions and render municipal services, and may exercise any power for municipal purposes, except when expressly prohibited by law; and

**WHEREAS,** Section 166.021(4), Florida Statutes, provides that changes in terms of elected officers and the manner of their election shall be by charter amendment via referendum, except for the selection of election dates and qualifying periods for candidates and to changes in terms of office necessitated by such changes in elections dates; and

**WHEREAS,** Section 100.3605(2), Florida Statutes, further provides that the governing body may, by ordinance change the dates for qualifying and for the election of members of the governing body of the municipality and provide for the orderly transition of office resulting from such date changes; and

**WHEREAS,** the Florida Attorney General in 1995 opined that the changes to Section 100.3605 allow a municipality to amend their charter to change the election dates and qualifying periods for candidates, including any changes in terms of offices necessitated by such amendment, such as an extension of term, without a referendum (Op. Att'y Gen. Fla. 2000-61, Op. Att'y Gen. Fla. 2003-52, Op. Att'y Gen. Fla. 2007-34, Op. Att'y Gen. Fla. 2013-05); and

**WHEREAS,** the City Commission for the City of Quincy recently determined that the current district boundary result in malapportioned districts; and

**WHEREAS,** the City Commission for the City of Quincy determined that the current voting district boundaries do not achieve the "one person one vote" constitutional principle: and

**WHEREAS,** On January 30, 2020 in a Special Meeting**,** the City Commission for the City of Quincy voted to amend Section 2.01 of Article II of the Charter of the City of Quincy and to reapportion the City Commission districts for each of the five members; and,

**WHEREAS,** On January 30, 2020 in a Special Meeting**,** the City Commission for the City of Quincy voted to authorized Kurt Spitzer of Kurt Spitzer & Associates, Inc., Governmental Consultants to draft proposed redistricting plans for consideration by the City Commissioners as the City has not redrawn the City districts since 1974; and,

**WHEREAS**, the City Commission has considered the alternative Proposed Redistricting PLANS; and

**WHEREAS**, the City Commission has selected one of the Alternative Proposed Redistricting PLANS; and

<div align="center">

2

</div>

**NOW, THEREFORE, BE IT RESOLVED** the City Commission for the City of Quincy, Florida, at an open public meeting, declares that:

      **Section 1.**   The City Commission for the City of Quincy adopts Redistricting Plan Alternative_____, as set forth in Exhibit A, attached hereto and made part hereof.

**PASSED AND DULY ADOPTED** by the City Commission of the City of Quincy, Florida this 24th day of March 2020.

Commissioner Harris motioned to accept the redistricting plan alternative 1 (one) recommended by the consultant.  Seconded by Commissioner Sapp. Commissioner Harris with support of Mayor Dowdell requested a roll call.

| | |
|---|---|
| Commissioner McMillan | No |
| Commissioner Harris | Yes |
| Commissioner Sapp | yes |
| Commissioner Bass-Prieto | No |
| Mayor Dowdell | yes |

The motion carried 3 to 2.

**Discussion:**

Commissioner Sapp recommended that the technology work for the next commission meeting (in two weeks) so that all could hear the information.

Commissioner Bass-Prieto expressed that she could not hear the information and was asked to vote. Her biggest concerns were that the citizens were left out of the process. She observed that the correct maps were not on the City's website. She expressed that government is supposed to be opened to the people and this process was not done in such a manner.

City Manager McLean stated that the maps were on the City's website. Citizens have been provided opportunities to participate.

Commissioner Harris asked about commissioners who request accommodations and are not present at the meetings. Attorney Roberts explained qualifications and requirements under ADA (Americans with Disabilities Act). In addition, he summarized the research done regarding the issue. The commissioner had requested functional accommodations and the City had properly made such arrangements in accordance with law.

There being no further business to discuss, therefore meeting adjournment: Motioned by Commissioner Harris; seconded by Commissioner Sapp at 5:45 pm.

**Please Note**: Recorded copy of meeting minutes placed on file with the Office of the City Clerk upon approval by the City Commission.

3

Submitted by: Dr. Beverly A. Nash, Acting Clerk

APPROVED:

_____
Keith A. Dowdell, Mayor and Presiding
Officer of the City Commission and of the
City of Quincy, Florida

ATTEST:

_____
Dr. Beverly A. Nash, Acting Clerk per
Clerk of the of Quincy, Florida
Clerk of the City Commission thereof

**4**