IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

| | |
|---|---|
| JULIE BAROODY, and <br> WILLIAM B. FARMER, <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF QUINCY, FLORIDA, <br> KEITH A. DOWDELL, in his official capacity as Commissioner and Mayor of the City of Quincy, RONTE R. HARRIS, in his official capacity as Commissioner and Mayor Pro-Tem of the City of Quincy, and ANGELA G. SAPP, in her official capacity as Commissioner of the City of Quincy, <br><br> Defendants. | Case No.: 4:20-cv-217-AW-MAF |

**PLAINTIFFS' REPLY BRIEF IN FURTHER SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTIVE RELIEF**

Plaintiffs, Julie Baroody and William B. Farmer,[1] by and through undersigned counsel, and pursuant to N.D. Fla. Loc. R. 7.1(I) and the Court's Order dated May 13, 2020, *see* ECF No. 13, hereby file this reply brief in further support of their Motion for Preliminary Injunctive Relief (the "Motion"), *see* ECF No. 15, respectively showing that their Motion should be granted, as follows:

---

[1] Declarations of Plaintiffs, Julie Baroody and William B. Farmer, are attached hereto as **Exhibits 1 and 2**, respectively.

## I.     INTRODUCTION

The evidence supporting (and indeed, establishing) each element of Plaintiffs' claim under Section 2 of the Voting Rights Act—and thus, their likelihood of success on the merits—is competent and substantial, and moreover, utterly unrefuted by Defendants on either factual or legal grounds. Notwithstanding Defendants' absurd and unfounded suggestion that the Court should read limitations and requirements into § 2 that simply do not exist (most notably including, *inter alia*, that the VRA does not protect the voting rights of Plaintiffs or any other non-traditional racial minority – which, of course, would create a manifest and flagrant violation of Equal Protection, rendering the VRA unconstitutional),[2] and/or their baseless representations that Plaintiffs do not meet their burden of establishing a substantial likelihood on the merits of their vote dilution claim, the evidence even at this early stage conclusively establishes Defendants violated the Voting Rights Act by way of the redistricting at-issue here. While Defendants emphasize that Quincy has not redistricted in many years, that fact simply does not (and cannot) give Defendants *carte blanche* to violate Plaintiffs' federally-protected rights.

---

[2] At the outset, Defendants notably cite no authority for their apparent contention that § 2 of the VRA does not apply to or protect White/Anglo citizens. That is because, upon survey of case law nationwide, no such authority exists in any reported decision of any federal court or jurisdiction. Indeed, a finding that § 2 of the VRA—a statute of patently neutral application, by its plain language—does not cover or protect White/Anglo citizens (or any particular race) would be a flagrant violation of Constitutional Equal Protection and Due Process principles, and thus would require that § 2 be invalidated *in toto*.

## II.   PLAINTIFFS READILY ESTABLISH THEIR VRA § 2 CLAIM

### A.   *Gingles 1*

As explained and established in Plaintiffs' Motion and supporting exhibits, the minority group at-issue is sufficiently large and geographically compact to constitute a majority in two single-member districts (*i.e.*, Districts 4 and 5). *See Thornburg v. Gingles*, 478 U.S. 30, 50-51 (1986).

*First*, Plaintiffs have offered evidence and expert testimony establishing that, utilizing total population under 2010 U.S. Decennial Census data, a demonstration plan **<u>can</u>** be drawn, within the acceptable 10% deviation, which creates two sufficiently compact and contiguous majority districts, based on a coalition of Whites/Anglos and Hispanics in Quincy.[3] *See* ECF No. 15-2 at 3-5 (¶¶ 6-8 & Figure 1).

*Second*, even putting aside the issue of whether Whites/Anglos and Hispanics are politically cohesive (and thus, form a coalition)—which they are—Plaintiffs have offered evidence and expert testimony establishing that, utilizing total population under most recently available ACS population data, another

---

[3] As explained and established in the Second Declaration of Dr. Jowei Chen (dated June 2, 2020), a copy of which is attached hereto as **Exhibit 3**, Whites/Anglos and Hispanics in Quincy are politically cohesive and thus form a coalition for purposes of a VRA § 2 analysis. *See* Ex. 3 at pp. 12-20, ¶¶ 12-22 & Table 4 & Figures 3-4. Defendants' reliance on socioeconomic data simply fails to rebut the existence of political cohesion (and thus, a coalition) between Whites/Anglos and Hispanics in Quincy, as demonstrated by the actual election results (and voter turnout data) analyzed and described in Dr. Chen's Second Affidavit.

demonstration plan ***can*** be drawn, within the acceptable 10% deviation, which also creates ***two sufficiently compact and contiguous White/Anglo-only majority districts***. *See* ECF No. 15-2 at 5-7 (¶¶ 9-10 & Figure 2).

*Third*, again putting aside the issue of whether Whites/Anglos and Hispanics are politically cohesive (and thus, form a coalition), ***and*** using the place-level disaggregation methodology utilized and represented by Defendants' own expert (Dr. William Cooper) as purportedly preferable to the block-level disaggregation methodology employed by Plaintiffs' expert (Dr. Chen),[4] Plaintiffs offer evidence and expert testimony establishing that, utilizing total population under most recently available ACS population data, yet another demonstration plan ***can*** be drawn, within the acceptable 10% deviation, which again creates ***two sufficiently compact and contiguous White/Anglo-only majority districts***. *See* Ex. 3 at pp. 55-57, ¶¶ 65-67 & Figure 6.

*Finally*, again putting aside the issue of whether Whites/Anglos and Hispanics are politically cohesive (and thus, form a coalition), ***and*** again using the place-level disaggregation methodology utilized by Dr. Cooper, ***and*** also using the voting age population (VAP) data that Defendants mistakenly assert is required or preferable to

---

[4] As explained by Plaintiffs' expert, Dr. Cooper's methodology was itself significantly flawed and demonstrably self-serving, *see, e.g.*, Ex. 3 at pp. 27-55, ¶¶ 64 & Tables 8-12 & Figure XX; moreover, his use of place-level disaggregation is objectively not superior to the block-level disaggregation employed by Dr. Chen in producing Plaintiffs' Demonstration Plan 2. *See* Ex. 3 at pp. 35-38, ¶¶ 41-45.

total population in establishing the first precondition of *Gingles*,[5] Plaintiffs offer evidence and expert testimony establishing that, utilizing VAP under most recently available ACS population data, yet another demonstration plan **_can_** be drawn, within the acceptable 10% deviation, which again creates **two sufficiently compact and contiguous White/Anglo-only majority districts**. *See* Ex. 3 at pp. 57-58, ¶¶ 68-70 & Figure 7.

In short, Plaintiffs have demonstrated under numerous traditional methodologies and using numerous traditional data sets, **_even_** under the methodology and using the data sets asserted by Defendants and their expert as acceptable and proper (or more acceptable and proper), and countenanced by binding authority. Plaintiffs have thus clearly and conclusively satisfied *Gingles* 1.

### B.   *Gingles 2 & 3 (Racially-Polarized Voting)*

As also explained and established in Plaintiffs' Motion and supporting exhibits, there can be no doubt that the White/Anglo minority group at-issue is

---

[5] Indeed, Defendants cite *Negron v. City of Miami Beach*, 113 F.3d 1563, 1566 (11th Cir. 1997) for the proposition that "total population share is simply not the appropriate legal metric for determining numerosity under *Gingles* precondition 1, which must be based on VAP or CVAP," *see* ECF No. 21 at 13; however, neither *Negron* nor any other binding authority imposes any such requirement to utilize VAP or CVAP, or otherwise forecloses the use of total population in satisfying *Gingles* 1. Moreover, even if *Negron* did suggest as much, that case is wholly distinguishable, most notably in that it was well-known that nearly half of the Hispanic population of Miami consisted of non-citizen residents, which potentially compromised the reliability and/or accuracy of total population data for that jurisdiction. In the instant case and jurisdiction of Quincy, there is no suggestion or reason to suspect that the Hispanic population of Quincy comprises any meaningful quantity or proportion of non-citizen Hispanic residents. Thus, there is no reason to suspect that the use of total population in Quincy is inherently unreliable, or any less reliable than VAP or CVAP, for purposes of the *Gingles* inquiry.

politically cohesive, and that the Black/African-American majority group at-issue votes sufficiently as a bloc to enable it usually to defeat the White/Anglo minority's preferred candidate—i.e., that voting is racially-polarized in Quincy, *Gingles*, 478 U.S. at 50-51. See ECF No. 15-2 at pp. 9-10, ¶16 & Table 1.

However, this conclusion is further and conclusively established, and the analysis foreclosed, by and through expert analysis of both endogenous elections in Quincy, *see* Ex. 3 at pp. 1-11, ¶¶ 1-11 & Tables 1-3 & Figures 1 & 2, as well as by and through ecological inference analysis of exogenous elections, *see* Ex. 3 at pp. 19-26, ¶¶ 23-31 & Tables 5a, 5b, 6, and 7.[6] To be sure, as readily testified to by City Manager Jack McLean, no White/Anglo has ***ever*** held the District 1 or 2 seat, no Black/African-American has ***ever*** held the District 4 or 5 seat, and on only two occasions has a White/Anglo ***ever*** held the District 3 seat in the nearly 50-year history of single-district Quincy City Commissioner elections.[7] Indeed, it is beyond

---

[6] Notably, as explained by Dr. Chen in his Second Declaration, neither the City of Quincy nor the Gadsden County Supervisor of Elections has made precinct-level results available for endogenous elections in Quincy (*i.e.*, Quincy City Commissioner elections), despite repeated requests made by Plaintiffs' counsel for such data, thereby limiting the ability of Plaintiffs to analyze endogenous elections. *See, e.g.*, June 2, 2020 Email of Quincy City Attorney Gary Roberts, a copy of which is attached hereto as **Exhibit 4**. Nevertheless, from the extremely limited endogenous election data provided by the City, it is readily demonstrated that when a White/Anglo candidate (*i.e.*, Otto E. Joyner) runs against a Black/African-American candidate (*i.e.*, Clarence LeVoyd Bryant), in any district within Quincy in which Blacks/African-Americans constitute the racial majority and Whites/Anglos constitute the racial minority, the White/Anglo candidate is usually, and nearly always, defeated. See 1975 Quincy City Commissioner District Election Results, attached hereto as **Exhibit 5**.

[7] An excerpt of the June 1, 2020 deposition transcript of Jack McLean, taken in and for the purposes of this action, is attached hereto as **Exhibit 6**. *See* Ex. 5 at 4:24-6:3.

dispute—and notably, Defendants effectively decline (or otherwise fail) to dispute in their Response to Plaintiffs' Motion—that voting is racially polarized in Quincy. Thus, Plaintiffs have conclusively satisfied their burden of establishing the preconditions of *Gingles* 2 and 3.

### C.     *Totality of the Circumstances*

Plaintiffs readily demonstrated and established that, based on the totality of the circumstances, members of the White/Anglo racial-minority group at-issue here have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice, 52 U.S.C. § 10301(b). *See* ECF No. 15 at 15-28.

In addition, further evidence establishes this to be the case, as well as the fact that Defendants intentionally sought to (and did in fact) dilute the voting strength of the White/Anglo racial minority group at-issue through the redistricting process and enacted redistricting plan. For example, during a March 24, 2020 public meeting of the City Commission, while deliberating over the different redistricting plans prepared and submitted by Mr. Spitzer, Mr. Spitzer was asked by City Manager Jack McLean "[w]hat's the percentage" of the various districts in a plan being discussed; of course, Mr. Spitzer knew this to mean "what's the black percentage"—the readily evident focus and predominant consideration and concern of the Defendant City Commissioners in the redistricting process—and thus, Mr. Spitzer proceeded to read

aloud ***only*** the Black/African-American population percentages (*i.e.*, and ***not*** the White/Anglo population percentages, or any other racial percentage) of each district, for which Mr. Spitzer was able to offer no non-discriminatory or reasonable basis, or any basis at all.[8]

Notably, in addition, Mr. Spitzer testified and confirmed that a predominant consideration in his preparation of the redistricting plans (including the enacted plan) was to prevent the dilution of minority votes, albeit considering Blacks/African-Americans to be the minority that he (and the Defendant City Commissioners and other City officials) sought to, and did in fact, protect by way of the redistricting process and plans. To be sure, Mr. Spitzer protected Black/African-American voting strength ***at the expense*** of the true racial-minority (*i.e.*, White/Anglo)'s voting strength, as confirmed by Mr. Spitzer's concession that he would have created additional and/or different redistricting plans if the racial minority in Quincy had been Blacks/African-Americans, rather than Whites/Anglos. Mr. Spitzer testified that he did ***nothing*** to protect the voting strength of the White/Anglo racial minority in Quincy. In fact, Mr. Spitzer admitted that he ***only*** tried to protect the voting strength of the Black/African-American majority. Moreover, Mr. Spitzer even

---

[8] *See* Transcript of March 24, 2020 City of Quincy Meeting of the City Commission, a copy of which is attached hereto as **Exhibit 7**, at pp. 16:18-17:10; *see also* May 20, 2020 deposition transcript of Kurt Spitzer, taken in and for the purposes of this action, a copy of which is attached hereto as **Exhibit 8**. *See, e.g.*, Ex. 8 at 60:23-63:2.

***removed*** what would have been a coalition district for Whites/Anglos and Hispanics as between his first draft of Alternative 1, and the ultimate draft of alternative 1 that was enacted by Defendants—which changes were made, of course, following the time Mr. Spitzer created or directed the creation of his heat maps for Whites/Anglos and Hispanics.[9]

Moreover, an acceptable map for purposes of equalizing population, Draft Alternative 1, was amended on or about March 14, 2020, to move approximately 2-3 blocks from District 1 to District 5, causing it to fall below being a coalition district, just in case the argument could be made that Whites/Anglos and Hispanics voted as a coalition. In other words, it was not enough to equalize population, as Mr. Spitzer claims was his most important tenet; rather, he had to ensure there was no chance Whites/Anglos and Hispanics could defeat a Black/African-American candidate in District 5. This evidence certainly confirms the admitted and manifest

---

[9] *See, e.g.*, Ex. 8 at 42:8-24, 43:10-16, 65:14-17, 83:24-85:18, 88:2-89:1, 139:13-141:5, 145:1-13, 145:22-146:6, 146:22-147:10. The fact Defendants cared only (and at the expense of Whites/Anglos) to protect Black/African-American voting strength, and furthermore that White/Anglo City Commissioners Frieda Bass-Prieto and Daniel McMillan were effectively prohibited by Defendants from meaningful (if any) participation in the City Commissioners' redistricting discussions, processes, and determinations, are reflected by comments of the Defendant Commissioners, and of Commissioners Bass-Prieto and McMillan, during March 18, 2020 and March 26, 2020 City Commission meetings, excerpted copies of the transcripts of which are attached hereto as **Exhibits 9 and 10**, respectively. *See* Ex. 9 at 10:3-10:7, 10:19-10:21, 11:5-10, 13:21-14:10, 14:17-23, 15:9-13, 16:24-17:17, 19:2-13; Ex. 10 at 11:6-12, 12:5-6, 12:24-13:2, 14:7-16-3, 20:1-21:9.

intent of Mr. Spitzer and Defendants—that is, to protect voting strength of the racial **_majority_** (Blacks/African-Americans), **_not_** voting strength of the racial **_minority_**.

## III.   CONCLUSION

Plaintiffs have clearly met their burden to establish their VRA § 2 claim, as well as to satisfy their burden to demonstrate entitlement to preliminary injunctive relief.[10] For all of the foregoing reasons, and the reasons set forth in Plaintiffs' Motion for Preliminary Injunctive relief, Plaintiffs respectfully request that this Court **GRANT** their Motion for Preliminary Injunction.

DATED this 2nd day of June, 2020.

[*Signature on following page*]

---

[10] Defendants' contentions, that a preliminary injunction is unwarranted or improper due to any purported hardship imposed upon them due to the immanency of the upcoming Quincy City Commissioner elections, the need to postpone such elections, the need to create and adopt a new or different redistricting plan, or the costs associated with same, are as unfounded as they are dangerous. Indeed, Defendants themselves caused and created the short time table, and the potential need to spend additional funds re-administering an election, by redistricting so close in time to the upcoming elections. A finding that the requested relief is unwarranted on such grounds would serve only to incentivize eleventh-hour redistricting such as that which occurred here, and more importantly, authorize (and insulate against legal challenge) even patently intentional attempts to discriminate against minority voting rights, or which otherwise have the effect of diluting or abridge minority voting rights, merely because redistricting measures were undertaken at the last minute. This, of course, would turn the Voting Rights Act on its head.

Respectfully submitted,

**ANDREWS LAW FIRM**
822 North Monroe Street
Tallahassee, Florida 32303
T: (850) 681-6416 / F: 681-6984

***/s/ Ryan J. Andrews***
RYAN J. ANDREWS (FBN 0104703)
DAVID A. WEISZ (*Pro Hac Vice Forthcoming*)
ryan@andrewslaw.com
service@andrewslaw.com
*Counsel for Plaintiffs*

## LOCAL RULE 7.1(F) & 7.1(I) CERTIFICATION

The undersigned certifies that the word count of the foregoing is 2,593, in compliance with Local Rules 7.1(I) & 7.1(F) of the Northern District of Florida.

## CERTIFICATE OF SERVICE

The undersigned certifies that on this 2nd day of June, 2020, a true and correct copy of the foregoing was electronically filed in the U.S. District Court, Northern District of Florida, using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

*/s/ Ryan J. Andrews*
RYAN J. ANDREWS
