IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

JULIE BAROODY and WILLIAM B.
FARMER,

      Plaintiffs,

v.                                    Case No. 4:20-cv-217-AW-MAF

CITY OF QUINCY, FLORIDA, et al.,

      Defendants.

_____/

## ORDER DENYING PRELIMINARY INJUNCTION MOTION

The City of Quincy is the county seat of Gadsden County and home to some 8,670 residents.[1] It has five city commissioners, each representing one single-member district. For decades, the district lines were essentially untouched. The districting plan enacted in 1974 was the districting plan in place in 2020[2]—at least until March 2020, when the City enacted a new districting plan. That new plan is the subject of this lawsuit.

_____

[1] According to the 2010 census, the City's population was 8,672. ECF No. 21-1 ¶ 17 ("Cooper Dec."). More recent data from the United States Census Bureau's 2014-2018 American Community Survey (ACS) shows a smaller population of 7,512. Cooper Dec. ¶ 17.

[2] The record does show, though, that the City annexed new territory since 1974, Cooper Dec. ¶ 17; ECF No. 21-2 at 9 ("McLean Dec."); ECF No. 21-3 at 160, 183 ("Spitzer Dep."), so assuming all City territory is within a district, one or more districts necessarily expanded to include the new territory. The record does not include detail on the expansion, and it does not appear pertinent to any issue decided today.

A majority of Quincy residents are black. A minority are white. According to the complaint, it has been this way for more than one hundred years. ECF No. 18 ¶ 5.

Two white voters—Julie Baroody and William Farmer—sued the City to challenge the new districting plan.[3] They allege that the plan "intended—through race-based redistricting measures constituting a quintessential racial gerrymander—to dilute, deny, and abridge the voting rights" of white Quincy voters. ECF No. 18 ¶ 1. According to their complaint, the new plan violates Section 2 of the Voting Rights Act and the First, Fourteenth, and Fifteenth Amendments to the United States Constitution. Based on these alleged violations, the Plaintiffs ask for an injunction prohibiting the City from using the new plan. ECF No. 15.

After enacting the new plan, the City did not wait long before putting it in use. Commissioners adopted the plan on March 26, 2020, and the next election is Tuesday, June 9. The Plaintiffs initiated the case on April 28 and filed their preliminary injunction motion on May 15. The City responded, and the court held an evidentiary hearing on June 4. Having considered the parties' filings and

---

[3] The Defendants are the City of Quincy and three City Commissioners sued in their official capacities. ECF No. 18. This order will refer to the Defendants collectively as the "City."

2

everything presented at the evidentiary hearing, I now deny the preliminary injunction motion.

## I.   THE PRELIMINARY INJUNCTION STANDARD IS A DEMANDING ONE.

A preliminary injunction is no small thing. It is "an extraordinary and drastic remedy" and should never be granted unless the party seeking it "clearly establishe[s]" entitlement. *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (quoting *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998)); *see also State of Tex. v. Seatrain Intern., S.A.*, 518 F.2d 175, 179 (5th Cir. 1975) ("[W]e must remember that granting a preliminary injunction is the exception rather than the rule."). To obtain an injunction, the Plaintiffs must clearly establish four factors: (1) that they have "a substantial likelihood of success on the merits"; (2) that they will suffer irreparable injury without an injunction; (3) that they face a threatened injury that "outweighs whatever damage the proposed injunction may cause" the City; and (4) that "the injunction would not be adverse to the public interest." *Siegel*, 234 F.3d at 1176. They must clearly establish all four—a failure on even one prong dooms their motion. *ACLU of Fla., Inc. v. Miami-Dade Cty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009).

The Plaintiffs have not met their burden on at least three of these necessary prongs. They have not clearly shown a substantial likelihood that they will prevail on the merits; they have not clearly shown that their threatened injury outweighs

3

injury to the City; and they have not clearly shown that the injunction they seek would be consistent with the public interest. Each of those failures constitutes an independent reason why I must deny the motion.

## II. THE PLAINTIFFS HAVE NOT SHOWN A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS.

Although the Plaintiffs' complaint presents constitutional claims, their preliminary injunction motion relies exclusively on their Section 2 claim. Therefore, the constitutional questions are not yet at issue.

Section 2 of the Voting Rights Act provides that no "standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a) (formerly cited as 42 U.S.C. § 1973(a)). There is a violation "if, based on the totality of circumstances, it is shown that . . . members of a class of citizens protected by subsection (a) . . . have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id.* § 10301(b). "The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986).

Section 2 claims come in different forms, but the claim here is vote dilution. The claim is that the districts are drawn in a way that dilutes white voting strength.[4] The parties agree that the challenged map produces one majority-white district. The Plaintiffs argue there should be two. To succeed on this type of claim, the Plaintiffs must satisfy "three threshold conditions." *Growe v. Emison*, 507 U.S. 25, 40 (1993). They must first prove "that the minority group is sufficiently large and geographically compact to constitute a majority in a [second] single-member district." *Id.* (cleaned up). They must then prove that the group "is politically cohesive." *Id.* And they must prove that the "majority votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate." *Id.* (cleaned up) (quoting *Gingles*, 478 U.S. at 50-51). Without proving these three prerequisites—known as the *Gingles* factors—no vote-dilution plaintiff can succeed. *Id.* at 40. If the *Gingles* factors *are* proven, a plaintiff must still show that the "totality of the circumstances" support the claim. *Gingles*, 478 U.S. at 50-51.

---

[4] The City suggests at the outset that Section 2 cannot apply to the Plaintiffs' claims because the Plaintiffs have not shown whites in Quincy are historically disadvantaged. ECF No. 21 at 3. But beyond that, they do not develop any argument suggesting white voters cannot present Section 2 claims. I will therefore not consider that argument. *Cf. also United States v. Brown*, 561 F.3d 420 (5th Cir. 2009) (affirming decision finding § 2 violation involving white minority).

**A.    The Plaintiffs Have Not Shown a Substantial Likelihood That They Can Satisfy the First *Gingles* Prong.**

The first *Gingles* factor requires a showing that the minority group is "sufficiently large and geographically compact" to create a majority in an additional district. *Growe*, 507 U.S. at 40 (quoting *Gingles*, 478 U.S. at 50). The Plaintiffs bear the burden of proving that a second district is possible; they "must demonstrate that the challenged system suppressed minority voting strength in comparison to some alternative, feasible benchmark system." *Nipper v. Smith*, 39 F.3d 1494, 1531 (11th Cir. 1994) (en banc).

Generally speaking, a court considers a remedy only after a violation is proven. But in § 2 vote dilution cases, "[t]he inquiries into remedy and liability . . . cannot be separated: A district court must determine as part of the *Gingles* threshold inquiry whether it can fashion a permissible remedy in the particular context of the challenged system." *Id.* at 1530-31. So the first question is whether the Plaintiffs have shown a plausible remedy.

The Plaintiffs offer several demonstration maps, each of which they say shows how to draw a second majority-white district. They submitted two demonstration maps with their preliminary injunction motion (Demonstration 1 and Demonstration 2). ECF No. 15-2 at 4, 6. They submitted two more with their reply brief (Demonstration 3 and Demonstration 4). ECF No. 22-3 at 56, 58 ("Second Chen Dec."). And they submitted a fifth (Demonstration 5) around 10:30 p.m. the night

before the hearing. ECF No. 28. They withdrew Demonstration 2 at the hearing, and I granted the City's motion in limine as to Demonstration 5.[5] The remaining maps, then, are Demonstration 1, Demonstration 3, and Demonstration 4. I conclude that none clearly shows the Plaintiffs are substantially likely to succeed on the merits.

### 1.    *Demonstration 1*

Demonstration 1 divides the City into five districts, two of which the Plaintiffs say would include white majorities. But the Plaintiffs have not clearly shown that the map would, in fact, yield two white-majority districts.

The Plaintiffs' expert is Dr. Jowei Chen, a professor in the Department of Political Science at the University of Michigan. ECF No. 15-2 ("First Chen Dec."). When the Plaintiffs first submitted Demonstration 1, they included Dr. Chen's declaration, which reported that two districts had 52% and 52.4% "White + Hisp. Share" of the districts' total population. First Chen Dec. at 4. Total population, though, is not the right metric. "Because a section 2 claim will fail unless the plaintiff can establish that the minority group constitutes an effective voting majority in a

---

[5] The City also asked to exclude Demonstration 3 and Demonstration 4. The City argued that the Plaintiffs waited too long to submit these, and that the City was prejudiced by not having adequate time to review them. It was clear that the City was prejudiced by the introduction of a new map (Demonstration 5) late the night before the hearing, and the Plaintiffs offered no valid reason for delaying as to Demonstration 5. I therefore excluded Demonstration 5 from consideration. I reserved ruling as to Demonstrations 3 and 4. Because I now determine that they do not prove the Plaintiffs' case anyway, I deny as moot the motion to exclude them.

single-member district, the proper statistic for deciding whether a minority group is sufficiently large and geographically compact is voting age population as refined by citizenship." *Negron v. City of Miami Beach*, 113 F.3d 1563, 1569 (11th Cir. 1997) (cleaned up); *accord id*. ("In order to elect a representative or have a meaningful potential to do so, a minority group must be composed of a sufficient number of voters or of those who can readily become voters through the simple step of registering to vote."); *cf. also Bartlett v. Strickland*, 556 U.S. 1, 13 (2009) (plurality) ("In majority-minority districts, a minority group composes a numerical, working majority of the voting-age population.").

At the hearing, the Plaintiffs tried to remedy this by presenting Dr. Chen's testimony as to the white voting-age population (VAP) and citizenship voting-age population (CVAP). They introduced an exhibit (Plaintiffs' Ex. 4) that listed the white VAP and CVAP share of Demonstration 1 districts 4 and 5 as 53.1% and 53.7%, respectively.[6] But the Plaintiffs have not shown that these new figures are reliable. In fact, the Plaintiffs have not shown *any* reliable VAP or CVAP data for Demonstration 1.

---

[6] The City objected to the testimony and exhibit, arguing they would be prejudiced because this data was not presented earlier. I withheld ruling, and I now overrule the objection. I have considered the testimony but find the Plaintiffs have not shown the numbers to be reliable.

As to white VAP and CVAP, Dr. Chen's estimates depend on the so-called Cooper method. Plaintiffs' Ex. 4; *see also* Second Chen Dec.; ECF No. 26-1 ("Third Chen Dec."). Dr. Chen made clear that his figures were calculated using the disaggregation method that the City's expert (William Cooper) used—an approach Dr. Chen criticized.[7] According to Dr. Chen, "the standard method that redistricting scholars normally use for ACS data is the disaggregated bloc group level data, *down to the block level*." Rough Tr. at 42 (emphasis added).[8] Yet Dr. Chen never applied his own preferred approach—the method he says is the standard method redistricting scholars normally use—to Demonstration 1. Instead, he relied on what he opined was Mr. Cooper's "less precise" method. Second Chen Dec. ¶ 42.

So although Dr. Chen—an expert with substantial experience in § 2 cases (*see* First Chen Dec. ¶ 4)—used his preferred and standard blockgroup disaggregation method to evaluate the now-withdrawn Demonstration 2, First Chen Dec. ¶¶ 9-10,

---

[7] The smallest geographic unit the decennial Census analyzes is a "block." The Census Bureau's periodic ACS data does not provide population estimates at the block level, but instead at the "blockgroup" level. First Chen Dec. ¶ 9; *see also* Cooper Dec. ¶ 51 n.14. Therefore, researchers calculating a district's current population or CVAP must disaggregate data from another source to the block level. First Chen Dec. ¶ 9.

[8] *See also id*. ("Q: For purposes – you state underneath [the figures] 'using Mr. Cooper's method' can you – is Mr. Cooper's method the preferred method you would use? A. No; it's not."); *id*. ("And so I did those calculations using [Mr. Cooper's] preferred method, even though it's not the normal way of doing things . . . .").

he never used that preferred and standard method to provide VAP or CVAP figures for Demonstration 1. This undermines any suggestion that his VAP or CVAP numbers are reliable—or that Demonstration 1 includes two districts for which white VAP or white CVAP exceeds fifty percent. Further undermining any such suggestion is the fact that Dr. Chen's initial declaration included no CVAP of VAP estimate (using any method) for Demonstration 1.

As indicated above, the total population figures are not the right metric, so Dr. Chen's total population estimates for Demonstration 1 districts do not help. Nor do Dr. Chen's estimates as to the racial breakdown of those who voted in 2018. *See* First Chen Dec. ¶ 8. Dr. Chen offers no opinion as to whether turnout figures mirror the VAP or CVAP figures, and indeed he later opines that voter turnout by race depends on who is on the ballot. Second Chen Dec. ¶ 15. In the end, I conclude that the Plaintiffs have not shown that Demonstration 1 includes two white-majority VAP or CVAP districts.

Demonstration 1 suffers additional, independent defects. For one, the Plaintiffs have not clearly demonstrated appropriate compactness of their proposed districts. Even if it is possible to draw *some* minority-majority district, § 2 does not require Quincy to draw a minority district that is not "reasonably compact." *Abrams v. Johnson*, 521 U.S. 74, 91-92 (1997) (quoting *Johnson v. De Grandy*, 512 U.S. 997 (1994)).

10

The Plaintiffs note that Demonstration 1's compactness score[9] is comparable to that of the plan they challenge. But that is not the right measure. Regardless of how compact (or noncompact) the enacted districts are, the Plaintiffs must show that a second "reasonably compact" majority-minority district could be drawn. *De Grandy*, 512 U.S. at 1008.[10] And "the § 2 compactness inquiry should take into account traditional districting principles such as maintaining communities of interest and traditional boundaries," *Abrams*, 521 U.S. at 92 (marks and citation omitted), yet this record includes no evidence that the proposed districts followed "traditional districting principles."

What is more, Dr. Chen indicated he created a computer simulation algorithm to randomly generate 2,500 districting plans for Quincy. First Chen Dec. ¶ 20. He relied exclusively on what he said were "traditional districting criteria, including equal population (within 5% of ideal district population, as measured using 2010 Census data), geographic contiguity, geographic compactness, and adhering to

---

[9] According to Dr. Chen's declaration, "[t]he Polsby-Popper score is a standard and commonly used measure of a districting plan's compactness, with higher-scores indicting more compact district shapes." First Chen Dec. ¶ 28.

[10] While it is the compactness of the minority group that matters, *Gingles*, 478 U.S. at 50; *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 433 (2006), "[t]he first *Gingles* condition requires the possibility of creating more than the existing number of reasonably compact districts with a sufficiently large minority population to elect candidates of its choice." *De Grandy*, 512 U.S. at 1008.

Census blocks." First Chen Dec. ¶ 20. Dr. Chen calculated the Polsby-Popper score for each of the Demonstration Plan 1 districts, Pl. Ex. 4, and the average score of the five districts is 0.296. According to the Dr. Chen's scatterplot, First Chen Dec. at 20, the vast majority (nearly 99%) of his 2,500 alternative plans—all based on "traditional districting criteria"—yielded a higher compactness score.[11]

Next, Demonstration 1 has unequal population distribution, underpopulating the two proposed districts with the largest white population and overpopulating predominately black districts. First Chen Dec. at 4. Proposed district 4, which the Plaintiffs indicate would have 52% "White + Hisp. Share," is 4.69% below the ideal population size, based on 2010 data. First Chen Dec. at 4. Proposed district 1, which would include only 3.3% "White + Hispanic," is underpopulated by 3.61%. First Chen Dec. at 4. Generally, districts must "be of nearly equal population, so that each person's vote may be given equal weight." *Voinovich v. Quilter*, 507 U.S. 146, 160-61 (1993) (marks and citation omitted). It is true that minor population deviations (up to 10%) are presumptively constitutional, *id.* at 161, but the Plaintiffs have cited no authority suggesting that § 2 requires creation of majority-minority districts when

---

[11] It is the compactness of the proposed majority-minority districts (here 4 & 5) that matter; the average of all districts is less important. It is nonetheless noteworthy that Dr. Chen's computer simulation highlights that Demonstration 1 is a severe outlier in terms of overall compactness. At the hearing, Dr. Chen testified that a 0.27 score was "an unusually low level compared to the computer simulations." Rough Tr. at 29.

that creation depends on the population inequality they propose. More importantly, the Plaintiffs have presented no evidence explaining why (or if) the population disparity was appropriate. The Plaintiffs have not shown Demonstration 1 to be an adequate alternative.

2.    *Demonstration 3*

Demonstration 3 is no better. First, the Plaintiffs have not clearly shown two districts with white VAP or CVAP majorities. Although Dr. Chen's third declaration reports white CVAP of 58.3% and 52.9% for Demonstration 3's district 4 and district 5, respectively, he did not testify that these figures were reliable. Instead, he testified (as with Demonstration 1) that these were the figures produced "using Mr. Cooper's method"—the "less precise" method Dr. Chen criticized. Third Chen Dec. at 6. As before, the Plaintiffs have not provided reliable evidence to show the white CVAP or VAP of their proposed districts.

On top of that, Demonstration 3's districts are significantly malapportioned. Mr. Cooper testified that, according to 2010 census data, the total deviation far exceeded ten percent, which is the presumptive constitutional limit. *See* Def. Exh. 2; *see also Brown v. Thomson*, 462 U.S. 835, 842 (1983) ("[A]n apportionment plan with a maximum population deviation under 10% falls within this category of minor deviations."). The Plaintiffs do not dispute the fact that 2010 census data shows significant malapportionment, and decennial census data is typically the appropriate

13

measure when determining equal population, *Evenwel v. Abbott*, 136 S. Ct. 1120, 1124 (2016) ("[I]n the overwhelming majority of cases, jurisdictions have equalized total population, as measured by the decennial census."); *Johnson v. DeSoto Cty. Bd. of Comm'rs*, 204 F.3d 1335, 1341 (11th Cir. 2000) ("The presumption is that census figures are continually accurate."). The Plaintiffs instead choose to rely on ACS data, which Dr. Chen reports shows a smaller total deviation. Second Chen Dec. at 56. It is not necessarily impermissible to rely on the ACS data, *see Johnson*, 204 F.3d at 1341 ("The continuing accuracy of census figures is presumed only until the party challenging the census data overcomes the presumption with competent evidence to the contrary."), but Dr. Chen again relied on the "Cooper method" that he found less precise. The Plaintiffs have not provided reliable evidence to show that the population deviation in Demonstration Plan 3 was less than ten percent.

Nor have the Plaintiffs provided any evidence about compactness, other than to report Polsby-Popper scores, the average of which was 0.3, Third Chen Dec. at 6, putting it well below the vast majority of the 2,500 proposed plans Dr. Chen's simulation produced.

Evidence regarding other traditional criteria is lacking, too. The Plaintiffs, for example, offered no explanation as to why they underpopulated district 4, which they contend has a white majority VAP. In short, Demonstration 3 fares no better than Demonstration 1.

3.    *Demonstration 4*

The Plaintiffs' Demonstration 4 suffers many of the same defects as Demonstrations 1 and 3. The Plaintiffs have provided no reliable VAP or CVAP figures for Demonstration 4's districts. They have not rebutted the City's evidence that the districts are severely malapportioned based on 2010 census data, and they have not provided reliable data showing that they are reasonably equal under any data set. Nor have they provided any evidence that the districts are reasonably compact—or any explanation for the underpopulation of the majority-white districts. Demonstration 4 does not fare better than the others.

\*        \*        \*

At the end of the day, none of the Plaintiffs' Demonstration Plans shows what the Plaintiffs must show: That there is an alternate plan with two reasonably compact districts with white VAP or CVAP majorities. Notably, their failure to make that showing is consistent with Dr. Chen's computer simulation project. Dr. Chen testified that he produced 2,500 random proposals, each relying exclusively on non-racial, traditional redistricting criteria. And as he acknowledged at the hearing, zero of those 2,500 proposed plans had two majority-white districts. Dr. Chen explained that his experiment was based on 2010 census data, and he testified that using more recent ACS data the results would differ. Perhaps so. Perhaps a different computer simulation would show different results. Perhaps a map drawer *could* prepare a map

showing two majority-white districts, with reliable population data to back it up. But at this stage, the Plaintiffs have not proven that a second district is possible. The Plaintiffs have not shown a substantial likelihood of success as to the first *Gingles* prong.[12]

**B.      The Plaintiffs Have Not Shown a Substantial Likelihood That They Can Satisfy the Second or Third *Gingles* Prongs.**

Even if the Plaintiff had satisfied the first *Gingles* prong, they would not be entitled to preliminary injunctive relief because they have not provided sufficient evidence of voter cohesion and bloc voting. Section 2 plaintiffs must show they constitute a "politically cohesive unit" and that the majority votes sufficiently as a bloc usually to defeat the minority's preferred candidates. *Gingles*, 478 U.S. at 56. There is not a simple doctrinal test for legally significant racial bloc voting, but a plaintiff must prove "a correlation between the race of voters and the selection of certain candidates." *Id.* 74 (Op. of Brennan, J.); *see also id*. at 51, 58.

For minority voter cohesion, the second *Gingles* factor, the Plaintiffs first point to certain statewide elections. They estimate that in four 2018 general election races, a low percentage of Gadsden County's black voters (ranging from 3.18% to 3.90%) voted for a Republican candidate, but a majority of white voters (ranging

---

[12] The parties dispute whether the relevant white population includes Hispanics identifying as white. Because the Plaintiffs have not provided reliable VAP or CVAP data, this dispute ended up making no difference.

16

from 68.87% to 76.72%) did, as did about half of the Hispanic voters (ranging from 52.16% to 54.52%). First Chen Dec. at 10. This analysis—covering only four races and curiously excluding the 2018 gubernatorial contest—is not particularly probative. *See Gingles*, 478 U.S. at 57 ("[A] pattern of racial bloc voting that extends over a period of time is more probative of a claim that a district experiences legally significant polarization than are the results of a single election."). If anything, it shows that white Gadsden County voters are hardly unified as to preferred statewide candidates. (If 25-30% of white voters prefer the same candidates as black voters, it cannot be said that black bloc voting is what causes defeat of white-preferred candidates.) At any rate, endogenous election data—data local to the covered area— is the more useful data. *See Johnson v. Hamrick*, 196 F.3d 1216, 1222 (11th Cir. 1999). Indeed, it seems obvious that how Quincy citizens vote in City Commission elections is more probative than how they vote in statewide Chief Financial Officer or Agriculture Commissioner elections.

After the City challenged the usefulness of the Plaintiffs' limited statewide-contest analysis, the Plaintiffs included with their reply a new voter cohesion theory with new evidence. Second Chen Dec. The City's motion in limine asked to exclude this evidence. ECF No. 25. The City persuasively argues that the Plaintiffs could have provided evidence of this theory before their reply brief—and that the City was prejudiced by the delay in its inability to present rebuttal expert evidence. (Mr.

Cooper testified that he is not an expert in voter cohesion.) I have nonetheless considered the Plaintiffs' challenged voter cohesion evidence, which I find insufficient.

In his second declaration, Dr. Chen analyzed district-level election results and race data from Quincy City Commissioner elections from 2007 to 2019.[13] Second Chen Dec. ¶¶ 2-3. He noted that without certain data (which was unavailable), "it is not possible to perform a standard ecological inference (EI) analysis on racial voting patterns in these endogenous elections." Second Chen Dec. ¶ 2. He found, though, that majority-black districts always elect a black candidate—but that only black candidates have run in these districts over the past twenty years. Second Chen Dec. ¶¶ 3, 5. District 1 and district 2 voters have never elected a white candidate, and district 3 voters have not elected a white candidate since 1996. Second Chen Dec. ¶ 5; ECF No. 22-6 at 5 ("McLean Dep."). He also found that in the past ten years, most voters who turned out for elections in districts 1, 2, and 3 were black. Second Chen Dec. ¶ 5. Additionally, Dr. Chen found that in contests for which white and Hispanic voters outnumbered black voters, a white candidate always won. Second Chen Dec. ¶ 3. In the past ten years, over half of those who voted in district 4 and

---

[13] The Plaintiffs report that precinct-level data for recent Quincy City Commissioner election contests are not available. Second Chen Dec. ¶ 3. They also contend they could not get results from four election contests between 2007 and 2019. Second Chen Dec. at 3.

district 5 elections identified as white or Hispanic, and those districts routinely elect white candidates. Second Chen Dec. ¶ 6. (In four of six elections in district 4 and district 5, no black candidates ran. Second Chen Dec. ¶ 6.).

Dr. Chen also reports that in the past fifteen years, there have been only three contests featuring a black candidate running against a white candidate: 2007 (district 4), 2017 (district 5), and 2019 (district 4). Second Chen Dec. ¶ 7. In these races, he opined, there was a close correlation between the share of combined white and Hispanic turnout and the white candidate's vote share. Second Chen Dec. ¶¶ 7-8.

Last, Dr. Chen concluded that black and white voters are "significantly more likely" to vote in a city commission election if the ballot includes a candidate that matches their racial background. Second Chen Dec. ¶ 19. Because he found that black and white voters are more likely to vote when a black candidate faces a white candidate, Dr. Chen concluded that these "voters feel especially motivated to elect a candidate of their own racial identity and to defeat candidates of a different race." Second Chen Dec. ¶ 20.

There are several problems with Dr. Chen's analysis. First the Plaintiffs contend black voters prefer black candidates and white (and Hispanic) voters prefer white candidates. But "the race of the candidate *per se* is irrelevant to racial bloc voting analysis." *Gingles*, 478 U.S. at 67 (Op. of Brennan, J.). What is important "is the *status* of the candidate as the *chosen representative of a particular racial group,*

19

not the race of the candidate." *Id*. at 68 (Op. of Brennan, J.); *cf. also Johnson v. Hamrick,* 196 F.3d 1216, 1221-22 (11th Cir. 1999). In addition, Dr. Chen offers only broad conclusions, rather than historical data showing statistical correlations for each election cycle. *Cf. City of Carrollton Branch of the N.A.A.C.P. v. Stallings*, 829 F.2d 1547, 1556 (11th Cir. 1987) ("This analysis, in statistical terms, is called an R2 coefficient, which correlates the percentage of a particular racial group registered in a given precinct, with the percentage of the precinct votes for a minority candidate."). And insofar as Dr. Chen suggests Hispanic voters prefer white candidates, the raw data he provides reveals that fewer than a dozen Hispanic voters participated in any one of the past five commission races, *see* Second Chen Dec. at 27, providing little statistical value. Moreover, the Plaintiffs have shown no method to determine whether there was any consistency in the turnout data. *See Gingles*, 478 U.S. at 53 n.21 ("[R]acial polarization exists where there is a consistent relationship between the race of the voter and the way in which the voter votes." (marks and citation omitted)).

Next, the Plaintiffs have not demonstrated a pattern of black bloc voting to regularly defeat white-preferred candidates over even a short time. *See Gingles*, 478 U.S. at 57. "Section 2 'does not assume the existence of racial bloc voting; plaintiffs must prove it.'" *Growe*, 507 U.S. at 42 (quoting *Gingles*, 478 U.S. at 46)). The Plaintiffs' evidence for black bloc voting hinges almost entirely on estimates from

the results of four general election races in a single year. Second Chen Dec. at 21-26. This is insufficient—a plaintiff "must show not only that [the majority] vote[s] as a bloc, but also that [majority] bloc voting *regularly causes* the candidate preferred by [minority] voters to lose; in addition, plaintiffs must show not only that blacks and whites sometimes prefer different candidates, but that blacks and whites *consistently* prefer different candidates." *Johnson,* 296 F.3d at 1074 (quoting *Johnson v. Hamrick*, 196 F.3d 1216, 1221 (11th Cir. 1999)); *accord Gingles*, 478 U.S. at 49 ("[A] bloc voting majority must *usually* be able to defeat candidates supported by a politically cohesive, geographically insular minority group."); *Concerned Citizens of Hardee Cty. v. Hardee Cty. Bd. of Comm'rs*, 906 F.2d 524, 526-27 (11th Cir. 1990).

For these reasons, I conclude that the Plaintiffs have not met their burden of showing a substantial likelihood of success on the second or third *Gingles* factors. And because the Plaintiffs have not shown all *Gingles* factors, I need not consider the totality-of-the-circumstances arguments. *See Nipper v. Smith*, 39 F.3d 1494, 1513 (11th Cir. 1994) (en banc) ("[P]roof of the *Gingles* threshold factors is a necessary precondition to section 2 relief . . . .").

## III. THE PLAINTIFFS HAVE NOT SHOWN ALL REMAINING PRELIMINARY INJUNCTION FACTORS.

Even if the Plaintiffs could establish a likelihood of success on the merits, a preliminary injunction would not issue because they have not clearly established that

their threatened injury outweighs the potential harm to the City or that an injunction would not be adverse to the public interest.

The election is already underway. Election day is June 9, but many voters have already received vote-by-mail ballots and, as of the date of the hearing, the Gadsden County Supervisor of Elections had received some 341 ballots from some of the 1,606 active eligible voters.[14] I must consider the disruption the Plaintiffs' proposed remedy will cause. *See Reynolds v. Sims*, 377 U.S. 533, 585 (1964). This is true, even if the Plaintiffs were likely to prevail on the merits.

> [U]nder certain circumstances, such as where an impending election is imminent and a State's election machinery is already in progress, equitable considerations might justify a court in withholding the granting of immediately effective relief in a legislative apportionment case, even though the existing apportionment scheme was found invalid. In awarding or withholding immediate relief, a court is entitled to and should consider the proximity of a forthcoming election and the mechanics and complexities of state election laws, and should act and rely upon general equitable principles. With respect to the timing of relief, a court can reasonably endeavor to avoid a disruption of the election process which might result from requiring precipitate changes that could make unreasonable or embarrassing demands on a State in adjusting to the requirements of the court's decree.

*Id.*

---

[14] The court takes judicial notice of the Gadsden County Supervisor of Elections Office voter turnout data available on its website, available at https://tqv.vrswebapps.com/?state=FL&county=GAD&election=202. *See* Fed. R. Evid. 201(b)(2).

A federal court order halting the election would likely produce voter confusion. *Cf. Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006) ("Court orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase."). Considering all of the circumstances, I conclude that even if the Plaintiffs had shown a likelihood of success on the merits, their requested preliminary injunctive relief would not be appropriate.

## IV.   CONCLUSION

A plaintiff's failure on even one preliminary injunction factor is fatal. *See ACLU*, 557 F.3d at 1198. Here, the Plaintiffs have failed on at least three: They have not shown a substantial likelihood that they will succeed on their Section 2 claim, they have not shown the balance of harm favors them, and they have not shown their requested injunction is in the public interest. The court therefore cannot grant preliminary injunctive relief.

IT IS NOW ORDERED:

1.     The Plaintiffs' preliminary injunction motion (ECF No. 15) is DENIED.

2.     The City's unopposed motion for leave to file a supplemental memorandum (ECF No. 23) is GRANTED, and that filing is accepted.

3.      The City's motion in limine (ECF No. 25) is GRANTED to the extent it sought to exclude consideration of the Plaintiffs' Demonstration 5; it is otherwise DENIED as moot.

4.      A scheduling order to control the remainder of the case will issue separately.

SO ORDERED on June 7, 2020.

s/ *Allen Winsor*_____
United States District Judge